Slip Op. 21 – 49

## UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————
                                 :

JILIN FOREST INDUSTRY JINQIAO     :
FLOORING GROUP CO., LTD.,         :
                                   :

        Plaintiff,            :

                                   :     Before: Richard K. Eaton, Judge

        v.                :

                                   :     Court No. 18-00191

UNITED STATES,                :

                                   :

        Defendant.        :

———————————————————————:

## OPINION and ORDER

[Remanding U.S. Department of Commerce's final results of fifth administrative review of multilayered wood flooring from the People's Republic of China.]

Dated: April 29, 2021

    *Ronald M. Wisla*, Fox Rothschild LLP, of Washington, DC, argued for Plaintiff. With him on the brief were *Lizbeth R. Levinson* and *Brittney R. Powell*.

    *Sonia M. Orfield*, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Tara K. Hogan*, Assistant Director. Of Counsel on the brief was *Rachel A. Bogdan*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

    Eaton, Judge:  Plaintiff, Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. ("Jilin"), is

a mandatory respondent supplier of multilayered wood flooring, located in the People's Republic

of China ("China").  Jilin challenges the final results of the fifth administrative review of the

antidumping duty order on that flooring.  *See Multilayered Wood Flooring From the People's*

*Republic of China*, 83 Fed. Reg. 35,461 (Dep't Commerce July 26, 2018), P.R. 351 ("Final

Results"), and accompanying Issues and Decision Mem. (July 18, 2018), P.R. 340 ("Final IDM").

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018) and 28 U.S.C.

§ 1581(c) (2018).

By its motion for judgment on the agency record, Jilin disputes the Final Results in two

respects: (1) that the United States Department of Commerce ("Commerce" or the "Department")

unlawfully determined that Jilin was not separate from the control of the government of China;

and (2) that Commerce's failure to calculate an individual rate for it as a fully cooperative

mandatory respondent was contrary to law.  *See* Pl.'s Mem. Supp. Mot. J. Agency R., ECF No.

20-1 ("Pl.'s Br."); Pl.'s Reply, ECF No. 27; *see also* Compl. ¶¶ 14-21, ECF No. 9.

Defendant the United States, on behalf of Commerce, urges the court to sustain the Final

Results as supported by substantial evidence and otherwise in accordance with law.  *See* Def.'s

Opp'n Pl.'s Mot. J. Agency R., ECF No. 23 ("Def.'s Br.").

For the reasons set forth below, Jilin's motion for judgment on the agency record is

granted, and this case is remanded to the Department for further proceedings consistent with this

opinion.


## BACKGROUND

The antidumping duty order on multilayered wood flooring from China dates from

December 8, 2011.  *See Multilayered Wood Flooring From the People's Republic of China*, 76

Fed. Reg. 76,690 (Dep't Commerce Dec. 8, 2011), *as amended by Multilayered Wood Flooring

From the People's Republic of China*, 77 Fed. Reg. 5,484 (Dep't Commerce Feb. 3, 2012)

("Order").  On the 2016 anniversary month of the Order, the domestic industry petitioners

Coalition for American Hardwood Parity requested review of the 2015-2016 period.  *See* Pet'rs'

Req. for Admin. Rev. (Dec. 30, 2017), P.R. 14; *Antidumping or Countervailing Duty Order,*

*Finding, or Suspended Investigation; Opportunity To Request Admin. Rev.*, 81 Fed. Reg. 86,694

(Dep't Commerce Dec. 1, 2016); *see also* 19 U.S.C. § 1675(a)(1).   Commerce subsequently

identified 115 exporters, producers, or importers of the flooring as subjects of the review in its

*Initiation of Antidumping & Countervailing Duty Administrative Reviews*, 82 Fed. Reg. 10,457

(Dep't Commerce Feb. 13, 2017), *as corrected by Initiation of Antidumping & Countervailing*

*Duty Administrative Reviews.*, 82 Fed. Reg. 13,795 (Dep't Commerce Mar. 15, 2017).   *See*

Respondent Selection Mem. (Apr. 7, 2017), P.R. 161 ("RSM").

In the initiation notices, Commerce stated that China was a nonmarket economy country[1]

and therefore that it would employ its nonmarket economy policy of applying the rebuttable

presumption that all respondents were subject to state control (the "NME Policy").   *See* 82 Fed.

Reg. at 13,796.   Respondents that could rebut this presumption—by providing evidence of *de jure*

decentralized control from the state, including "an absence of restrictive stipulations associated

with an individual exporter's business and export licenses" and also evidence that their "export

---

[1]       A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).  The implication for entities operating subject to a nonmarket economy structure is that their financial and sales information is unreliable for the purpose of determining the "normal value" of subject merchandise.  *See* 19 U.S.C. § 1677b(a); *see also Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004).

activities"[2] (or rather "export functions"[3]) are not subject *de facto* to Chinese governmental control—would be entitled to receive a rate that is separate from the country-wide rate assigned to all companies or entities that are presumptively considered state-controlled as part of an amalgamated "NME entity."  *See* U.S. Dep't Commerce, *Import Administration Policy Bulletin 05.1* (Apr. 5, 2005), https://enforcement.trade.gov/policy/bull05-1.pdf ("Policy Bulletin 05.1").

Jilin was among seventy-two firms that submitted a request for separate rate status.  *See* Decision Mem. for the Preliminary Results of Antidumping Duty Admin. Rev.: Multilayered

---

[2]        *See, e.g.*, *Guizhou Tyre Co. v. United States*, 44 CIT ___, ___, 469 F. Supp. 3d 1338, 1345 (2020) (quoting the Department's reference to "export activities" in its final determination); *Gerber Food (Yunnan) Co. v. United States*, 31 CIT 921, 945, 491 F. Supp. 2d 1326, 1350 (2007) (quoting the Department's reference to "export activities" in its final determination).  This opinion relies on the Department's original articulation of "export functions" in the Import Administration Policy Bulletin 05.1.  *See* U.S. Dep't Commerce, *Import Administration Policy Bulletin 05.1* (Apr. 5, 2005), https://enforcement.trade.gov/policy/bull05-1.pdf.

[3]        Import Administration Policy Bulletin 05.1 states:

Typically, the Department considers four factors in evaluating whether each respondent is subject to *de facto* governmental control of its export *functions*: 1) whether the export prices are set by, or subject to the approval of, a governmental authority; 2) whether the respondent has authority to negotiate and sign contracts and other agreements; 3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and 4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

U.S. Dep't Commerce, *Import Administration Policy Bulletin 05.1* (Apr. 5, 2005), https://enforcement.trade.gov/policy/bull05-1.pdf (emphasis added).  In developing these factors, Commerce relied upon neither statute nor regulation.  Rather it has cited two of its own prior decisions, including *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide From the People's Republic of China*, 59 Fed. Reg. 22,585, 22,587 (Dep't Commerce May 2, 1994) and *Notice of Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol From the People's Republic of China*, 60 Fed. Reg. 22,544, 22,545 (Dep't Commerce May 8, 1995).

Wood Flooring from the People's Republic of China; 2015-2016 (Jan. 2, 2018), P.R. 308 ("PDM") at 10. Jilin's separate rate certification stated that it had been granted separate rate status in the previous administrative review. *See* Jilin Separate Rate Certification (Mar. 14, 2017), P.R. 97. Jilin had also received a separate rate (*i.e.*, the "all-others" rate) in the initial investigation and in each of the four preceding administrative reviews. The company reported, as required, that it was not under the control of the Chinese government *de jure* nor were its export functions subject to governmental control *de facto*, and it provided documentation to support its claim. *See* Jilin Separate Rate Certification.

Thereafter, relying on 19 U.S.C. § 1677f-1(c)(2), the Department selected Jilin and Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Jiangsu")[4] as "mandatory respondents," as they accounted for the "largest" volume of subject merchandise. *See* RSM at 7. The Department then sent its usual antidumping questionnaires to Jilin and Jiangsu.

Between May and September 2017, Jilin timely responded to Commerce's requests for information in sections A, C, and D of the original questionnaire, which included detailed factor-of-production calculations. Jilin also provided timely responses to four lengthy supplemental questionnaires detailing its operations and ownership structure, asserting that it operated independently of the Chinese government, providing all of the other information requested regarding its operations, and submitting surrogate value information to enable Commerce to calculate an individual margin based on its factors of production. *See* Pl.'s Br. 28-29; *see also* Jilin Section A Resp. (May 16, 2017), P.R. 202-207. There is no indication on the record that Commerce ever called into question the accuracy and adequacy of Jilin's responses to the

---

[4]      Jiangsu is not a party to this action.

questionnaires, or that Jilin ever failed to cooperate or provided untimely responses to Commerce's requests for information.  *See* Pl.'s Reply 10.

Commerce issued its Preliminary Decision Memorandum and accompanying Preliminary Separate Rate Analysis for Jilin on January 2, 2018.  The Department preliminarily determined that Jilin was not entitled to a separate rate because it had not demonstrated an absence of *de facto* governmental control as to its export functions.  *See* PDM at 12; Preliminary Separate Rate Analysis for Jilin (Jan. 2, 2018), C.R. 208, P.R. 309 ("SRM") at 1, 6.  Commerce's specific finding on state control concerned ownership of Jilin's shares, and the Chinese government's ability to appoint members of Jilin's board of directors and key operational positions.  *See* SRM at 5-6.

In its Final Results, Commerce continued to find that Jilin had not qualified for a separate rate but that sixty-nine of the seventy-two companies requesting a separate rate had qualified for one.  Jiangsu, the only other mandatory respondent, was one of those that qualified for a separate rate.  Commerce calculated Jiangsu's rate as *de minimis* (0.00 percent) and ultimately used this rate as the all-others rate for the other separate rate respondents.  *See* Final Results, 83 Fed. Reg. at 35,462-63.  Finding that Jilin was not entitled to a separate rate, Commerce apparently halted any further examination of Jilin's individual data and selected the pre-existing 25.62 percent China-wide rate[5] for Jilin.  *See* Final IDM at 8; Final Results, 83 Fed. Reg. at 35,464.  Jilin brought its objections here.

---

[5]       The 25.62 percent China-wide rate is based on application of "adverse facts available," and results from litigation that altered the original adverse facts available China-wide rate of 58.84 percent.  *See Baroque Timber Indus. (Zhongshan) Co. v. United States*, 38 CIT ___, ___, 971 F. Supp. 2d 1333, 1338-39 (2014) ("The changes . . . resulted in a new calculated highest transaction-specific rate of 25.62 percent.  Commerce selected this rate as the revised [adverse facts available] rate for the [China]-wide entity."); *see also* Final Results of Redetermination Pursuant to

## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."   19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

I.      **Commerce's Determination of *De Facto* Government Control of Jilin Lacks the Support of Substantial Evidence and Is Not in Accordance with Law**

On the issue of whether Jilin is entitled to a separate rate, the question concerns governmental control over Jilin's export functions.   *See* Policy Bulletin 05.1.   Jilin contends Commerce (1) ignored the evidence it placed on the record of the absence of government involvement, (2) made certain assertions unsupported by substantial evidence, and (3) misapplied the presumption of state control.   *See* Pl.'s Br. 13-27.   In particular, Jilin argues that Commerce's reliance late in the administrative review (not until the Final IDM), on the *Aluminum Foil* investigation ("*Aluminum Foil*"),[6] which was a separate proceeding that concerned, among other issues, the status of labor unions in China, deprived the parties of the opportunity to rebut, clarify,

---

Court Order at 27, Baroque Timber Indus. (Zhongshan) Co. v. United States, No. 12-0007 (CIT Nov. 14, 2013), ECF No. 132 ("Based on the updated [surrogate values], the highest calculated transaction-specific rate on the record is 25.62 percent and, as a result, 25.62 percent is now the rate assigned to the [China]-wide entity.").

        [6]        As used in this opinion, "*Aluminum Foil*" refers collectively to the following documents cited in the Final IDM at 8, notes 29 and 30: *Certain Aluminum Foil From the People's Republic of China: Notice of Initiation of Inquiry Into the Status of the People's Republic of China as a Nonmarket Econ. Country Under the Antidumping & Countervailing Duty Laws*, 82 Fed. Reg. 16,162 (Dep't Commerce Apr. 3, 2017); *Certain Aluminum Foil From the People's Republic of China: Notice of Extension of Time for Public Comment Regarding Status of the People's Republic of China as a Nonmarket Econ. Country Under the Antidumping & Countervailing Duty Laws*, 82 Fed. Reg. 20,559 (Dep't Commerce May 3, 2017); and Memorandum, "Aluminum Foil from the People's Republic of China: China's Status as a Non-Market Economy" (Oct. 26, 2017).

or correct new factual material placed on the administrative record by the Department as directed

by 19 C.F.R. § 351.301(c)(4).  *See* Pl.'s Reply 8 (citing Final IDM at 8).

In the Final Results, Commerce found that Jilin was not entitled to a dumping rate separate

from the China-wide entity because it had not demonstrated that its export "activities" were *de facto*

free from government control:

> In recent proceedings, we have concluded that where a government entity holds a
> majority equity ownership, either directly or indirectly, in the respondent exporter,
> the majority ownership holding in and of itself means that the government exercises,
> or has the potential to exercise, control over the company's operations.  This may
> include control over, for example, the selection of management, which is a key
> factor in determining whether a company has sufficient independence in its export
> activities to merit a separate rate.  Consistent with normal practice, we would expect
> any majority shareholder, including a government, to have the ability to control, and
> an interest in controlling, the operations of the company, including the selection of
> management and the profitability of the company.  Therefore, in assessing the
> degree of government control over [Jilin], we analyzed the level of government
> ownership of [Jilin].
>
> In the *Preliminary Results*, we found, after a review of each owner's capital
> verification report, that the majority of [Jilin]'s shares are held by a state-owned
> enterprise (SOE).  [Jilin] does not dispute this key fact.  Rather, [Jilin] simply
> reiterates arguments it made before the *Preliminary Results* as to why it is not
> controlled by the government.  For example, [Jilin] restates that its Articles of
> Association establish that three of five members of the Board of Directors are elected
> by [its] Labor Union, a non-governmental organization.  This example, according to
> [Jilin], demonstrates that it is free from the control, supervision, or interference of
> any government entity.  [Jilin]'s reiterated arguments are not responsive to
> Commerce's separate rate analysis.  The crux of Commerce's separate rate analysis
> centers on the implications of majority government ownership, *i.e.*, a potential,
> ability, interest, *etc.*, to control the company.  [Jilin]'s arguments fail to resolve these
> notable implications of the SOE's ownership.

Final IDM at 7-8.  The fuller determination was based on an analysis of the chain of company

ownership back to the Chinese government, the percentage of government ownership, the relevant

Company Law of China, Articles of Association provisions establishing shareholder rights, and

relevant legal precedent.  *See id.* at 6-8; *see also* SRM at 3-6.  Commerce insists that, where a

government entity holds a majority ownership share, either directly or indirectly, in the

respondent exporter, it may conclude that the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations generally.   The Department further claims that this finding is consistent with this Court's *Advanced Technology* decisions.   *See* Def.'s Br. 7-8; *see also Advanced Tech. & Materials Co. v. United States*, 36 CIT 1576, 885 F. Supp. 2d 1343 (2012); *Advanced Tech. & Materials Co. v. United States*, 37 CIT 1487, 938 F. Supp. 2d 1342 (2013), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014) (collectively, "*Advanced Technology*").[7]

Jilin opposes Commerce's position.   It argues that its questionnaire responses made clear that corporate control of the company was in the hands of its workers (the "Labor Union") and not those of "the majority government shareholder."   Pl.'s Br. 8-12.   Acknowledging that a majority of its shares are indirectly controlled by the government, Jilin argues substantial evidence shows that the Labor Union controlled a majority of the board of directors and supervisors pursuant to the company's Articles of Association, which conferred upon the Labor Union the ability to select three of the five members of the board of directors and two of the three operational supervisors:

> [S]pecific terms contained in [Jilin]'s Articles of Association effectively restrain the ability of the majority shareholder to exert control over the appointment of [Jilin]'s board of directors and the selection of [its] senior management.   Article 24 of the Articles of Association designates [Jilin]'s board of directors, and not the shareholders or the shareholders' meeting, as the management decision-making body of the company. . . .   Thus, in accordance with Article 24.9 of the Articles of Association, it is the board of directors, and not the Chinese government majority shareholder, that appoints the company's general manager and senior management.

---

[7]       In *Advanced Technology*, Commerce ultimately reversed its original finding that the respondent company was entitled to a separate rate, based on its reconsideration of the facts on that record.

Pl.'s Reply 1-2 (citing Jilin's 4th Suppl. Resp. (Sept. 29, 2017), C.R. 178, P.R. 282, Ex. S4-2 at 3).

Jilin thus contends that Commerce's interpretation of *Advanced Technology* unlawfully imposed

an "irrebuttable" presumption of *de facto* government control in the Final Results.  *See* Pl.'s Br. 14.

Commerce, however, faults Jilin's implicit assumption regarding the "independence" of its

Labor Union.  In response to Jilin's "selection of management" argument, the Department, albeit

late in the game, placed on the record "factual information" from the *Aluminum Foil* nonmarket

economy inquiry.  *See* Final IDM at 8 (citing *Aluminum Foil*); *see also* 19 C.F.R. § 351.301

(2018).  In the course of the *Aluminum Foil* inquiry, Commerce evaluated the extent to which

wage rates in China are determined by free bargaining between labor and management and

concluded that "[l]abor unions are under the control and direction of the All-China Federation of

Trade Unions (ACFTU), a government-affiliated [Chinese Communist Party] organ."  Final IDM

at 8.  Commerce applied its *Aluminum Foil* findings to Jilin's facts when considering the

"autonomy" of Jilin's Labor Union and found that "[t]his [*Aluminum Foil*] determination is not

undermined by [Jilin]'s excerpts from the Trade Union Law and assertion that the labor union is

not under government ownership.  Therefore, [Jilin]'s reliance on the labor union's control over

the selection of management does not rebut the finding of government control."  Final IDM at 8.

Jilin complains of the eleventh-hour placement, by Commerce, of factual information

from the *Aluminum Foil* proceeding, and disputes its relevance to this case.  Jilin states in its

briefs that its "Labor Union does not operate under Chinese Government control," arguing that

*Aluminum Foil* relates to a different proceeding, different labor union, and different issue

(specifically, whether wage rates in China were determined by free bargaining between labor and

management) from the issue before Commerce in this proceeding, which is whether Jilin's

selection of its management was made in the absence of Chinese government control.  *See* Pl.'s

Br. 26.  After restating relevant provisions of its Articles of Association that vest in the Labor Union the ability to appoint members to the boards of directors and supervisors, Jilin concludes "[t]here is no evidence [in its] Articles of Association that indicate[s] that any of the activities or the elections of the Labor Union are influenced or controlled by any level of the Chinese government."  Pl.'s Br. 26-27.

By regulation, Commerce permits itself, at any time, to place factual information on the record.  *See* 19 C.F.R. § 351.301(c)(4).  If Commerce does so, however, it is generally required by that regulation to permit an opportunity for a party to respond to such information.  Here, Commerce contends that Jilin did, in fact, have an opportunity to comment on the *Aluminum Foil* proceeding, as the proceeding's notice published in the Federal Register solicited comments from the public at large.  *See* Def.'s Br. 15.  The notice-and-comment of *that* proceeding, however, does not satisfy the requirement that Jilin be afforded the opportunity to respond to the new information placed on the record in *this* proceeding.  *See* 19 C.F.R. § 351.301(c)(4).

Commerce placed *Aluminum Foil* on the record late in the proceeding, alerting the parties to it only in its Final IDM.  This information had the effect of placing Jilin under the Chinese government's control despite the company having been able to demonstrate the absence of government control in previous reviews.  As mentioned above, Commerce's argument that Jilin had an opportunity to address the labor union issue in another proceeding to which Jilin was not a party is without merit.

Jilin must be given "a meaningful opportunity to be heard."  *See PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761-62 (Fed. Cir. 2012) (quoting *LaChance v. Erickson*, 522 U.S. 262, 266 (1998)).  On remand, Commerce shall permit Jilin, in advance of draft remand results and in accordance with 19 C.F.R. § 351.301(c)(4), to submit written argument with respect

to the Department's inclusion of the *Aluminum Foil* proceeding on the record of this review, and shall consider such argument in its draft remand results.

In addition, it is worth emphasizing that the fundamental question here concerns state control over *export functions*.  *See* Policy Bulletin 05.1 ("Typically, the Department considers four factors in evaluating whether each respondent is subject to *de facto* governmental control of its export functions.").  There is little discussion of this in the Final Results, in particular how "majority equity ownership" translates into control of export functions. On remand, the Department shall explain its use of the phrase, and state whether "export functions" are synonymous with "export activities" or "company's operations."  Further, Commerce shall state whether analysis of "export functions" is required as part of its *de facto* control analysis, and if so, how that consideration affects its remand results, and how the phrase figures in this case.  The Department shall also consider any relevant arguments presented by Jilin to Commerce on the issue of state control.

## II.    Commerce Has Failed to Explain How the Application of Its NME Policy to Jilin Is in Accordance with Law and Supported by Substantial Evidence

### A.    Jilin's Legal Status as a Mandatory Respondent

#### 1.    Individually-Examined Respondents

Commerce is required to "determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise." 19 U.S.C. § 1677f-1(c)(1).  That determination normally requires calculating the dumping margin for "each entry" of subject merchandise.  *See id.* § 1675(a)(2)(A)(i), (ii).  The "dumping margin" is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." *Id.* § 1677(35)(A).  Normal value is "the price at which the foreign like product is first sold . . .

for consumption in the exporting country." *Id.* § 1677b(a)(1)(B)(i).  If the exporting country is a

market economy country, Commerce determines normal value using sales prices or constructed

normal value in the home market—or if there are no sales prices in the home market, Commerce

may use sales prices in a third country.  *See id.* § 1677b(a); *see also* 19 C.F.R. §§ 351.403-.407.

If the exporting country is a nonmarket economy country, Commerce determines normal value

based on a nonmarket economy producer's factors of production using values obtained from a

surrogate market economy country or countries.  *See* 19 U.S.C. § 1677b(c); *see also* 19 C.F.R.

§ 351.408.

       The congressional goal of directing this exercise (and the goal found in treaties and

agreements to which the United States is a signatory) is for Commerce to determine an *accurate*

margin for each respondent.  *See Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345,

1356 (Fed. Cir. 2016) ("'[T]here is a clear congressional intent' that administrative reviews 'be

as accurate *and current* as possible.'") (quoting *Allegheny Ludlum Corp. v. United States*, 346

F.3d 1368, 1373 (Fed. Cir. 2003)); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716

F.3d 1370, 1379 (Fed. Cir. 2013) (emphasis added) ("An overriding purpose of Commerce's

administration of antidumping laws is to calculate dumping margins *as accurately as possible.*")

(citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).

       In the usual case, where Commerce calculates the rates for individual respondents, the

calculation of each dumping margin is determined by using a respondent's own data.  *See* 19

U.S.C. § 1677f-1(c)(1) ("In determining weighted average dumping margins under section

1673b(d), 1673d(c), or 1675(a) of this title, the administering authority shall determine the

individual weighted average dumping margin for each known exporter and producer of the subject

merchandise."); *id.* § 1677a (defining export price and constructed export price); *id.* § 1677(16),

(25) (defining foreign like product and subject merchandise, respectively).  The statute provides

for an exception, however, under circumstances that are described in 19 U.S.C. § 1677f-1(c)(2)

(the "Mandatory Respondent Exception").

### 2.     The Statute's Mandatory Respondent Exception

The Mandatory Respondent Exception is used when the number of respondents in a

proceeding is so "large" that it is "not practicable to make individual weighted average dumping

margin determinations."   19 U.S.C.  § 1677f-1(c)(2).   When that occurs, Commerce may

determine the weighted-average dumping margins for a "reasonable" number of exporters or

producers by limiting its examination to (1) "a sample of exporters, producers, or types of

products that is statistically valid based on the information available to the administering authority

at the time of selection," or (2) "exporters and producers accounting for the largest volume of the

subject merchandise from the exporting country that can be reasonably examined."   *Id.*

§ 1677f-1(c)(2)(A), (B).  The weighted average of the rates for each mandatory respondent forms

the basis of the all-others rate for respondents not individually examined.   *See id.*

§ 1673d(c)(1)(B)(i).   Here, noting the "large" number of respondents in the underlying

proceeding, Commerce chose to employ this Mandatory Respondent Exception and base the

determination of the all-others rate[8] on the rate determined for two mandatory respondents, which

were the two largest exporters of subject merchandise by volume during the period of review.

*See* RSM at 1.  Jilin was one of these.  The other was Jiangsu.

The aim of the Mandatory Respondent Exception is to determine an *accurate* all-others

rate, based on a weighted average of rates determined for mandatory respondents by statistical

---

[8]     Although, as shall be seen, just what the "all-others" rate is, has some mystery
connected to it.  *See, e.g.*, *Thuan An Prod. Trading & Serv. Co. v. United States*, 42 CIT __, ___,
348 F. Supp. 3d 1340, 1347 (2018).

sampling or the use of a statistically sufficient volume of exports.  The statute directs Commerce to (1) "determine the estimated weighted average dumping margin for each exporter and producer individually investigated" and (2) "determine" in accordance with the statute's method "the estimated all-others rate for all exporters and producers not individually investigated."  19 U.S.C. § 1673d(c)(1)(B)(i), (c)(5)(B).  Use of the Mandatory Respondent Exception is intended to fulfill the prime purpose of the antidumping duty statute to calculate accurate rates.  *Compare* 19 U.S.C. § 1677f-1(c)(2), *with* 19 U.S.C. § 1673d(c)(1)(B)(i).  The role of the mandatory respondents is therefore broader than that of the usual individually-examined respondent, because the mandatory respondents serve as surrogates for what can be (and is, in this case) a much larger group.

Commerce now employs the Mandatory Respondent Exception often, and reviews only a limited number of selected respondents.  *See, e.g.*, *Certain Fresh Cut Flowers From Colombia: Preliminary Results & Partial Rescission of Antidumping Duty Admin. Rev.*, 62 Fed. Reg. 16,772 (Dep't Commerce Apr. 8, 1997).  Indeed, Commerce's practice has devolved to the point where it regularly chooses only two (and sometimes one[9]) mandatory respondents to be "representative" of unexamined respondents for the purpose of calculating the all-others rate in a review, a devolution that this Court has regarded with some skepticism.  *See, e.g.*, *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 33 CIT 1125, 637 F. Supp. 2d 1260 (2009); *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 662 F. Supp. 2d 1337 (2009).

---

[9]         *See, e.g.*, *Certain Carbon & Alloy Steel Cut-To-Length Plate From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 79,450, 79,451 (Dep't Commerce Nov. 14, 2016) (Commerce selected one entity as "the sole mandatory respondent in this investigation").  In Jilin's case, Commerce chose the two respondents that together accounted for a "large" share of the export volume of subject merchandise, although not the majority of such export volume, and it subsequently relied only on Jiangsu's data.

Even when Commerce does choose two mandatory respondents (and despite having replaced or substituted mandatory respondents in the past[10]), it has more recently declined to name a mandatory respondent replacement when it became clear that a chosen mandatory entity would not participate or is otherwise excluded from examination. *See, e.g.*, *Bestpak*, 716 F.3d at 1374. When one of two chosen mandatory respondents does not participate or is excluded from participation, a failure to name a replacement can result (as it did here) in an all-others rate being determined based on the margin of a sole respondent whose percentage of export volume is quite small in relation to the total volume of exports. *See, e.g.*, *Stainless Steel Sheet & Strip From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value & Preliminary Affirmative Determination of Critical Circumstances*, 81 Fed. Reg. 64,135 (Dep't Commerce Sept. 19, 2016), and accompanying decision memorandum.

In November 2013, Commerce announced changes in its method of selecting mandatory respondents. *See Antidumping Procs.: Announcement of Change in Dep't Practice for Respondent Selection in Antidumping Duty Procs. & Conditional Review of the Nonmarket Econ. Entity in NME Antidumping Duty Procs.*, 78 Fed. Reg. 65,963 (Dep't Commerce Nov. 4, 2013) ("*Practice Change*").

As originally enacted, a 1984 change in the statute permitted Commerce to use "statistical sampling" of products "whenever a significant volume of sales is involved or a significant number of adjustments to prices is required."[11] *See* Pub. L. No. 98-573, § 620(a), 98 Stat. 2948, 3039

---

[10]        *See, e.g.*, *Certain Kitchen Appliance Shelving & Racks from the People's Republic of China: Postponement of the Preliminary Determination of the Antidumping Duty Investigation*, 73 Fed. Reg. 78,721 (Dep't Commerce Dec. 23, 2008).

[11]        The authority to sample "types of products" in 19 U.S.C. § 1677f-1(c)(2)(A) is a carryover from the original statute, 19 U.S.C. § 1677f-1(a), that was added to the Tariff Act ten

(1984).  With passage of the Uruguay Round Agreements Act in 1994, Commerce's mandatory

respondent selection practice came to rely generally upon the then-new provision of 19 U.S.C.

§ 1677f-1(c)(2) for "exporters and producers accounting for the *largest volume* of the subject

merchandise from the exporting country *that can be reasonably examined*" ("subsection (B)"),

and it resorted to using the "statistically valid" sampling provision ("subsection (A)") only rarely.

*See Proposed Methodology for Respondent Selection in Antidumping Procs.; Req. for Cmt.*, 75

Fed. Reg. 78,678, 78,678 (Dep't Commerce Dec. 16, 2010) ("*Proposed Methodology*") (emphasis

added) (the Department has used subsection (B) in "*virtually every one of its proceedings*").  The

2013 *Practice Change* announced that Commerce would

> consider sampling when it can select a *minimum of three respondents* to examine
> individually and when the three largest respondents (or more if the Department
> intends to select more than three respondents) by import volume of the subject
> merchandise under review account for normally no more than 50 percent of total

---

years prior to passage of the Uruguay Round Agreements Act ("URAA").  *See* Pub. L. No. 98-573, § 620(a), 98 Stat. 2948, 3039 (1984).  As originally enacted, § 1677f-1(a) permitted Commerce to use "generally recognized sampling techniques whenever a significant volume of sales is involved or a significant number of adjustments to prices is required," provided "such samples and averages shall be representative of the transactions under investigation."  19 U.S.C. § 1677f-1(a) (Supp. II 1984).  Section 229 of the URAA slightly altered this congressional delegation in subsection (a):

> For purposes of determining the export price (or constructed export price) under
> section 1677a of this title or the normal value under section 1677b of this title, and
> in carrying out reviews under section 1675 of this title, the administering authority
> may . . . use averaging and statistically valid samples, if there is a significant
> volume of sales of the subject merchandise or a significant number or types of
> products, and . . . decline to take into account adjustments which are insignificant
> in relation to the price or value of the merchandise.

Pub. L. No. 103-465, § 229, 108 Stat. 4809, 4889 (1994).  In conjunction with the authority of subsection (a) of 19 U.S.C. § 1677f-1 to sample *products*, Congress in subsection (c)(2) of 19 U.S.C. § 1677f-1 also permitted Commerce to sample respondent *exporters* and *producers*, as an exception to the general rule of subsection (c)(1) requiring Commerce to determine the individual weighted-average dumping margin for each known exporter and producer of the subject merchandise. *See id.*

volume. *The Department considers 50 percent [of import volume] to be a reasonable threshold* because in these circumstances the agency would be able to calculate specific dumping margins *for the majority* of imports during a period of review.

*Practice Change*, 78 Fed. Reg. at 65,968 (emphasis added).

Thus, the *Practice Change* announced that Commerce would use the statistical sampling found in subsection (A) only if certain conditions were met. Otherwise, subsection (B) (volume) would be used. Specifically, Commerce would use the sampling of subsection (A) "where possible" on a case-by-case basis for the selection of mandatory respondents,[12] if interested parties made a specific request to use that method. *See Proposed Methodology*, 75 Fed. Reg. at 78,678. Commerce, however, would forgo the subsection (A) option (and rely on the (B) option): (1) if it is unable to examine at least three companies "due to resource constraints"; or (2) *when the largest companies by import volume account for at least 50 percent of total imports*; or (3) when the "characteristics" of the underlying population make it highly likely that results obtained from the largest possible sample would be unreasonable to represent the population (*i.e.*, when "information obtained by or provided to the Department provides a reasonable basis to believe or suspect that the average export prices and/or dumping margins for the largest exporters differ from such information that would be associated with the remaining exporters"). *Practice Change*, 78 Fed. Reg. at 65,964-65.

---

[12]     *See, e.g.*, *Certain Steel Nails From the People's Republic of China: Preliminary Results of the Antidumping Duty Admin. Rev. & Preliminary Determination of No Shipments; 2017-2018*, 84 Fed. Reg. 55,906 (Dep't Commerce Oct. 18, 2019); *Certain Steel Nails From the People's Republic of China: Preliminary Results of the Antidumping Duty Admin. Rev. & Preliminary Determination of No Shipments; 2016-2017*, 83 Fed. Reg. 45,883 (Dep't Commerce Sept. 11, 2018); *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Results of Antidumping Duty Admin. Rev.; 2013-2014*, 80 Fed. Reg. 12,441 (Dep't Commerce Mar. 9, 2015).

There can be little doubt that relying almost exclusively on subsection (B) made Commerce's work easier, while still, at least arguably, using a sufficiently large sample of imports to calculate an accurate rate for the unexamined respondents receiving the all-others rate. *Cf. Practice Change*, 78 Fed. Reg. at 65,968. The Department, however, does not appear to always follow the guidance of the *Practice Change*. *See, e.g.*, *id.* ("The Department considers 50 percent [of import volume] to be a reasonable threshold because in these circumstances the agency would be able to calculate specific dumping margins for the majority of imports during a period of review.").

Although authorizing a different method for determining the rate for unexamined respondents, there is nothing in the language of the Mandatory Respondent Exception exempting Commerce from its statutory duty to determine a dumping margin for Jilin as a "*known*" exporter or producer that is selected for examination using its own information. *Compare* 19 U.S.C. § 1677f-1(c)(2), *with* 19 U.S.C. § 1673d(c)(1)(B)(i) (the Department must (I) "determine the estimated weighted average dumping margin for each exporter and producer individually investigated" and (II) "determine" in accordance with the statute's methodology "the estimated all-others rate for all exporters and producers not individually investigated"); *see also* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, Vol. 1 at 872 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4200 ("Commerce will calculate individual dumping margins for those firms selected for examination and an 'all others' rate to be applied to those firms not selected for examination.").

Nor does the Mandatory Respondent Exception free Commerce from its duty to determine an accurate rate for both the unexamined and examined respondents. *See Albemarle*, 821 F.3d at 1356. Considering that Commerce now routinely identifies only two mandatory respondents to

act as stand-ins for numerous unexamined respondents, the statutory requirement of calculating a

rate for each respondent selected for individual examination using its own data becomes all the

more important in satisfying the accuracy requirement.[13]  *Cf. id.*

### 3.    Commerce's "Nonmarket Economy" Policy

Over the years, Commerce has developed an administrative practice of applying a

rebuttable presumption that all companies within a nonmarket economy country are controlled by

the government of that country, *i.e.*, the "NME Policy."  The NME Policy has not been formalized

by regulation but is found in the *Notice of Final Determination of Sales at Less Than Fair Value:*

*Silicon Carbide From the People's Republic of China*, 59 Fed. Reg. 22,585 (Dep't Commerce

May 2, 1994) ("*Silicon Carbide*") as well as the *Final Determination of Sales at Less Than Fair*

*Value: Sparklers From the People's Republic of China*, 56 Fed. Reg. 20,588 (Dep't Commerce

May 6, 1991) ("*Sparklers*").

---

[13]    Although no party has challenged the selection of the mandatory respondents or the impact of ignoring the data for Jilin and using only Jiangsu's data to calculate the all-others rate, it is unlikely that substantial evidence supports a finding that that rate was determined, in this instance, in accordance with the statute's injunction that it be determined by "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined."  19 U.S.C. § 1677f-1(c)(2)(B); *compare* RSM at 1 (Commerce, opting for the Mandatory Respondent Exception, anticipated that the determination of the all-others rate would be based on the weighted-average rates determined for *both* Jilin and Jiangsu, the two largest exporters of subject merchandise by volume), *with Practice Change*, 78 Fed. Reg. at 65,968:

> *The Department considers 50 percent to be a reasonable threshold* [for sampling] because in these circumstances the agency *would be able to calculate specific dumping margins for the majority of imports* during a period of review.  However, when [the act of] selecting the largest respondents does not allow the Department to calculate dumping margins for the majority of imports, and the Department has the resources to review at least three respondents, the Department may choose to sample in view of the enforcement concerns discussed herein.

The problem the NME Policy was meant to address was that the Chinese government, in particular, had been less than forthcoming with information about its involvement in Chinese companies, after changes in the laws of China were introduced in the period prior to 1991.  *Cf. Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Admin. Rev.*, 56 Fed. Reg. 2,742, 2,743-44 (Dep't Commerce Jan. 24, 1991).  Until that time, Commerce, consistent with the statute, had calculated separate individual rates for all respondents within a nonmarket economy country.  *See Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (Fed. Cir. 2002).  Changes in Chinese law, or its administration, led to difficulties for Commerce in trying to determine whether certain respondents were truly independent of state control.  *See, e.g.*, *Iron Construction Castings From the People's Republic of China*, 56 Fed. Reg. at 2,744.

To address these difficulties, Commerce adopted a policy that imposed an additional burden of proof on each respondent from a nonmarket economy country seeking an individual separate rate, requiring it to demonstrate independence from state control.  The presumption that every respondent is subject to state control implies that every respondent is part of a single "entity," an amalgam of all firms in the industry within the nonmarket economy country, and that these respondents should receive a single country-wide rate.  Thus, the nonmarket economy entity ("NME Entity") is not "*the State*" itself but consists of producers or exporters *controlled by* "the State."  The NME Policy placed all respondent-exporters within such a single NME Entity—a country-wide legal fiction employed for convenience—until such time as Commerce is persuaded otherwise with respect to any individual respondent.[14]

---

[14]     In Jilin's case, for example, under "Exporters" the Order lists a "PRC-wide Entity" with its own rate that is distinct from the separate all-others rate (discussed further *infra*) that

Apparently, one idea behind the NME Policy was that a respondent facing the prospect of an AFA-determined rate would "encourage" a reluctant Chinese government to comply with Commerce's requests for information or that the Chinese government would itself be motivated to seek to avoid having its domestic businesses receive a rate based on AFA.  *See Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 932-37, 806 F. Supp. 1008, 1011-12 (1992).  The NME Policy was thus designed as an inducement for cooperation and participation.  That is, through AFA, the NME Policy is intended to encourage respondents and their governments to be forthcoming with respect to Commerce's requests for information in administrative proceedings.

Some support for the general idea of inducement has been found in such cases as *Fine Furniture (Shanghai) Ltd. v. United States* and *KYD, Inc. v. United States*.  *See Fine Furniture*, 748 F.3d at 1373 (remedy that collaterally reaches respondent-plaintiff has the potential to encourage China to cooperate so as not to hurt its overall industry); *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) (the AFA rate calculated *for a non-cooperating exporter* could be applied to a cooperating importer of that exporter's goods).  The reasoning in these cases is, however, inapplicable to cases where the collaterally injured respondent could not possibly influence the behavior of a third party or, as is the case here, where the cooperation of, or information concerning, the third party (China) is not sought.

The NME Policy has not been codified by regulation and remains policy.  The closest Commerce came to formalization was in 1997 when it published its regulation to calculate a "single rate" for producers and exporters from a nonmarket economy country.  *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997); *see also*

---

Commerce applied to respondents who had not been individually investigated or reviewed.  *See* Order, 76 Fed. Reg. at 76,692-93.

19 C.F.R. § 351.107(d) ("In an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."). Participants had urged Commerce to codify the NME Policy, but it has declined to do so, concluding that the nature of nonmarket economies is not static. *See* 62 Fed. Reg. at 27,304 ("[B]ecause of the changing conditions in those [nonmarket economy] countries most frequently subject to [antidumping duty] proceedings, we do not believe it is appropriate to promulgate the presumption [that all exporters and producers of such countries are subject to state control] or the separate rates test in these regulations. Instead, we intend to continue developing our policy in this area, and the comments that were submitted will help us in that process.").

Development of the policy has had its critics. *See, e.g.*, *China Mfrs. All., LLC v. United States*, 41 CIT ___, ___, 205 F. Supp. 3d 1325, 1340 (2017) ("Commerce may not exercise the discretion inherent in [19 C.F.R. § 351.107(d)], which states that rates 'may' consist of a single margin, to apply a single antidumping duty margin to all exporters and producers in a nonmarket economy country in a way that fails to heed the statutory requirement to assign an individual weighted average dumping margin to a fully cooperative exporter or producer it designated for individual examination pursuant to 19 U.S.C. § 1677f-1(c) [*i.e.*, the sampling and averaging statute, including the Mandatory Respondent Exception].").

Nevertheless, the use of the NME Policy has been applied to various factual situations. After the announcement of *Antidumping Duties; Countervailing Duties*, the Federal Circuit in *Sigma Corp. v. United States*, held that the employment of a presumption of state control for exporters in a nonmarket economy

> was within Commerce's authority . . . . Moreover, because exporters have the best
> access to information pertinent to the "state control" issue, Commerce is justified
> in placing on them the burden of showing a lack of state control.

*Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997) (first citing 19 U.S.C.

§ 1677(18)(B)(iv), (v); and then citing *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583

(Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the

necessary information.")).

    Following *Sigma*, the Federal Circuit was presented with a number of specific factual

situations demonstrating how Commerce administers its NME Policy when considering the cases

of individual plaintiffs.  In an unpublished decision, the Federal Circuit agreed that "substantial

evidence supported Commerce's conclusion that the specified brake rotor exporters satisfied their

burden of establishing their *de jure* and *de facto* independence from the central government and

were therefore not required to be assigned a country-wide antidumping rate."  *Coal. for Pres. of*

*Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 232 F.3d 913 tbl., 2000 WL 380087,

at *3 (Fed. Cir. Apr. 13, 2000).  In *AMS Associates, Inc. v. United States*, the Federal Circuit

considered the case of the plaintiff's affiliate, a Chinese exporter that withdrew from the

administrative review and removed its confidential information from the record after initially

showing independence from the Chinese government.  *See AMS Assocs., Inc. v. United States*,

719 F.3d 1376 (Fed. Cir. 2013).  There, the Federal Circuit upheld this Court's decision that the

circumstances necessarily indicated that the affiliate was unable to carry its burden of

affirmatively showing lack of *de jure* and *de facto* control by the Chinese government, because

the remaining public information on the record did not include verifiable evidence that would be

necessary to establish the affiliate's eligibility for a separate rate, and it was thus not entitled to a

separate company-specific antidumping duty rate.  *Id.* at 1380-81.  To give another example,

*Dongtai Peak Honey Indus. Co. v. United States*, the Federal Circuit likewise reviewed the record

and concluded "substantial evidence supports Commerce's determination that [the appellant]

failed to demonstrate the absence of de facto and de jure government control, as required for

separate-rate status," because the record lacked information as to shareholders, management,

accounting practices, corporate structure, and affiliations, as well as information addressing

whether several organizations to which the plaintiff belonged were state-sponsored, controlled

the plaintiff's business operations, or coordinated its "export activities."  *Dongtai Peak Honey*

*Indus. Co. v. United States*, 777 F.3d 1343, 1353-54 (Fed. Cir. 2015).  These and other cases

indicate that the Federal Circuit has addressed the NME Policy on a case-by-case basis,[15] and

because it is policy, rather than a regulation, the Court has sustained the Policy's use only for the

facts before it.

      As the NME Policy currently stands, an exporter may overcome the presumption of state

control only by persuading Commerce that its export functions are subject to neither *de jure* nor

*de facto* control by the state.  If Commerce is not persuaded that an exporter is independent from

state control, then the exporter is assigned the NME Entity rate—which, to the court's knowledge,

is always based on AFA.  Commerce has extended what amounts to an AFA "policy" rate even

to *cooperative* "mandatory" respondents based on their inability to rebut the presumption of state

control.  *See Multilayered Wood Flooring From the People's Republic of China: Final Results of*

*Antidumping Duty Admin. Rev. & Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg.

38,002 (Dep't Commerce Aug. 5, 2019).

      The NME Policy thus accomplishes a result that cannot be achieved through application

of the AFA statute: under particular circumstances, for *cooperative* respondents that fail to rebut

---

[15]    *See SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.") (citing *CBS v. United States*, 316 U.S. 407, 421 (1942)).

the presumption of state control, Commerce may apply a rate based on AFA[16] (the China-wide

rate) *without* (1) finding a "gap" in the *individual* factual record of the respondent that would

justify the use of facts available, *and without* (2) finding a *failure* in the *behavior* of the respondent

justifying the use of an adverse inference.[17]  *See Fine Furniture*, 748 F.3d at 1371.  In other words,

Commerce believes it does not have to make the requisite findings under 19 U.S.C. § 1677e(a)-

(b) in order to impose an AFA-inclusive margin on a respondent.  It believes the AFA rate may

be imposed because the respondent is presumed to be under state control.

Still, the essential purpose of the NME Policy seems to be to encourage compliance, not

to punish respondents for failing to prove their independence from the state.  Were the

administrative application of the NME Policy employed to justify punishment, it would be in

violation of the statute.  *See SKF USA Inc. v. United States*, 29 CIT 969, 979, 391 F. Supp. 2d

1327, 1336 (2005) ("Section 1677e(b) is geared to promote cooperation by respondents, but not

impose 'punitive, aberrational, or uncorroborated' margins; this is evidenced in the 19 U.S.C.

---

[16]        *See, e.g.*, *Small Diameter Graphite Electrodes from the People's Republic of China: Final Results of the First Admin. Rev. of the Antidumping Duty Order & Final Rescission of the Admin. Rev., in Part*, 76 Fed. Reg. 56,397, 56,399 (Dep't Commerce Sept. 13, 2011) (adverse facts available applied to adjust certain of cooperating mandatory respondent's reported factors of production resulting in final margin of 56.63 percent); *Wooden Bedroom Furniture From the People's Republic of China: Preliminary Results of Antidumping Duty Admin. & New Shipper Revs. & Partial Rescission of Rev.*, 74 Fed. Reg. 6,372, 6,379 (Dep't Commerce Feb. 9, 2009) (adverse facts available applied to adjust certain of cooperating mandatory respondent's reported factors of production resulting in a preliminary margin of 124.31 percent).

[17]        Commerce must make two separate findings before resorting to AFA.  *First*, Commerce must find that it has to resort to "facts available" "[i]f . . . necessary information is not available on the record, or . . . an interested party or any other person . . . fails to provide . . . information [that has been requested by Commerce] . . . in the form and manner requested" or "significantly impedes" a proceeding. 19 U.S.C. § 1677e(a)(1)-(2)(B), (C).  *Second*, Commerce must find that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." Only at that point may Commerce use an adverse inference "in selecting from among the facts otherwise available." *Id.* § 1677e(b)(1).

§ 1677e(c) corroboration requirement which intends the AFA rate 'to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.'") (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)); *Am. Silicon Techs. v. United States*, 26 CIT 1216, 1223, 240 F. Supp. 2d 1306, 1312-13 (2002) ("Although an adverse facts available margin is to have 'some built-in increase intended as a deterrent to non-compliance' in this instance it is so far removed from being 'a reasonably accurate estimate of the respondent's actual rate' that it is disproportionately punitive in nature.") (quoting *De Cecco*, 216 F.3d at 1032).  The long history of U.S. unfair trade law has repeatedly emphasized its remedial intent.  *See Sunpreme Inc. v. United States*, 946 F.3d 1300, 1321 (Fed. Cir. 2020) (citations omitted) (describing repeated congressional iteration of the "curative purpose" and "remedial intent" of the statutory scheme).  Thus, punitive application of the statute has routinely been rejected.

Although Commerce argues otherwise, under the facts of this case, Commerce's NME Policy is entitled to no deference.  While courts have authorized the Policy's use in specific situations, it has never been reduced to a regulation, and the only writings purporting to explain the Policy are found in *Sparklers*, *Silicon Carbide*, and other individual administrative determinations.  And, while the Policy's use has been confirmed by the courts in specific factual situations, no court may provide the explanation for its lawful use in any case where the Department has not supplied one itself.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (no deference "to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question"); *see also Prime Time Commerce LLC v. United States*, 43 CIT ___, ___ n.14, 396 F. Supp. 3d 1319, 1331 n.14 (2019) ("[I]t is not for this court to provide a rationale supporting Commerce's determination.").

Judicial review of an agency's construction of the statute begins with whether Congress "has directly spoken to the precise question at issue," because if it has, and Congress' intent is clear, then "that is the end of the matter," and effect is given to the unambiguously expressed intent of Congress. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). When deciding if Congress has clearly expressed its intent, courts use the usual tools including the canons of statutory construction and legislative history to find the meaning of the words they have before them. If the statute is silent or ambiguous with respect to the specific issue, then the question is whether the agency's interpretation is based on a permissible construction of the statute. *See id*. at 843. The agency's construction need not be the only—or even the most reasonable—interpretation, *see Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978), but no deference is given "where the agency itself has articulated no position on the question . . . ." *Bowen*, 488 U.S. at 212. Also, in contrast to regulations, agency "interpretations contained in policy statements, agency manuals, and enforcement guidelines . . . lack the force of law [and] do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *cf. United States v. Mead Corp.*, 533 U.S. 218, 230 (2001) (an agency's statutory interpretations are due *Chevron* deference when articulated in "a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement" having the force of law). Importantly, courts may not provide a reasoned interpretation when an agency, such as Commerce, has not.

Unlike a reasoned statutory interpretation, a policy lacking any clear expression of why an agency has chosen to implement a statute in a particular manner is entitled to no deference, because no court can determine if the policy represents a reasonable interpretation of the statute or not. In addition, policies, like the NME Policy, do not merit "*Skidmore*" deference, because an

unexplained policy does not have the "power to persuade." *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). It is worth repeating that courts cannot provide the reasons to justify an agency's particular interpretation of a statute. The agency must supply the interpretation, and the courts then determine if it is reasonable.

As far as the court's knowledge extends, Commerce has never performed a *Chevron* analysis[18] with respect to the specific statute Commerce claims to be construing when applying the NME Policy—nor, for that matter, has Commerce clearly identified the statute whose silence or ambiguity requires interpretation. In particular, Commerce has never explained why the NME Policy should apply to rates being determined pursuant to the Mandatory Respondent Exception or identified the statute or statutes that it has construed to reach that result.

### B.    Commerce Must Explain Adequately the Application of Its NME Policy to Jilin After Selecting Jilin for Examination Pursuant to the Mandatory Respondent Exception

Pursuant to statute, Commerce is directed to determine an individual rate for each known exporter or producer of subject merchandise. *See* 19 U.S.C. § 1677f-1(c). This is the "general rule" of § 1677f-1(c)(1), and it is subject only to the Mandatory Respondent Exception in subsection (c)(2), which implicitly provides for a calculation of the all-others rate based upon the weighted-average rates of mandatory respondents. The statute clearly directs that Commerce must determine an individual rate for respondents chosen for individual examination as mandatory respondents, because they are "known" exporters or producers. *See id.*

---

[18]        *See, e.g.*, *Jinko Solar Co. v. United States*, 961 F.3d 1177, 1183 (Fed. Cir. 2020) ("[I]f 'the intent of Congress is clear, that is the end of the matter;' . . . but if the statute is ambiguous or does not include the aspect at issue, then the agency's interpretation must be accepted unless it is 'procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.'") (first quoting *Chevron*, 467 U.S. at 842; and then citing *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009)) (applying *Chevron* to antidumping determinations).

Here, Commerce did not first determine which entities were eligible for a separate rate and which were not, prior to deciding which entities would be designated as mandatory respondents. Instead, having designated Jilin a mandatory respondent and thus a "known exporter," Commerce placed itself under the general obligation to determine for Jilin an "individual weighted average dumping margin." *See id.* The Department states that it need not comply with the statute, because of Jilin's failure to demonstrate independence from state control. Beyond concluding that the NME Policy should be applied, Commerce does little to explain why it did not determine Jilin's individual rate.[19] It bears repeating that it appears Commerce had all of the information it needed to determine an individual weighted-average dumping margin for Jilin. Moreover, because of the importance of the Mandatory Respondent Exception's goal of determining an *accurate* all-others rate by means of a weighted-average calculation of the rates

---

[19]     The China-wide rate that Commerce applied to Jilin was based on an adverse inference. *See, e.g., Baroque Timber*, 38 CIT at ___, 971 F. Supp. 2d at 1338-39 ("Commerce selected . . . the revised AFA rate for the [China]-wide entity."). The application of an AFA rate to a fully cooperative respondent is unanticipated by the statute. The statute only provides for the use of AFA when there is (1) a gap in the record, and (2) uncooperative behavior by respondent. That is, if information necessary to the record is "missing," then Commerce is permitted to base an individual weighted-average dumping margin on the use of "facts otherwise available" (19 U.S.C. § 1677e(a)(1)), and indeed, if circumstances permit, with resort to AFA (19 U.S.C. § 1677e(b)). No such circumstances are apparent on the record before the court. Commerce did not make a finding, supported by record evidence, that "necessary information," within the meaning of 19 U.S.C. § 1677e(a), was unavailable on the record with respect to Jilin's information. *Cf. China Mfrs. All.*, 41 CIT at ___, 205 F. Supp. 3d at 1338 ("The authority Congress provided in 19 U.S.C. § 1677e does not extend to the use of an adverse inference against Double Coin, a fully cooperative int[e]rested party that Commerce examined individually in the review and for which Commerce calculated (but declined to apply) an individual weighted average dumping margin based on information it found to be sufficient for that purpose."); *but see Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1313 n.6 (Fed. Cir. 2017) (noting, in dicta, that *China Manufacturers Alliance* "does not properly apply our precedent upholding Commerce's use of the [China]-wide entity rate for companies that fail to rebut the presumption of government control and is incompatible with the underlying NME presumption," although *China Manufacturers Alliance* had yet to be finally decided by this Court).

of the *two* mandatory respondents *selected* for this review, compliance with the statute assumes even greater importance.

It also bears repeating that the purpose of the NME Policy is to encourage compliant participation in a proceeding, not only on the part of an individually-examined respondent, but also by the nonmarket economy country government. The Policy does this by shifting the burden to respondents to demonstrate their independence from the government. Here, there is nowhere on the record any indication that Jilin, in its efforts to demonstrate its independence from state control and provide the factual information necessary to determine its individual rate, was not entirely cooperative with Commerce's requests for information. Thus, Jilin was compliant. Also absent from the record is any evidence that China was sent a questionnaire, or that Commerce sought information from Chinese officials in any other way.[20] When asked to cooperate, Jilin

---

[20]     The Department does say that it "matters" that no request to review the China-wide entity was submitted here. Commerce apparently believes that circumstance absolves it of any duty to inquire further as to the status of the NME Entity. It is unclear, however, why Jilin should be charged with shouldering the burden of asking that the China-wide entity be reviewed. The evidence indicates that Jilin did not expect to be included in the entity. It never was before. And it presented evidence, once again, that it was not. Commerce itself proceeded along that same assumption when it selected Jilin as a mandatory respondent. Therefore, Jilin had no reason to request review of the China-wide entity.

Moreover, this Court has found that a mandatory respondent cannot ask for a review of the "NME-wide entity." The relevant regulation on the subject confers no such right. *See Guizhou Tyre*, 44 CIT at ___, 469 F. Supp. 3d at 1355-57. The regulation indicates that only Commerce, or possibly the foreign government impacted, could request a review of the NME Entity. *See* 19 C.F.R. § 351.221(b) ("on the Secretary's own initiative"); *see also id.* § 351.213(b)(1) ("or an interested party described in section 771(9)(B) of the Act (foreign government)"). Respondents or importers may only request administrative review with respect to their own products, exports, or imports. *See id.* § 351.213(b)(2), (b)(3). Furthermore, the evidence of record indicates that the composition of—or even the actual existence of—the so-called "China-wide entity" was a complete "unknown" at the beginning of the review. It is, after all, a legal fiction constructed for convenience. It is, therefore, difficult to see how Jilin could be required to "request" a review of an indefinite entity that has yet to be "clarified" at the start of an administrative proceeding. *Cf. id.* § 351.213(b)(1) (emphasis added) ("*specified individual* exporters or producers covered by an order").

did.  The government of China was never asked to "cooperate," so it could not have failed to do

so.  In other words, "compliance" is not an issue in this case.

Both Commerce and the Federal Circuit have been mindful that the need to encourage

compliance can be combined with the primary goal of determining an accurate rate and thus avoid

rates that serve to punish a respondent.  *See Albemarle*, 821 F.3d at 1356 (citation omitted)

(administrative reviews should "be as accurate *and current* as possible").

An examination of the record further reveals that it is difficult to figure out just what

entities were under review (being examined) as well as the statutory authority to apply to Jilin the

China-wide rate.  *See* Final IDM at 10 ("Because [Jilin] has failed to rebut the presumption of

government control, it is subject to the same rate applicable to all members of the China-wide

entity that have not proven their independence from the state.").  The question of what entities

are actually under review is not one that is presenting itself here for the first time.  This Court has

questioned what type of rate Jilin's NME Entity rate actually is, given that the rates specified in

the antidumping statute for an "individually investigated" respondent and for the *all-others rate*

for those respondents "not individually investigated" are the only two rates explicitly authorized

by the statute.  *See, e.g.*, *Thuan An*, 42 CIT at ___, 348 F. Supp. 3d at 1351 ("That courts have

permitted Commerce to presume state control in an NME country does not address the problem

of Commerce lacking statutory authority for a country-wide rate that is neither an individually

investigated rate nor an all-others rate.  Although Defendant-Intervenors argued initially that the

country-wide rate in this case was indeed an individual rate, [Commerce] expressly denied that

the Vietnam-wide rate in this case is an individual rate."); *UCF Am. Inc. v. United States*, 20 CIT

320, 325-26, 919 F. Supp. 435, 440 (1996) ("Other than pointing to its current rationale for its

NME policy, including an example of application of a single country-wide 'all others' rate where

no company proved autonomy from the central government, Commerce has pointed to no authority for establishing a 'PRC rate' in lieu of an 'all others' rate."). Commerce has not stated the statutory authority for assigning Jilin the China-wide rate of 25.62 percent. [21]

Commerce has provided no reasoned explanation for its application of the NME Policy to mandatory respondent Jilin, nor has it provided a reasoned explanation for failing to calculate Jilin's rate as directed by statute and in light of its particular role in the Mandatory Respondent Exception. Therefore, on remand the Department shall calculate an antidumping duty rate for Jilin and use it in its construction of the all-others rate or provide a reasonable explanation for why it need not. Should the Department adopt the latter course, Commerce's explanation shall ensure that it has permitted Jilin, in advance of draft remand results and in accordance with 19 C.F.R. § 351.301(c)(4), to submit written argument with respect to the Department's inclusion of the *Aluminum Foil* proceeding on the record of this review, and shall take into consideration all relevant arguments presented by Jilin to Commerce on the issue of state control.

---

[21]     *Diamond Sawblades* and *Thuan An* do not direct a different result. *See Diamond Sawblades*, 866 F.3d at 1304; *Thuan An Production Trading & Service Co. v. United States*, 43 CIT __, 396 F. Supp. 3d 1310 (2019). In *Diamond Sawblades*, the parties did not raise, and the Court did not decide, whether the statute authorizes Commerce to apply a China-wide rate. *See Diamond Sawblades*, 866 F.3d at 1310 n.4 ("During oral argument, ATM clarified that it does not challenge Commerce's ability to apply a PRC-wide entity rate under the statutory framework."). In *Thuan An*, this Court rejected, as contrary to the statute, Commerce's determination that it had the authority to establish "a third type of rate, i.e., an NME-entity rate or country-wide rate," pursuant to 19 C.F.R. § 351.107(d), which Commerce viewed as neither "an individual rate [nor] an all-others rate." *Thuan An*, 43 CIT at __, 396 F. Supp. 3d at 1314 (citing 19 C.F.R. § 351.107(d)). After remand, the Court found sufficient, for purposes of compliance with its remand order, Commerce's "acknowledgement" in its redetermination, based on the facts of that case, that "the NME-entity rate in the underlying investigation was an individually investigated rate." *Id.* Neither case resolved the questions presented here, *i.e.*, just what entities were under review (being examined) as well as the statutory authority to apply to Jilin the China-wide rate.

In addition, should it endeavor to explain why it need not calculate an individual rate for Jilin, Commerce's explanation shall cover: (1) the role played by the Mandatory Respondent Exception and how the Mandatory Respondent Exception's purpose of establishing an accurate rate for Jilin and an accurate all-others rate is advanced by not calculating an individual rate for Jilin; (2) the purpose of the NME Policy and how the Policy's purpose is achieved by the application of the NME Policy to Jilin; (3) the statutory and/or regulatory basis for a request for review of the China-wide entity by Jilin; (4) the interplay of the NME Policy, the Mandatory Respondent Exception, and the purpose of the statute to determine accurate rates not only for Jilin but for all unexamined respondents subjected to the all-others rate; (5) because of its importance to determining whether the law directs Commerce to calculate an individual rate for Jilin, a specific statement as to whether and how Jilin was under review individually or as part of the China-wide entity; (6) an explanation as to why 19 C.F.R. § 351.212(c)(1) does not operate to continue Jilin's cash deposit rate, as the record seems to indicate that Commerce did not, apparently and/or completely, "review" Jilin; (7) the specific statutes the Department is construing with respect to both the NME Policy and the Mandatory Respondent Exception and any legal theories upon which it relies if it seeks deference for the construction of the statute; (8) an explanation of the Department's use of the various phrases "export functions," "export activities," and "company's operations," in particular a statement of the extent to which they differ or are synonymous, and a statement of the extent to which analysis of "export functions" is required as part of its *de facto* control analysis regarding Jilin, how that consideration affects its remand results, and how the phrase figures in this case; and (9) if Commerce should assign the AFA-inclusive China-wide rate to Jilin, then explain, with specificity, why it is reasonable to apply such an AFA-inclusive rate when Jilin has, apparently, been fully compliant in responding

to Commerce's requests for information and has not otherwise hindered or impeded the proceeding.  While Commerce may, on remand, cite to any cases it wishes, these cases cannot take the place of reasoned explanations.

## CONCLUSION and ORDER

In view of and in addition to the foregoing, Jilin's motion for judgment on the agency record is hereby granted, and this case is remanded to Commerce.  On remand, it is hereby:

**ORDERED** that Commerce shall reconsider the Final Results as directed by this Opinion and Order and submit a new determination upon remand ("Remand Redetermination") that complies with this Opinion and Order, is supported by substantial evidence, and is otherwise in accordance with law; and it is further

**ORDERED** that the Remand Redetermination shall be due ninety (90) days following the date of this Opinion and Order; any comments to the remand results shall be due thirty (30) days following the filing of the remand results; and any responses to those comments shall be filed fifteen (15) days following the filing of the comments.


_____/s/ Richard K. Eaton_____
Richard K. Eaton, Judge


Dated:       April 29, 2021
             New York, New York