A-570-970
Remand
Slip Op. 21-49
POR: 12/1/2015 – 11/30/2016
~~Business Proprietary Document~~
E&C/OVIII:  SB
**PUBLIC VERSION**

*Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*
**Slip Op. 21-49 (April 29, 2021), CIT Court No. 18-00191**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO REMAND ORDER**

## I.   SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the United States Court of International Trade's (CIT or the Court)

remand order in *Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*, Slip Op.

21-49 (April 29, 2021), CIT Court No. 18-00191 (*Remand Order*).  The *Remand Order* concerns

the *Final Results* of the 2015-2016 administrative review of the antidumping duty order on

multilayered wood flooring (MLWF) from the People's Republic of China (China) (the *Order*).[1]

In the *Remand Order*, the CIT held the following:  (1) Commerce's determination of *de facto*

government control of Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. (Jinqiao Flooring),

a cooperating mandatory respondent, lacks the support of substantial evidence and is not in

accordance with law; and (2) Commerce failed to explain how the application of its non-market

economy (NME) presumption to Jinqiao Flooring after the company was selected for individual

examination was in accordance with law and supported by substantial evidence.[2]

---

[1] *See Multilayered Wood flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015–2016*, 83 FR 35461 (July 26, 2018) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM); *see also Multilayered Wood Flooring from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 FR 76690 (December 8, 2011) (*Amended LTFV Final Determination and Order*).

[2] *See Remand Order* at 36.  The Court uses the terms "NME Policy" and "Mandatory Respondent Exception."  We address the use of these terms below.

With respect to the first issue, the Court held that Commerce did not provide Jinqiao Flooring a meaningful opportunity to respond to new factual information from the less-than-fair-value (LTFV) investigation of *Aluminum Foil from China*[3] relevant to its separate rate finding (specifically, the China NME Status Report) and directed Commerce to provide Jinqiao Flooring an opportunity to comment on the new factual information.  In addition, the Court posed a number of questions, discussed below, related to Commerce's determination of *de facto* government control of Jinqiao Flooring.  With respect to the second issue, the Court also posed a number of questions, discussed below, related to Commerce's application of its NME presumption to Jinqiao Flooring after the company was selected for individual examination.  We address each of the issues and the Court's questions below.

On July 22, 2021, the CIT heard oral arguments addressing the potential impact of the Court of Appeals for the Federal Circuit's (CAFC) recent holding in *China Manufacturers Alliance, LLC v. United States*, 1 F.4th 1028 (CAFC 2021) (*CMA*) on the *Remand Order*.[4]  In its subsequent order, the CIT held that, while the "holding in {*CMA*} certainly has some bearing on the way that Commerce may address the {*Remand Order* Instructions}, it does not compel any modification to the {*Remand Order* Instructions} themselves."[5]

On July 23, 2021, Commerce placed the China NME Status Report on the record, and provided parties an opportunity to comment and to submit rebuttal new factual information, in

---

[3] *See Certain Aluminum Foil from the People's Republic of China:  Notice of Initiation of Inquiry Into the Status of the People's Republic of China as a Nonmarket Economy Country Under the Antidumping & Countervailing Duty Laws*, 82 FR 16162 (April 3, 2017); and *Certain Aluminum Foil from the People's Republic of China:  Notice of Extension of Time for Public Comment Regarding Status of the People's Republic of China as a Nonmarket Economy Country Under the Antidumping & Countervailing Duty Laws*, 82 FR 20559 (May 3, 2017) (collectively, *Aluminum Foil from China*); *see also* Memorandum, "Aluminum Foil from the People's Republic of China: China's Status as a Non-Market Economy," dated Oct. 26, 2017 (China NME Status Report).
[4] *See Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*, CIT Court No. 18-00191, ECF No 54.
[5] *Id*. at 1.

accordance with 19 CFR 351.301(c)(4) and the CIT's instructions.[6]  Jinqiao Flooring submitted

no comments and no rebuttal new factual information concerning the China NME Status Report

in response to the opportunity afforded by Commerce, nor did it request an extension of time to

do so.  In addition, no other party commented or submitted rebuttal new factual information.

Finally, upon Commerce's motion, on August 4, 2021, the CIT ordered an extension of

time for Commerce to file its final results of redetermination.[7]

On October 7, 2021, we released the draft results to interested parties.[8]  On the day

comments on the draft results were due, Jinqiao Flooring requested an extension of time to file

comments on the draft results, which we granted, in part.[9]  We received timely-filed comments

from Jinqiao Flooring on October 19, 2021.[10]  No comments were submitted by other interested

parties.

Commerce provides its analysis for these final results of redetermination in Section II and

addresses Jinqiao Flooring's Comments in Section III.  As set forth below, in these final results

of redetermination, pursuant to the *Remand Order*, Commerce has reconsidered the *Final*

*Results*, taking into account the Court's *Remand Order* and Jinqiao Flooring's Comments.

Below we explain that:  (1) we continue to find that Jinqiao Flooring has failed to demonstrate its

eligibility for a separate rate and thus, is part of the China-wide entity; and (2) the application of

Commerce's NME presumption and the resulting China-wide entity rate to Jinqiao Flooring, as

---

[6] *See* Memorandum, "Remand Redetermination Concerning the 2015-2016 Administrative Review of Multilayered Wood Flooring from the People's Republic of China," dated July 23, 2021.
[7] *See Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*, CIT Court No. 18-00191, ECF No. 57.
[8] *See* Draft Results of Remand Redetermination, *Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*, Slip Op. 21-49 (April 29, 2021), CIT Court No. 18-00191.
[9] *See* Jinqiao Flooring's Letter, "Request for Extension of Time for Comments on Draft Remand Results"; and Commerce's Letter, "Multilayered Wood Flooring from the People's Republic of China; Draft Results of Redetermination Pursuant to Remand Order," both dated October 15, 2021.
[10] *See* Jinqiao Flooring's Letter, "Multilayered Wood Flooring from the People's Republic China:  Jinqiao Flooring's Comments on Commerce's Draft Results of Redetermination Pursuant to Remand Order," dated October 19, 2021 (Jinqiao Flooring's Comments).

part of the China-wide entity, in the *Final Results* is reasonable and in accordance with law.

Accordingly, we have made no changes to the *Final Results* for these final results of

redetermination.

## II.   REMANDED ISSUES

### A.   <u>Jinqiao Flooring's Separate Rate Status</u>

#### 1. Background

As explained in the *Preliminary Results*, Commerce considers China to be an NME

country.[11]  In accordance with section 771(18)(C)(i) of the Tariff Act of 1930, as amended (the

Act), a determination that a country is an NME country shall remain in effect until revoked by

the administering authority.  Since no party submitted a request to reconsider China's NME

status as part of this administrative review, Commerce continued to treat China as an NME

country in the *Final Results*.[12]

In a proceeding involving an NME country, Commerce maintains the rebuttable

presumption that all companies within the NME country are subject to government control and,

thus, should be assessed a single antidumping duty rate, *i.e.*, the NME presumption[13] (the Court

---

[11] *See Multilayered Wood Flooring from the People's Republic of China:  Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission of Review, in Part; 2015–2016*, 83 FR 2137 (January 16, 2018) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 8.

[12] *See Final Results* IDM.

[13] *See* Policy Bulletin 05.1:  Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries, available at http://enforcement.trade.gov/policy/bull05-1.pdf (Policy Bulletin 05.1); *see also Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part:  Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079, 53082 (September 8, 2006); *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances:  Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303, 29307 (May 22, 2006); and *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 FR 10457, 10458 (February 13, 2017) (*Initiation Notice*) ("In proceedings involving non-market economy (''NME'') countries, the Department begins with a rebuttable presumption that all companies within the country are subject to government control and, thus, should be assigned a single antidumping duty deposit rate. It is the Department's policy to assign all exporters of merchandise subject to an administrative review in an NME country this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.")

refers to this as the "NME Policy" in the *Remand Order*).[14]  It is, therefore, Commerce's policy to assign all exporters of the subject merchandise in an NME proceeding a single antidumping duty rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its export activities or functions.[15]  If an exporter cannot make such a demonstration, it will not qualify for a separate rate.  To establish whether a company is sufficiently independent to be entitled to a separate, company-specific rate, Commerce analyzes each exporter in an NME proceeding requesting a separate rate under the test established in *Sparklers*,[16] as amplified by *Silicon Carbide*,[17] and further clarified by *Diamond Sawblades*.[18]

In order to demonstrate its eligibility for a separate rate, Commerce requires that an exporter submit either a separate rate application (SRA) or a separate rate certification (SRC).  In general, a company for which a review was initiated and which, at the time of the initiation of the administrative review, has a separate rate, may submit an SRC rather than an SRA stating that it continues to meet the criteria for obtaining a separate rate.[19]  Further, if a company is issued an antidumping questionnaire, Commerce requires that a respondent provide the information

---

[14] *See Remand Order* at 3.

[15] *See* Policy Bulletin 05:1 at pages 1 and 2 of the PDF (using the terms "export activities" and "export functions" interchangeably).

[16] *See Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588 (May 6, 1991) (*Sparklers*).

[17] *See Notice of Final Determination of Sales at Less Than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994) (*Silicon Carbide*).

[18] *See Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China* (May 6, 2013) (*Diamond Sawblades*) in *Advanced Technology & Materials Co., Ltd. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012), sustained, *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd, Case No. 2014-1154 (CAFC 2014).  This remand redetermination is on the Enforcement and Compliance website at http://enforcement.trade.gov/remands/12-147.pdf; *see also Diamond Sawblades and Parts Thereof from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 77098 (December 20, 2013), and accompanying PDM at 7, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014), and accompanying IDM at Comment 1.

[19] *See Initiation Notice* at 82 FR 10458.

required to establish its eligibility for a separate rate as part of the response to section A of the questionnaire.[20]

Jinqiao Flooring submitted a timely SRC on March 14, 2017 in which, as noted by the CIT, Jinqiao Flooring reported having received a separate rate in the 2014-2015 administrative review and the LTFV investigation.[21]  Subsequently, on April 18, 2017, Commerce selected Jinqiao Flooring as one of two mandatory respondents, marking the first time since the issuance of the *Order* that Jinqiao Flooring had been selected as a mandatory respondent.[22]  Jinqiao Flooring responded to Commerce's initial and supplemental antidumping questionnaires and, on September 18, 2017, the Coalition for American Hardwood Parity, the petitioner in the underlying proceeding, submitted evidence that Jinqiao Flooring was [

---

[20] *See Remand Order* at 5 (citing Jinqiao Flooring's Letter, "Multilayered Wood Flooring from the People's Republic of China; Submission of Separate Rate Certification," dated March 14, 2017 (Jinqiao Flooring's SRC)); *see also Multilayered Wood Flooring from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value*, 76 FR 30656 (May 26, 2011) (*Preliminary LTFV Determination*), unchanged in *Multilayered Wood Flooring from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (October 18, 2011) (*Final LTFV Determination*); and *Amended LTFV Final Determination and Order*, 76 FR 76690.  Jinqiao Flooring also received a separate rate in the intermediate administrative reviews.  *See Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 26712 (May 9, 2014); *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Results of New Shipper Review; 2012– 2013*; and *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013–2014*, 81 FR 46899 (July 19, 2016).
[21] *See Remand Order* at 5 (citing Jinqiao Flooring's Letter, "Multilayered Wood Flooring from the People's Republic of China; Submission of Separate Rate Certification," dated March 14, 2017 (Jinqiao Flooring's SRC)); *see also Multilayered Wood Flooring from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value*, 76 FR 30656 (May 26, 2011) (*Preliminary LTFV Determination*), unchanged in *Multilayered Wood Flooring from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (October 18, 2011) (*Final LTFV Determination*); and *Amended LTFV Final Determination and Order*, 76 FR 76690.  Jinqiao Flooring also received a separate rate in the intermediate administrative reviews.  *See Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 26712 (May 9, 2014); *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Results of New Shipper Review; 2012– 2013*; and *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013–2014*, 81 FR 46899 (July 19, 2016).
[22] *See* Memorandum, "Selection of Respondents," dated April 7, 2017 (RSM); *see also* Commerce's Letter, "Respondent Selection," dated April 18, 2017 (denying Jinqiao Flooring's request to be de-selected as a mandatory respondent and noting that Jinqiao Flooring's comments regarding respondent selection were untimely and therefore rejected).

].[23]  As a result, Commerce issued its fourth supplemental questionnaire to Jinqiao Flooring requesting additional information regarding its shareholders, to which it responded on September 29, 2017.[24]  In this response, Jinqiao Flooring did not contest that two of its three shareholders, Chinese entities accounting for [      ] percent ownership in Jinqiao Flooring, were majority owned by the "[

      ]" ([    ]) of [                                        ]," a Chinese government entity, with minority ownership in each of these two shareholders being held by the [

                                        ].[25]  The third shareholder, accounting for the remaining [    ] percent ownership in Jinqiao Flooring, was held by the [                                        ], an entity which we determined was also under Chinese government control.[26]  Accordingly, we determined that "it is the government, through its majority equity ownership, that has the ability to control, and an interest in controlling, the operations of {Jinqiao Flooring}" and that Jinqiao Flooring had not, therefore, demonstrated an absence of *de facto* government control.[27]

## 2. Analysis

The *Remand Order* concludes that Commerce's determination of *de facto* government control over Jinqiao Flooring lacks the support of substantial evidence and is not in accordance with law.[28]  As indicated above, the Court held that Commerce must provide Jinqiao Flooring the

---

[23] *See* Petitioner's Letter, "Multilayered Wood Flooring from the People's Republic of China," dated September 18, 2017 (Petitioner's Letter).
[24] *See* Jinqiao Flooring's Letter, "Multilayered Wood Flooring from the People's Republic of China:  Submission of Fourth Supplemental Response," dated September 29, 2017 (SQR4).
[25] *See generally* SQR4.
[26] *Id.*; *see also Final Results* IDM at Comment 2; and the "Analysis" section below.
[27] *See* Memorandum, "Preliminary Separate Rate Analysis Memorandum for Jilin Forest Industry Jinqiao Flooring Group Co., Ltd.," dated January 2, 2018 (Separate Rate Analysis Memorandum); *see also Preliminary Results* PDM at 12-13.
[28] *See Remand Order* at 7.

opportunity to submit written argument on the China NME Status Report in accordance with 19 CFR 351.301(c)(4).[29]  On July 23, 2021, Commerce provided such opportunity and Jinqiao Flooring submitted no comments or rebuttal new factual information in response to the China NME Status Report.

The Court also held that, "there is little discussion of {government control of the respondent's export functions} in the *Final Results*, in particular how 'majority equity ownership' translates into control of export functions."  The Court held on remand that Commerce:

> {S}hall explain its use of the phrase, and state whether "export functions" are synonymous with "export activities" or "company's operations."  Further, Commerce shall state whether analysis of "export functions" is required as part of its *de facto* control analysis, and if so, how that consideration affects its remand results, and how the phrase figures in this case.  The Department shall also consider any relevant arguments presented by Jilin to Commerce on the issue of state control.[30]

We first address the Court's general questions regarding Commerce's *de facto* criteria relating to government control of a company's export functions.  Second, we address the Court's questions regarding Jinqiao Flooring.

### i. Criteria to Examine De Facto Government Control

Typically, in an NME proceeding, Commerce has considered four criteria in evaluating whether a respondent has affirmatively demonstrated an absence of government control in fact (*de facto*) over its export activities.[31]  These are:  (1) whether the respondent's export prices are set by or are subject to the approval of a governmental agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has

---

[29] *Id.* at 11-12.
[30] *Id.* at 12, 33-34.
[31] *See, e.g.*, *Preliminary Results* PDM at 11, unchanged in *Final Results*.

autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses.[32]  Commerce has determined that an analysis of the *de facto* control criteria is critical in determining whether an exporter should receive a separate rate.  When conducting our *de facto* separate rate analysis, Commerce asks an exporter requesting a separate rate questions regarding:  (1) ownership of the exporter and whether any individual owners hold office at any level of the NME government; (2) export sales negotiations and prices; (3) composition of company management, the process through which managers were selected, and whether any managers held government positions; (4) the disposition of profits; and (5) affiliations with any companies involved in the production or sale in the home market, third-country markets, or the United States of merchandise which would fall under the description of merchandise covered by the scope of the proceeding.[33]

Further, in response to the Court's question,[34] Commerce considers that the four *de facto* criteria and the related questions that appear in the SRA and SRC identified above constitute Commerce's analysis of "export functions" which is a required part of Commerce's *de facto* control analysis.  Further, in the context of examining separate rate eligibility in an NME proceeding, Commerce may use the terms "export functions" and "export activities" interchangeably to denote the tasks undertaken by a company in selling its merchandise outside its own country.  In addition, the term "company operations" generally refers the general operations of a company and encompasses a broad range of business activities, inclusive of export functions/activities, as well as management, board meetings, manufacturing, sales,

---

[32] *See, e.g.*, *Silicon Carbide*; and *Notice of Final Determination of Sales at Less Than Fair Value:  Furfuryl Alcohol from the People's Republic of China*, 60 FR 22544, 22545 (May 8, 1995).
[33] *See, e.g.*, Jinqiao Flooring's SRC.
[34] *See Remand Order* at 12, 33-34.

advertising, and marketing.

> ii. *Jinqiao Flooring's Request to Maintain a Separate Rate*

As identified above, Jinqiao Flooring submitted an SRC and information included in its response to section A of the original and supplemental questionnaires, upon which Commerce relied to perform its analysis concerning *de facto* government involvement in Jinqiao Flooring's export activities.[35]  As summarized above, this material informed our analysis of whether Jinqiao Flooring has affirmatively demonstrated an absence of *de facto* government control over its export activities and therefore rebutted the NME presumption detailed above.  Finding that Jinqiao Flooring was majority-owned by the Chinese government, indicating the government's potential to exercise control over Jinqiao Flooring's export activities, Commerce determined that Jinqiao Flooring had not made the requisite affirmative demonstration to rebut the NME presumption.  In addition, Commerce found that Jinqiao Flooring's arguments regarding the role played by the labor union in the selection of the board of directors and management did not demonstrate that Jinqiao Flooring was free from government control over its export activities.

As the Court noted, the crux of Commerce's separate rate analysis in the underlying review, *i.e.*, to determine whether a company in an NME country has affirmatively demonstrated an absence of *de facto* government control, centers on the implications of majority government ownership which speaks to a potential or ability to control, or an interest in controlling, the company.[36]  Accordingly, because Jinqiao Flooring is majority owned by the Chinese government, in the *Final Results*, we stated that:

> we have concluded that where a government entity holds a majority equity ownership, either directly or indirectly, in the respondent exporter, the majority

---

[35] *See, e.g.*, Jinqiao Flooring's Letter, "Multilayered Wood Flooring from the People's Republic of China; Submission of First Supplemental Response - Section A Questions," dated August 11, 2017 (SAQR); and SQR4.
[36] *See Zhejiang Machinery Import & Export Corp. v. United States*, Slip Op. 21-78 at 11 (June 23, 2021), CIT Court No. 19-00039 (*ZMC*) (citing *Sigma Corp v. United States*, 117 F.3d 1401, 1405-06 (CAFC 1997) (*Sigma*)).

ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the *company's operations*. This may include control over, for example, the selection of management, which is a key factor in determining whether a company has sufficient independence in its *export activities*.[37]

This potential or ability to exercise control, or interest in exercising control, over Jinqiao Flooring's company operations extends specifically to Jinqiao Flooring's export activities, including the selection of management, the setting of export prices, the negotiation and signature of contracts and other agreements, and decisions regarding the disposition of profits or losses. Specifically, the record reflects that Jinqiao Flooring's shareholders appoint the Board of Directors who have the right to "appoint or dismiss the general manager," and "according to nomination of the general manager, to appoint or dismiss the vice general manager, financial manager..."[38] Thus, through their appointment of the Board of Directors, Jinqiao Flooring's shareholders *i.e.*, its government shareholders, have the ability and potential to control, and interest in controlling, the company's operations, including Jinqiao Flooring's export activities.

Thus, under such circumstances, Jinqiao Flooring has failed to rebut the presumption that the Chinese government has a potential, ability, interest, *etc.* in controlling the company in its export activities. In other words, Jinqiao Flooring has failed to demonstrate that the Chinese government *does not* have such potential, ability, interest, etc.[39] Further, it is consistent with case law recognizing that Commerce's conclusion that a respondent failed to rebut the presumption of control where the government has the potential to exercise control as a majority owner "does not require a showing of actual control, but simply a potential for government

---

[37] *See Final Results* IDM at Comment 2 (emphasis added).
[38] *See* SQR4.
[39] *See ZMC*, Slip. Op. 21-78 at 12 ("Thus, because the burden is on a separate rate applicant to show that there is no potential for government control, ZMC's various arguments that Commerce needed to show actual control are unpersuasive.")

control" and that requiring such a showing would "erroneously reverse the burden of rebutting the presumption of government control."[40]

Moreover, no record evidence indicates that Jinqiao Flooring's majority government shareholders do not have the ability or potential to control and interest in controlling company operations related to Jinqiao Flooring's export activities. In fact, although *not* required to demonstrate actual government control under the presumption of government control, Commerce did state that evidence on the record demonstrated that the majority shareholders exercised their ability to control Jinqiao Flooring's operations, as its board of directors were required to convene and report to the shareholders, *i.e.*, including its government shareholders.[41] Further, as noted in the underlying administrative review, the "Company Law of China" specifically allows a majority owner to exercise control over its holding.[42] While Jinqiao Flooring did not dispute that it is majority owned by the government, in the *Final Results,* it argued that a labor union, which Jinqiao Flooring claimed was a non-governmental organization, controlled the company by appointing three of the five board of directors and two of three supervisors.[43] However, this does not rebut the presumption of control, because the labor union is controlled by the government. Commerce determined, as articulated in the China NME Status Report, that in China, "{l}abor unions are under the control and direction of the All-China Federation of Trade Unions (ACFTU), a government-affiliated and {Chinese Communist Party} CCP organ."[44] Further, we affirm our findings, based on the China NME Status Report, that (1) the ACFTU has a legal monopoly on all trade union activities; (2) the Chinese government prohibits independent unions;

---

[40] *Id.* at 11.
[41] *See Final Results* IDM at Comment 2
[42] *See* Jinqiao Flooring's Separate Rate Analysis Memorandum (citing SAQR at Appendix A-2, "Foreign Trade Law of the People's Republic of China").
[43] *See* SQR4; *see also* Jinqiao Flooring's Letter, "Multilayered Wood Flooring from the People's Republic of China: Submission of Administrative Case Brief," dated February 28, 2018 at 2 – 4.
[44] *See Final Results* IDM at Comment 2 (citing China NME Status Report at 5).

and (3) the ACFTU presides over a network of subordinate trade unions.[45]

Lastly, Jinqiao Flooring has not rebutted the findings from the China NME Status Report, including that a labor union within China functions as an instrument of the government to exercise control.  In the *Final Results*, Commerce relied upon the China NME Status Report to reject Jinqiao Flooring's argument that the authority of a labor union to appoint a majority of board members and management negated the majority ownership of [      ].  In the *Remand Order*, the Court directed Commerce to provide the opportunity to interested parties to provide comment and rebuttal new factual information concerning the China NME Status Report.  No comment or rebuttal new factual information was submitted, including from Jinqiao Flooring. Further, the CIT has upheld as sufficient Commerce's findings articulated in the China NME Status Report that all labor unions in China are controlled by the government.[46]

Accordingly, while Commerce has reexamined and further explained the *Final Results*, it maintains its determination that the government has a potential and an ability to control, and an interest in controlling, Jinqiao Flooring's various activities including its export activities/functions.  Thus, Jinqiao Flooring has not satisfied its burden of demonstrating that it is free from *de facto* government control.  Additionally, in response to comments from Jinqiao Flooring, discussed below, we have further clarified that the record supports a finding that Jinqiao Flooring is wholly owned by the government.

**B.      Commerce's Application of the China-Wide Rate to Jinqiao Flooring**

### 1. Background

On February 13, 2017, Commerce initiated an administrative review under section 751(a) of the Act for 115 producers and exporters of MLWF, covering the period December 1, 2015,

---

[45] *See* China NME Status Report .
[46] *See ZMC*, Slip. Op. 21-78 at 7.

through November 30, 2016.  On April 1, 2017, Commerce issued its RSM.  Finding that "the number of exporters and producers identified in this administrative review constitutes a large number relative to the resources available{,}" Commerce determined that it was not practicable to determine individual weighted-average dumping margins for each known exporter and producer involved in the review under section 777A(c)(2) of the Act.[47]  Further, Commerce determined to select the exporters or producers accounting for the largest volume of subject merchandise that Commerce could reasonably examine, in accordance with section 777A(c)(2)(B) of the Act and 19 CFR 351.204(c)(2).  Based on the U.S. Customs and Border Protection (CBP) entry data and other available information on the record, Commerce selected, in alphabetical order, Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. and Jinqiao Flooring as mandatory respondents.[48]

Subsequent to selecting Jinqiao Flooring as a mandatory respondent, as explained above, Commerce conducted a separate rate analysis based on the information submitted by Jinqiao Flooring in its questionnaire responses and determined that the company had not demonstrated its independence from government control with respect to its export activities, and, therefore, had failed to rebut the NME presumption (as stated above, the Court refers to this as the "NME Policy" in the *Remand Order*).  As a result, Jinqiao Flooring had not demonstrated that it was independent from the China-wide entity, an entity that was not under review in the immediate administrative review because there had been no request for review of the entity.  Therefore, Jinqiao Flooring was not eligible for its own individual rate and, as part of the China-wide entity, was assigned the rate for the China-wide entity – a rate which was not subject to change in the instant administrative review.

---

[47]*See* RSM.
[48] *Id.*

## 2.  Analysis

As discussed further below, the Court held that Commerce failed to explain how the application of its NME presumption to Jinqiao Flooring (and the resulting application of the China-wide entity rate to Jinqiao Flooring) is in accordance with law and supported by substantial evidence.[49]  The Court further held that "on remand the Department shall calculate an antidumping duty rate for Jilin and use it in its construction of the all-others rate or provide a reasonable explanation for why it need not."[50]  The Court also provided a list of questions related to various aspects of Commerce's practice and the application of the China-wide entity rate to Jinqiao Flooring.[51]  We address these issues below.

### i.  Limited Examination, Non-Selected Rate, and NME Presumption

The Court first posed a series of questions related to, in the Court's terminology, the "Mandatory Respondent Exception" (*i.e.*, "limited examination"), the "NME Policy" (*i.e.*, "NME presumption") and the "all others rate" (*i.e.*, the weighted-average dumping margin determined for non-examined companies that are eligible for a separate rate) asking Commerce to explain:

> (1) the role played by the Mandatory Respondent Exception and how the Mandatory Respondent Exception's purpose of establishing an accurate rate for Jilin and an accurate all-others rate is advanced by not calculating an individual rate for Jilin {*i.e.*, Jinqiao Flooring};
>
> (2) the purpose of the NME Policy and how the Policy's purpose is achieved by the application of the NME Policy to Jilin {*i.e.*, Jinqiao Flooring};
> ***
>
> (4) the interplay of the NME Policy, the Mandatory Respondent Exception, and the purpose of the statute to determine accurate rates not only for Jilin {*i.e.*, Jinqiao Flooring} but for all unexamined respondents subjected to the all-others rate;
> ***

---

[49] *See Remand Order* at 12-35.
[50] *Id.* at 33.
[51] *Id.* at 34-35.  We address the Court's eighth question regarding Commerce's *de facto* control analysis in Section II.A, above.

(7) the specific statutes the Department is construing with respect to both the NME Policy and the Mandatory Respondent Exception and any legal theories upon which it relies if it seeks deference for the construction of the statute{.}[52]

Because these questions deal with similar issues, we address them together, beginning with an overview of Commerce's broad authority under the statutory scheme; the purpose of Commerce's NME presumption and the interplay with "limited examination" of all known producers and exporters under section 777A(c)(2) of the Act; and the relevant legal theories regarding deference to the agency. We then turn to the application of Commerce's NME presumption, and the corresponding rate for the China-wide entity applied to Jinqiao Flooring. Lastly, we discuss the implications of these issues for the rate for the non-examined (separate rate) companies.

Section 731 of the Act states that, if Commerce determines that a "class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value," and the International Trade Commission finds a domestic industry is being injured as a result of dumping, "there shall be imposed upon such merchandise an antidumping duty." Furthermore, sections 735(a)(1) and 735(c)(1)(B)(i) of the Act state that if Commerce makes an affirmative final determination of sales at LTFV in an investigation, then Commerce "shall (I) determine the estimated weighted average dumping margin for each exporter and producer individually investigated, and (II) determine, in accordance with {section 735(c)(5)}, the estimated all-others rate for all exporters and producers not individually investigated."

Section 751(a)(1) of the Act provides that if a request for review has been received, Commerce shall "review, and determine (in accordance with {section 751(a)(2) of the Act}, the

---

[52] *Id.* at 34.

amount of any antidumping duty{.}"  Section 751(a)(2) of the Act provides that Commerce shall determine "(i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry."

Section 777A(c)(1) of the Act, applicable to investigations and reviews, directs Commerce to determine an individual weighted-average dumping margin for each known exporter and producer of the subject merchandise.  However, when Commerce is faced with a large number of producers or exporters, and Commerce determines it is not practicable to individually examine all companies, section 777A(c)(2) of the Act provides an exception to section 777(A)(c)(1) of the Act and authorizes Commerce to determine the weighted-average dumping margin for a reasonable number of such companies by limiting its examination under section 777A(c)(2)(A) or (B).  The Court refers to this as the "Mandatory Respondent Exception" in the *Remand Order*.  For purposes of this remand redetermination, we generally refer to this as "limited examination" of all known producers and exporters pursuant to section 777A(c)(2) of the Act.

As described by the CAFC, there exists a general statutory recognition of a "close correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources."[53]  This is evident in various provisions of the Act, including section 771(18) of the Act (providing the definition of an NME) and section 773(c) of the Act (providing special rules for the determination of normal value if the subject merchandise is exported from an NME).  The CAFC has also recognized that Commerce has "broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate."[54]

In light of its broad authority, and the general recognition under the statute of the

---

[53] *See Sigma*, 117 F.3d at 1405-06 (citing section 771(18)(B)(iv)(v)).
[54] *Id.* at 1402.

distinctions between a market economy country and an NME country, further explained below, Commerce has developed a longstanding practice, codified in regulation, of applying a single rate to all exporters in an NME country who are unable to demonstrate independence from the government.  Section 351.107(d) of Commerce's regulations, entitled "Rates in antidumping proceedings involving nonmarket economy countries," states:  "In an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."[55]  According to the CAFC in its recent *CMA* decision, "binding cases (too numerous to list in their entirety) have uniformly sustained Commerce's recognition of an NME-wide entity as a single exporter for purposes of assigning an antidumping rate to the individual members of the entity."[56]

The NME presumption itself (what the Court refers to as the "NME Policy"), as explained in detail above, provides that exporters that do not demonstrate independence from government control with respect to their export activities do not qualify for an antidumping duty rate separate from the NME-wide entity.[57]  The NME presumption, although itself not specifically codified by regulation, lay at the heart of Commerce's practice and corresponding regulation of applying a single rate to the NME-wide entity which is composed of individual exporters who do not qualify for a separate rate.  The NME presumption and application of a

---

[55] *See also Antidumping Duties; Countervailing Duties*, 61 FR 7308, 7311 (February 27, 1996) ("In addition, the second sentence of the definition clarifies that in an antidumping proceeding involving imports from a nonmarket economy ('NME') country, the Secretary may calculate a single dumping margin applicable to all exporters and producers.  Because the government of an NME country may control export activities, the Department currently presumes that a single rate will apply, but allows individual exporters or producers to receive their own separate rates if they can demonstrate independence from the NME government.")

[56] *CMA*, 1 F.4th at 1036-37 (citing *Michaels Stores, Inc. v. United States*, 766 F.3d 1388, 1390-91 (CAFC 2014)).

[57] The NME presumption provides an individual company the opportunity to demonstrate its independence from government control with respect to its export activities such that it may be entitled to a separate rate.  Commerce's separate rate analysis examines government ownership and control over the decision-making process related to export activities/functions on a company-specific basis.  *See also*, e.g., *Final Determination of Sales at Less Than Fair Value:  Certain Cut-to-Length Carbon Steel Plate from Ukraine*, 62 FR 61754, 61757 (November 19, 1997).

https://enforcement.trade.gov/policy/bull05-1.pdf

single antidumping duty rate to the NME-wide entity, both individually and taken together, have

been affirmed by the CAFC:

> Our court has previously approved Commerce's application of a presumption of
> government control over exporters in NME countries, as well as Commerce's use
> of a single antidumping rate for an NME-wide entity composed of companies that
> have not demonstrated their independence from government control.[58]

Commerce's NME presumption and use of a single antidumping duty rate for the NME-

wide entity are consistent with a general statutory recognition of a "close correlation between a

nonmarket economy and government control of prices, output decisions, and the allocation of

resources."[59]  Indeed, in the case of China, Commerce has recently affirmed that the Chinese

economy does not operate sufficiently on market principles to permit the use of Chinese prices

and costs for purposes of Commerce's antidumping analysis.  The basis for Commerce's

conclusion is that the state's role in the economy and its relationship with markets and the private

sector results in fundamental distortions in China's economy.[60]

Thus, were Commerce to apply numerous individual rates to companies within a state-

controlled economy, where the state is presumed to control export activities of such companies

and where there has been no demonstration of independence from the government, this would

allow for the potential manipulation of price or production related to such exports.  Allowing for

such potential manipulation, by assigning numerous individual rates to companies who have

---

[58] *See CMA*, 1 F.4th at 1030-31 (citing *Sigma*, 117 F.3d at 1405-06); *id.* at 1032 ("Commerce's policy, which we have approved, is that exporters that fail to demonstrate independence from government control do not qualify for a separate rate.") (citing *Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (CAFC 2002)).

[59] *See Sigma*, 117 F.3d at 1405-06 (citing section 771(18)(B)(iv)(v)); *see also Iron Construction Castings from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 56 FR 2742, 2744 (January 24, 1991) ("Our determination that the PRC is a state-controlled economy in which all entities are presumed to export under the control of the state leads us to question the application of multiple rates, absent a clear showing of legal, financial and economic independence.  Thus, we conclude that a single country-wide rate is appropriate for this case.  We have determined one weighted-average margin for each review period for all exports from the PRC of iron construction castings."); and *Sparklers* ("We have determined that exporters in nonmarket economy countries are entitled to separate, company-specific margins when they can demonstrate an absence of central government control, both in law and in fact, with respect to exports.")

[60] *See* China NME Status Report at 4.

failed to demonstrate their independence from common government control, would undermine Commerce's goals of determining an accurate weighted-average dumping margin for each company.  Further, as a matter of basic logic, and as recognized by the CAFC across numerous factual scenarios, it is reasonable to apply the same antidumping duty rate to all members of the same NME-wide entity.[61]  In this respect, Commerce has applied its NME presumption and use of a single antidumping duty rate for the NME-wide entity to a mandatory respondent who:  1) is selected for individual examination where Commerce has limited examination under section 777A(c)(2) of the Act; and 2) has failed to demonstrate its independence from the government. This application is reasonable in light of Commerce's policy goals of determining the same rate for all members of the same NME-wide entity to prevent potential manipulation of weighted-average dumping margins, thus ensuring accuracy in Commerce's dumping calculations.

In short, as highlighted above, Commerce's NME presumption (a policy developed over years of practice) and use of a single antidumping duty rate for the NME-wide entity, as provided for by regulation, taken together, are a reasonable exercise of Commerce's "broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate."[62]

In its *Remand Order*, the Court defined Commerce's "NME Policy" as Commerce's

---

[61] *See Transcom, Inc. v. United States*, 294 F.3d 1371, 1381 (CAFC 2002) ("If the producers are assumed from the outset to be part of the NME entity, then Commerce's conclusion that the NME entity is subject to a BIA-based rate logically requires Commerce to apply the same BIA-based rate to all other producers within the scope of the review that have not proved their independence of the state."); *see also Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1313 (CAFC 2017) ("Because ATM failed to rebut the presumption of government control, Commerce's conclusion that the PRC-wide entity is subject to an AFA-based rate logically requires Commerce to apply the same AFA-based rate to all members of the PRC-wide entity that have not proven their independence from the state, including ATM.")

[62] *See Sigma*, 117 F.3d at 1402 ("D & L questions the applicability of the presumption of state control as applied to the PRC, and particularly to a company operating in Guangdong province in the late 1980s.  Commerce, however, has broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate. *See Torrington Co. v. United States*, 68 F.3d 1347, 1351 (CAFC 1995).  We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control.")

practice of "applying a rebuttable presumption that all companies within a nonmarket economy country are controlled by the government of that country."[63]  The Court also held that the CAFC has only examined the NME presumption on a case-by-case basis and the NME presumption is entitled "no deference" in review of its lawfulness.[64]  However, the CAFC has sustained the lawfulness of Commerce's NME rebuttable presumption (*i.e.*, the "NME Policy").[65]  The CAFC has also sustained Commerce's use of a single rate applied to the NME-wide entity, *i.e.*, to exporters and producers that fail to rebut the presumption of control.[66]  Here, Commerce is using the NME presumption and single antidumping duty rate for the NME-wide entity in accordance with its practice and precedential case law.

Whether an exporter has rebutted the presumption of government control is a factual inquiry such that a court's evaluation of the lawfulness of Commerce's determination to deny or grant a separate rate will vary from case to case.  However, such case-by-case factual variations do not impact the lawfulness of Commerce's practice to place a presumption of government control on exporters in an NME proceeding, and to determine for those companies that fail to rebut the presumption of government control a single antidumping duty rate.[67]  This is evident in the broad language the CAFC has recently used in *CMA*, again sustaining the NME presumption

---

[63] *See Remand Order* at 20.

[64] *Id.* at 25 (holding that the CAFC has only "sustained the Policy's use before the facts before it{.}"); *id.* at 27 ("{W}hile the Policy's use has been confirmed by the courts in specific factual situations, no court may provide the explanation for its lawful use in any case where the Department has not supplied one itself."); *id.* at 28-29 ("{A} policy lacking any clear expression of why an agency has chosen to implement a statute in a particular manner is entitled no deference.")

[65] *See Sigma*, 117 F.3d at 1401, 1405-06 (holding that the employment of the presumption of state control for exporters in a nonmarket economy was within Commerce's authority); *see also CMA*, 1 F.4th at 1030 ("Our court has previously approved Commerce's application of a presumption of government control over exporters in NME countries . . . . ")

[66] *See CMA*, 1 F.4th at 1036-37 ("binding cases (too numerous to list in their entirety) have uniformly sustained Commerce's recognition of an NME-wide entity as a single exporter for purposes of assigning an antidumping rate to the individual members of the entity.") (citing *Michaels Stores, Inc. v. United States*, 766 F.3d 1388, 1390-91 (CAFC 2014)).

[67] *Id.*

and use of a single rate for the China-wide entity.[68]

Accordingly, in Commerce's view, these issues are settled as a matter of law,[69] and, as such, Commerce's use of the NME presumption in this review is consistent with law.  In addition, the CIT has recognized that "decisions of the Court of Appeals for the Federal Circuit bind this Court, unless overruled by an *en banc* decision by that court or by the Supreme Court."[70]

Lastly, to the extent the Court takes issue with the fact that Commerce has not codified the NME presumption through regulation,[71] we recognize that Commerce can be owed deference under *Chevron* even if a practice is not adopted by notice and comment rulemaking.[72]  Further, not only has the NME presumption and use of a single antidumping duty rate for the NME-wide entity been affirmed by the CAFC, but Commerce has described these policies in detail in the context of its administrative proceedings[73] and in adopting its regulation 19 CFR 351.107(d).[74] Therefore, we respectfully disagree with the Court that Commerce's NME presumption is "lacking any clear expression of why {the} agency has chosen to implement a statute in a particular manner" and "is entitled no deference."[75]

We next address the application of Commerce's NME presumption, and the

---

[68] *Id.* at 1039-40.

[69] *See Viraj Forgings, Ltd. v. United States*, 283 F. Supp. 2d 1335, 1342 (CIT 2003) ("Commerce considers the legal interpretations of prior antidumping and countervailing duty determinations precedential."); *id.* at 1353 ("Precedent, unless inapplicable or properly invalidated, binds this court and Commerce.")

[70] *See Aireko Construction, LLC v. U.S.*, 425 F.Supp.3d 1307 (CIT 2020) (citing *Cemex, S.A. v. United States*, 384 F.3d 1314, 1321 n.5 (CAFC 2004)).

[71] *See Remand Order* at 28.

[72] *See Barnhart v. Walton*, 535 U.S. 212, 221 (2002) (holding that an agency is entitled *Chevron* deference even where its interpretation is adopted in means less formal than notice and comment rulemaking) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984) (*Chevron*)); *see also United States v. Mead Corp.*, 533 U.S. 218, 230-231 (2001) (pointing to instances in which the Court has applied *Chevron* deference to agency interpretations that were not a product of notice-and-comment rulemaking).

[73] *See, e.g.*, *Sparklers*; and *Silicon Carbide*.

[74] *See, e.g.*, *Antidumping Duties; Countervailing Duties*, 61 FR 7308, 7311 (February 27, 1996).

[75] *See Remand Order* at 28-29.

corresponding rate for the China-wide entity, to Jinqiao Flooring, beginning with the establishment of the single weighted-average dumping margin for the China-wide entity.  Here, in the underlying investigation,[76] numerous companies failed to respond to Commerce's quantity and value (Q&V) questionnaire, and Commerce treated these non-responsive companies as part of the China-wide entity because they did not demonstrate their eligibility for a separate rate.  As a result, because the China-wide entity was asked to respond to the Q&V questionnaire and failed to respond, and also failed to cooperate to the best of its ability, Commerce relied on the application of facts available with an adverse inference under section 776 of the Act in assigning a single weighted-average dumping margin to the China-wide entity.  The rate for the China-wide entity (based on the NME presumption and Commerce's use of a single rate NME entity rate) determined in the investigation constitutes an "individually-investigated" weighted-average dumping margin within the meaning of section 735(c)(1)(B)(i)(I) of the Act.[77]

With respect to the rate determined for the China-wide entity, this rate, contrary to the Court's information, is not "always based on AFA."[78]  The Court appears to draw this conclusion based on the reasoning that Commerce is applying "an AFA 'policy' rate" to a cooperative respondent because of the respondent's inability to rebut the presumption of state control rather than:  "(1) finding a 'gap' in the *individual* factual record of the respondent that would justify the use of facts available, and *without* (2) finding a *failure* in the *behavior* of the respondent justifying the use of an adverse inference."[79]  As an initial matter, as explained above, the rate

---

[76] *See Preliminary LTFV Determination*, 76 FR 30656, unchanged in *Final LTFV Determination*, 76 FR 64318; *see also Amended LTFV Final Determination and Order*, 76 FR 76690.

[77] *See CMA*, 1 F.4th at 1037 ("The PRC-wide entity rate resulting from Commerce's initial investigation constitutes an 'individually investigated' weighted average dumping margin within the meaning of § 1673d(c)(1)(B)(i)(I) because 'Commerce treats the companies comprising the China-wide entity as a single entity and investigated them as such in the original investigation.'") (internal citations omitted).

[78] *See Remand Order* at 25.

[79] *Id.* at 25-26 (emphasis in the original).

assigned to the NME-wide entity in a particular investigation is based on the factual record of

that investigation.  As discussed further below, this rate will remain in effect until revised in an

administrative review.  Where there is missing record information concerning the NME-wide

entity, and the NME-wide entity has been found not to have provided requested information and

not acted to the best of its ability to provide such information, Commerce has, pursuant to section

776(a) and (b) of the Act, determined the estimated weighted-average dumping margin for the

NME-wide entity based on AFA.  In the underlying LTFV investigation of this proceeding, the

China-wide entity was found not to have cooperated by not providing requested information, and

accordingly, Commerce relied on AFA for the *Final LTFV Determination* with respect to the

China-wide entity.[80]

     In other LTFV investigations, the estimated weighted-average dumping margin for the

NME-wide entity has not been based on AFA.  For example, in *Copper Pipe and Tube from

Vietnam*, Commerce found that the Vietnam-wide entity had cooperated with Commerce's

request for information, and the estimated weighted-average dumping margin for the Vietnam-

wide entity was determined to be the same rate as that calculated for the mandatory respondent,

which was also the same rate determined for the non-examined separate rate companies

consistent with section 735(c)(5)(A) of the Act.[81]  In *53-Foot Containers from China*, Commerce

not only found that the China-wide entity cooperated with its requests for information, but also

calculated an estimated weighted-average dumping margin for the companies which comprised

---

[80] *See Final LTFV Determination.*

[81] *See Seamless Refined Copper Pipe and Tube from the Socialist Republic of Vietnam:  Preliminary Affirmative Determination of Sales at Less Than Fair Value and Preliminary Negative Determination of Critical Circumstances*, 86 FR 7698 (February 1, 2021), and accompanying PDM, unchanged in *Seamless Refined Copper Pipe and Tube from the Socialist Republic of Vietnam:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 86 FR 33228 (June 24, 2021) (*Copper Pipe and Tube from Vietnam*), and accompanying IDM; *see also Welded Stainless Pressure Pipe from the Socialist Republic of Vietnam:  Final Determination of Sales at Less Than Fair Value*, 79 FR 31092 (May 30, 2014).

the China-wide entity.[82]  As with a rate for the NME-wide entity based on AFA, these rates

would remain in effect until revised as part of an administrative review of the NME-wide entity.

We turn next to the application of the NME presumption and the rate for the China-wide

entity to Jinqiao Flooring in the instant administrative review.  In this review, we relied on

section 777A(c)(2) of the Act to limit our examination and selected Jinqiao Flooring for

individual examination as one of two mandatory respondents from among the numerous

companies for which we initiated an administrative review.[83]  As explained above, subsequent to

selecting Jinqiao Flooring as a mandatory respondent, Commerce determined that record

evidence demonstrated that Jinqiao Flooring was not eligible for a separate rate.  Accordingly,

Jinqiao Flooring was found to be part of the China-wide entity.  The application of the rate for

the China-wide entity to Jinqiao Flooring was the result of Jinqiao Flooring's inability to

demonstrate its independence from Chinese government control and not for a failure to cooperate

with Commerce's examination of Jinqiao Flooring as a mandatory respondent in the instant

administrative review.

---

[82] *See 53-Foot Domestic Dry Containers from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value; Preliminary Negative Determination of Critical Circumstances; and Postponement of Final Determination and Extension of Provisional Measures*, 79 FR 70501 (November 26, 2014), and accompanying PDM; and *53-Foot Domestic Dry Containers from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value; Final Negative Determination of Critical Circumstances*, 80 FR 21203 (April 17, 2015) (collectively, *53-Foot Containers from China*).

[83] The Court appears to raise a potential concern with Commerce's limited examination and initially selecting two companies for individual examination, but, as noted by the Court, no party has challenged these issues.  *See Remand Order* at 20 n. 13.  Therefore, we have not further addressed these issues in this redetermination.  The Court also discusses, in *dicta*, that Commerce has "more recently declined to name a mandatory respondent replacement when it became clear that a chosen mandatory entity would not participate or is otherwise excluded from examination."  *See Remand Order* at 16.  Like Commerce's initial decisions of whether to limit examination and the number of respondents it can reasonably examine in light of its resources, a subsequent decision by Commerce of whether to select an additional mandatory respondent will be based on the circumstances of an individual case.  We note that in numerous cases in recent years, Commerce has in fact selected one or more additional mandatory respondents where the facts warranted such selection and in light of Commerce's available resources and deadline restrictions.  *See, e.g.*, *Certain Collated Steel Staples from the People's Republic of China:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 84 FR 61021 (November 12, 2019), and accompanying PDM at 2 (noting that, at the request of the petitioner, Commerce selected an additional mandatory respondent to replace a mandatory respondent that did not respond to the initial questionnaire).

In an administrative review, Commerce is directed to "review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty."[84]  Section 751(a)(2) of the Act describes that, in calculating the amount of the antidumping duty, Commerce must determine a dumping margin for "each entry of the subject merchandise for producers or exporters *for which a review was requested*."[85]  Consistent with section 751 of the Act, if a review is requested of the NME-wide entity in an administrative review, under its current practice (which was in effect at the time of this review), Commerce will review the NME-wide entity and determine a rate potentially different from the rate determined in the underlying investigation.[86]  However, when no request to review the NME-wide entity is filed with Commerce, as was the case in the instant administrative review, Commerce does not reexamine the rate applied to the NME-wide entity, but instead "carries forward" the rate for the NME-wide entity as determined in a prior segment of the proceeding (*e.g.*, the investigation).  This rate will be applied to companies for which a review has been requested and who have failed to demonstrate their independence from the government, including mandatory respondents selected for individual examination where Commerce has limited examination under section 777A(c)(2) of the Act and where the mandatory respondent has failed to demonstrate its eligibility for a separate rate.[87]

Although the antidumping statute (*i.e.*, sections 751(a) and 777A(c) of the Act) does not specify whether the rate from the investigation or a completed review may be carried forward to subsequent periods of review in an NME proceeding, the Act does not prohibit this practice, and

---

[84] *See* section 751(a)(1)(B) of the Act.
[85] *See* section 751(a)(1) of the Act (clarifying that section 751(a)(1)(B) and (a)(2) apply "if a request for such a review has been received") (emphasis added).
[86] *See Antidumping Proceedings:  Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 FR 65963, 65970 (November 4, 2013) (*2013 Change in Practice*).
[87] *Id.*

Commerce has employed this practice in numerous reviews.[88]  Commerce's interpretation of the antidumping statute to permit this methodology was within its discretion as the agency charged with implementing the antidumping statute.[89]

Further, as discussed above, this interpretation is reasonable in light of Commerce's policy goals of determining the same rate for all members of the same NME-wide entity to prevent potential manipulation of dumping margins, thus ensuring accuracy in Commerce's dumping calculations.  Had Commerce calculated a separate individual weighted-average dumping margin for Jinqiao Flooring, even though Jinqiao Flooring had failed to rebut the NME presumption and demonstrate its independence from the China-wide entity, this would have constituted an impermissible separate rate applied to a government-controlled entity contrary to the policy reasons underlying the NME presumption and use of a single rate for the NME-wide entity.  As such, the application of the NME presumption to Jinqiao Flooring achieves the purpose of Commerce's policy.  The alternative (*i.e.*, granting a company that had not demonstrated independence from the government a different individual rate based exclusively on its own data simply because that company was selected as a mandatory respondent), would undermine Commerce's policy goals and run contrary to Commerce's longstanding practice for determining a single rate for the NME-wide entity.

Further evincing the lawfulness of assigning to Jinqiao Flooring the rate for the China-wide entity, this practice has been expressly upheld by the CAFC in similar circumstances. Specifically, the CAFC in *CMA* recently upheld Commerce's authority to find that a cooperative, mandatory respondent is not eligible for a separate rate, and, therefore, is part of the NME-wide

---

[88] *See, e.g.*, *CMA*, 1 F.4th at 1037-38.
[89] *See Sigma*, 117 F.3d at 1402 (Commerce "has broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate.")

entity.  In particular, the CAFC held that:  (1) the rate for the NME-wide entity may be based on an "individually investigated" rate within the meaning of section 735(c)(1)(B)(i)(I) of the Act; (2) "Commerce may permissibly assign such a rate to the unitary group of exporters in an NME country that have failed to rebut the presumption of government control;" (3) "{t}his rate may be based in whole or in part on {facts available} or AFA;" and (4) "Commerce may carry forward an initial NME entity rate, including adverse inferences built into that rate, in subsequent administrative reviews."[90]  The CAFC's holdings establish that Commerce was not required in the instant review to calculate an individual weighted-average dumping margin for Jinqiao Flooring, and appropriately applied the existing weighted-average dumping margin for the China-wide entity.  The rate for the China-wide entity represents an accurate rate for Jinqiao Flooring as a part of the China-wide entity because it failed to rebut the presumption of government control over its export activities.  As such, with respect to the antidumping duty rate applied to Jinqiao Flooring as part of the China-wide entity, Congress's intent that Commerce calculate accurate rates in administrative reviews[91] was achieved in the underlying administrative review.

Lastly, with respect to the "all-others rate," as described above, the statute does not expressly apply to either the NME-wide entity or to the companies not selected for individual examination in a review under section 751 of the Act.  Commerce only calculates an "all-others" rate in a market economy LTFV investigation pursuant to section 735(c)(5) of the Act.  Commerce does not calculate an all-others rate in an NME investigation or in an administrative review, whether involving a non-market or market economy.  Section 735(c)(5) of the Act is limited to calculating an estimated weighted-average dumping margin "for all exporters and

---

[90] *See CMA*, 1 F.4th at 1039-40.
[91] *See Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1356 (CAFC 2016).

producers not individually investigated"[92] in a preliminary determination (section 733(d) of the Act) and in a final determination (section 735(c) of the Act) in an LTFV investigation.  With respect to an NME LTFV investigation, the NME presumption provides that all exporters in the NME are presumed to be part of a government-controlled NME-wide entity.  Commerce determines an estimated weighted-average dumping margin for the NME-wide entity, which may be based wholly on AFA, as in this proceeding, when constituent parties of the NME-wide entity do not cooperate with Commerce during the course of the investigation,[93] or on some other basis as illustrated in the determinations described above, including the calculation of an estimated weighted-average dumping margin based on information submitted by parties that constitute the NME-wide entity.  The NME presumption further states that a separate rate will be determined for companies which demonstrate their *de jure* and *de facto* independence of their export activities.  Pursuant to section 777A(c) of the Act, Commerce may subdivide these companies into two groups:  mandatory respondents which are selected for individual examination, and companies which are not selected for individual examination.  When Commerce does not individually examine these companies, it determines an estimated weighted-average dumping margin for them normally based on the rates determined for the individually-examined companies consistent with the methodology of section 735(c)(5) of the Act;  however, this is not a weighted-average dumping margin for all other producers and exporters, *i.e.*, the "all-others" rate.[94]  This same approach is followed in an administrative review, whether involving a market

---

[92] *See* section 735(c)(1)(B)(II) of the Act.

[93] *See Final Results*.

[94] *See Sigma*, 117 F. 3d at 1407; *see also Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 783 F. Supp. 2d 1343, 1349 (CIT 2011) (*Bestpak*) (noting that when calculating the separate rate, "Commerce normally relies on the statutory provision {that} describes the all-others rate used in market economy investigations."), *rev'd on other grounds*, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1374 (CAFC 2013); *Amanda Foods (Vietnam) v. United States*, 647 F. Supp. 2d 1368 (CIT 2009) ("To determine the dumping margin for nonmandatory respondents in NME cases . . . Commerce normally relies on the 'all others rate' . . . .")); *Soc Trang*

or non-market economy country, where Commerce does not have the resources to examine all companies for which the review has been initiated and must therefore rely on a limited examination of these companies.

Next, we also do not find any concerns with the accuracy of the weighted-average dumping margin for the non-examined, separate rate companies with the exclusion of a rate calculated based on the information submitted by Jinqiao Flooring.  We note that section 735(c)(5) of the Act provides for the exclusion of rates that are zero, *de minimis*, or based entirely on facts available from the calculation of the estimated all-others rate, which is the guidance followed when determining the weighted-average dumping margin for non-examined companies.[95]  Here, as discussed above, Jinqiao Flooring was selected for individual examination as a mandatory respondent, but failed to rebut the presumption.  Pursuant to our practice, and as affirmed by the CAFC,[96] rather than determining an individual rate for Jinqiao Flooring, we assigned Jinqiao Flooring the rate for the China-wide entity by "carrying-forward" the entity's rate that was determined in a prior segment of this proceeding.  Further, because there was no request for review of the China-wide entity, pursuant to our practice, the entity's rate was not subject to review or change. Thus, the exclusion of a rate for a mandatory respondent that has

---

*Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329, 1334 (CIT 2018) ("Commerce has a practice of calculating the separate rate in the same manner as the all-others rate in investigations . . . ."); and *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1377-78 (CIT 2010) ("{W}hen calculating an NME 'sample pool' rate, Commerce is guided by the 'all others rate' provision . . . Commerce typically need not calculate an 'all others' rate.")

[95] *See Albemarle Corp. v. United States*, 27 F. Supp. 3d 1336, (CAFC 2014) (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994), reprinted in 994 U.S.C.C.A.N. 4040, ("In… situations {where} dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis of the facts available or are zero or *de minimis*, Commerce may use any reasonable method to calculate the all others rate.  The expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available.  However, if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods.")

[96] *See CMA*, 1 F.4th at 1039-40.

been found to be part of the China-wide entity which was not under review, when limited examination is based on section 777A(c)(2)(B) of the Act (*i.e.*, accounting for the largest volume of subject merchandise), does not impact the accuracy of the weighted-average dumping margin calculated for companies not selected for individual examination.[97]

### ii. Request for Review of the NME-Wide Entity

The *Remand Order* also requests Commerce to explain:

(3) the statutory and/or regulatory basis for a request for review of the China-wide entity by Jilin{.}[98]

To clarify, in the *2013 Change in Practice*, Commerce announced that the NME-wide entity would no longer be reviewed unless Commerce receives a request for review of the NME-wide entity or self-initiates a review of the entity.[99] The announcement specifically referenced 19 CFR 351.213(b)(1), which provides that:

Each year during the anniversary month of the publication of an antidumping or countervailing duty order, a domestic interested party or an interested party described in section 771(9)(B) of the Act (foreign government) may request in writing that the Secretary conduct an administrative review under section 751(a)(1) of the Act of specified individual exporters or producers covered by an order (except for a countervailing duty order in which the investigation or prior administrative review was conducted on an aggregate basis), if the requesting person states why the person desires the Secretary to review those particular exporters or producers.

According to the *2013 Change in Practice*: "In accordance with 19 CFR 351.213(b)(1), parties should specify that they are requesting a review of entries from exporters comprising the entity, and to the extent possible, include the names of such exporters in their request."[100]

---

[97] Use of limited examination pursuant to section 777A(c)(2)(B) of the Act (*i.e.*, the producers or exports accounting for the largest volume of subject merchandise) is distinct from the selection of respondents pursuant to section 777A(c)(2)(A) of the Act (*i.e.*, statistical sampling) as cited by the Court. *See Remand Order* at 14-15, 16-17.
[98] *See Remand Order* at 34.
[99] *See 2013 Change in Practice*, 78 FR at 65970. The opportunity to request this administrative review was published on July 1, 2015; therefore, Commerce's new practice was applicable to the underlying administrative review.
[100] *Id.*

Here, we note that Jinqiao Flooring has not raised a concern that it was precluded from requesting review of the China-wide entity.  Furthermore, Commerce did not base its determinations that Jinqiao Flooring was ineligible for a separate rate and that Jinqiao Flooring would therefore be assigned the existing rate for the China-wide entity on the fact that Jinqiao Flooring did not request review of the entity.  Nonetheless, to answer the Court's question, under 19 CFR 351.213(b)(1) and the *2013 Change in Practice*, the only parties who may seek review of the entity would be a "domestic interested party" or an interested party described in section 771(9)(B) of the Act (*i.e.*, the foreign government).

> ### iii.  Review of Jinqiao Flooring

The Court next asks Commerce to address matters related to the review of Jinqiao Flooring, specifically:

> (5) because of its importance to determining whether the law directs Commerce to calculate an individual rate for Jilin, a specific statement as to whether and how Jilin was under review individually or as part of the China-wide entity; {and}

> (6) an explanation as to why 19 C.F.R. § 351.212(c)(1) does not operate to continue Jilin's cash deposit rate, as the record seems to indicate that Commerce did not, apparently and/or completely, "review" Jilin{.}[101]

We address both questions together.

As explained above, in an administrative review, Commerce is directed to "review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty."[102]  Section 751(a)(2) of the Act describes that, in calculating the amount of the antidumping duty, Commerce must determine a dumping margin for each entry of the subject merchandise for producers or exporters *for which a review was requested*.[103]  Here, Jinqiao Flooring was under

---

[101] *See Remand Order* at 34.
[102] *See* section 751(a)(1)(B) of the Act.
[103] *See* section 751(a)(1) of the Act (clarifying that section 751(a)(1)(B) and (a)(2) apply "if a request for such a review has been received").

review because a request for a review of Jinqiao Flooring was made[104] and Commerce initiated and conducted such review.[105]  Part of the review process in an NME proceeding is to determine whether a company is eligible for a separate rate.[106]  During the instant review, Commerce determined that Jinqiao Flooring was ineligible for a separate rate and was part of the China-wide entity, as discussed above.  Therefore, although Jinqiao Flooring (specifically, entries of Jinqiao Flooring) remained under review, the China-wide entity itself (*i.e.*, the entries of the China-wide entity, including other constituent parts of the China-wide entity) was not under review.

This is because, as discussed above, no interested party pursuant to 19 CFR 351.213(b)(1) had requested review of the China-wide entity, nor had Commerce self-initiated a review of the China-wide entity.[107]  In such circumstances, Jinqiao Flooring may be properly subject to review, but it is not entitled to an individual rate separate from the China-wide entity; nor was the rate for the China-wide entity properly subject to review such that Commerce could change that rate.  Therefore, under its "broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate,"[108] Commerce carried forward the rate for the China-wide entity previously determined in the investigation, and this rate was applied to the entries of Jinqiao Flooring as part of the China-wide entity (*see* section 751(a)(2) of the Act, requiring that Commerce determine a dumping margin for each entry of the subject merchandise for producers or exporters for which a review was requested.)  Thus, although the antidumping

---

[104] *See* Petitioner's Letter, "Request for Administrative Review:  Multilayered Wood Flooring from the People's Republic of China," dated December 30, 2016.
[105] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 FR 10457 (February 13, 2017).
[106] *See, e.g.*, *Bestpak*, 783 F. Supp. 2d at 1349 ("Commerce affords respondents the opportunity to establish an absence of *de jure* and *de facto* government control and thereby secure a separate rate.")
[107] *See 2013 Change in Practice*, 78 FR at 65970.
[108] *See Sigma*, 117 F.3d at 1402.

statute (*i.e.*, sections 751(a) and 777A(c) of the Act) does not specify whether the rate from the investigation may be carried forward to subsequent reviews in an NME proceeding, the statute does not prohibit this practice, and Commerce has employed this practice in numerous reviews. Commerce's interpretation is permissible under the statute and is reasonable in light of Commerce's policy goals of determining the same rate for all members of the same NME-wide entity to prevent potential manipulation of dumping margins, thus ensuring accuracy in Commerce's dumping calculations, discussed above.

For these same reasons, the entries of Jinqiao Flooring were under review and Commerce's regulation concerning automatic liquidation for entries that are not subject to review, 19 CFR 351.212(c)(1), is inapplicable.  We note, importantly, that 19 CFR 351.212(c)(1) did serve as the proper procedure for liquidation of entries for which a review was not requested, including other constituent parts of the China-wide entity.  As Commerce previously explained in the *2013 Change in Practice*:

> Following initiation of an administrative review when there is no review
> requested of the NME entity, the Department will instruct CBP to liquidate entries
> for all exporters not named in the initiation notice, including those that were
> suspended at the NME entity rate.  This change in practice will eliminate the
> unnecessary delay in liquidation of entries from the NME entity.[109]

Therefore, being subject to review and having lost its separate rate during the administrative review, Commerce intends to instruct CBP that Jinqiao Flooring's antidumping duty assessment rate for entries during the period of review would be the rate for the China-wide entity.[110] Nothing about these procedures demonstrates that the company was not "under review" or under

---

[109] *See 2013 Change in Practice*, 78 FR at 65970 (explaining the issue under the prior practice with delayed liquidation of entries subject to the entity rate).

[110] On September 20, 2018, the Court issued an injunction covering entries exported by Jinqiao Flooring and entered during the underlying administrative review's period of review.  *See* ECF No. 11.  Thus, Commerce has not yet issued liquidation instructions for Jinqiao Flooring for this period.

"full review" because, as discussed above, Commerce's procedures in a review involving an

NME country allow for Commerce to review the separate rate status of a company and determine

the appropriate rate for entries under review.

### iv. The Rate for the China-Wide Entity Applied to Jinqiao Flooring

Lastly, the *Remand Order* further instructs that:

(9) if Commerce should assign the AFA-inclusive China-wide rate to Jilin, then explain, with specificity, why it is reasonable to apply such an AFA-inclusive rate when Jilin has, apparently, been fully compliant in responding to Commerce's requests for information and has not otherwise hindered or impeded the proceeding.[111]

Confirming its holding in *Diamond Sawblades*, the CAFC in *CMA* explained that

Commerce may carry forward an initial rate for the NME-wide entity, including the adverse

inferences built into that rate, into subsequent administrative reviews.[112]  This rate may be

applied to a fully cooperative mandatory respondent which fails to rebut the presumption of

government control.[113]  The CAFC did not limit this holding to any particular set of facts.  It did

not hold that Commerce may carry forward an initial rate for the NME-wide entity with adverse

inferences only if Commerce updates the rate for the NME-wide entity to reflect, in part, a

calculated weighted-average dumping margin for the mandatory respondent deemed part of the

NME-wide entity.  Rather, the court recognized that Commerce may base the rate for the NME-

wide entity "in whole or in part" on facts available or adverse facts available and apply that rate

to a cooperative mandatory respondent that has failed to demonstrate its independence from

control of the government.[114]  Similarly, in *Diamond Sawblades*, in response to the respondent's

---

[111] *See Remand Order* at 34.
[112] *See CMA* (citing *Diamond Sawblades*, 866 F.3d at 1314-15)).
[113] *Id*. (holding that "{i}t was thus ATM's failure to rebut the presumption of government control, not the composition of the {China}-wide entity or the cooperation or non-cooperation of ATM or any other potential member of the {China}-wide entity, that validated Commerce's determination to apply the AFA-derived PRC-wide rate to ATM.")
[114] *Id*. at 8.

argument that its cooperation in the administrative review mandates that Commerce calculate an individual rate for it, the CAFC held that "{the respondent's} position ignores the effect of its failure to rebut the presumption of government control."[115]

Consistent with its NME practice and the CAFC's precedent (reaffirmed in *CMA*), Commerce assigned Jinqiao Flooring the rate for the China-wide entity pulled forward from the investigation.  The rate for the China-wide entity was based in whole on AFA because constituent parts of the China-wide entity did not cooperate with Commerce's request for information in the underlying LTFV investigation.  As described above, Jinqiao Flooring failed to demonstrate its independence from government control.  Accordingly, Jinqiao Flooring is subject to the rate for the China-wide entity for all the reasons explained above.  This determination was reasonable and consistent with the statute.

## III.    Jinqiao Flooring's Comments

## Comment 1:  Jinqiao Flooring's Separate Rate Status[116]

- Despite being majority-owned by two government-controlled entities, Jinqiao Flooring was entitled to separate rate status because it was controlled by its labor union and its Board of Directors, and not the majority shareholders.
    - o  Under Jinqiao Flooring's Articles or Association (*i.e.*, bylaws), the labor union was entitled to appoint three of five members of the Board of Directors.  The two government-owned majority shareholders were entitled to appoint one member.
    - o  Since the labor union controlled the majority of the Board of Directors, and the bylaws designated the Board of Directors as the sole management body of the company, Jinqiao Flooring properly certified that the company's export activities were not controlled by the Chinese government.
    - o  There is no record evidence that the labor union was influenced or controlled by the Chinese government.
- Commerce relied on the China NME Status Report in concluding that Jinqiao Flooring was 100 percent government-owned, but this report was not part of the underlying record. The issue before the Court is whether the administrative record at the time of the investigation (and subsequently filed with the Court) contained substantial evidence supporting Commerce's final determination.  Commerce cannot unilaterally re-open the record and add the report without Court authorization.

---

[115] *See Diamond Sawblades Manufacturers Coalition v. U.S.*, 866 F.3d 1304, 1310 (CAFC 2017).
[116] *See* Jinqiao Flooring's Comments at 2 – 6.

- o Regardless, the China NME Status Report is not relevant to this proceeding, as the report concerned a different administrative proceeding with a distinct administrative record.  Importantly, the report concerned China's continued status as an NME country and the state of labor unions in China, whereas the issue here concerns whether Jinqiao Flooring's selection of its management or its other export activities were made in the absence of Chinese government control.

- The draft results of redetermination did not take into account the entirety of the four *de facto* factors normally used to evaluate whether the government exercised control of a company's export function or activities but rather assumes that government ownership provides the potential to exercise control over all of Jinqiao Flooring's export activities. The record, which Commerce appears to have not considered, is contrary to Commerce's conclusion:

  - o Jinqiao Flooring's unrebutted SRC certified that:  1) export prices were not set by, or subject to any government entity approval; 2) the firm had independent authority to negotiate and sign export contracts and other agreements; 3) the firm had autonomy in making management selection decisions; 4) the firm was free to approval any of its candidates for managerial positions; and 5) the firm retained the proceeds of its export sales and made independent decisions regarding the disposition of profits or the financing of losses.

  - o Jinqiao Flooring's SAQR established that: the company negotiated independently with U.S. customers; senior management was selected by the Board of Directors and the labor union; no government authority had the right to reject management appointees or to control the management selection process; there were no restrictions on the company's use of export revenues; and company profits were disposed in accordance with the decisions of the Board of Directors and the labor union.

**Commerce's Position:**  We continue to find that Jinqiao Flooring was not entitled to a separate rate in the underlying administrative review.  As an initial matter, we disagree that Commerce cannot reopen the underlying administrative review record.  The Court directed Commerce to permit Jinqiao Flooring the opportunity to comment and submit rebuttal new factual information with regards to the China NME Status Report.[117]  In complying with the Court's order, Commerce included the document as part of the opportunity for comment and rebuttal new factual information in this remand proceeding.[118]

---

[117] *See Remand Order* at 11-12.
[118] *See* Memorandum, "Remand Redetermination Concerning the 2015-2016 Administrative Review of Multilayered Wood Flooring from the People's Republic of China," dated July 23, 2021.

Jinqiao Flooring argues that Commerce cannot reopen the underlying record without Court authorization to now include the China NME Status Report, nor can Commerce rely on it for purposes of our separate rate analysis.[119]  We disagree.  We note that the Court has previously held that Commerce may reopen the record on remand, unless the Court includes specific language barring Commerce from doing so.[120]  Here, the Court did not bar Commerce from reopening the record.[121]

Further, it was necessary for Commerce to open the record in this instance because the Court had ordered Commerce to provide interested parties, including Jinqiao Flooring, the opportunity to comment and provide rebuttal new factual information.  Therefore, Commerce's decision to place the China NME Status Report on the record was warranted, as it was Commerce's intent to comply with the *Remand Order* to allow interested parties, including Jinqiao Flooring, an opportunity to comment and submit rebuttal new factual information on that finding, in accordance with 19 CFR 351.301(c)(4), and to address any such argument in these final results of remand redetermination.[122]  Accordingly, Commerce's inclusion of the China NME Status Report complies with the *Remand Order*.  In addition, despite having the opportunity to comment and submit rebuttal new factual information with regard to the China NME Status Report, Jinqiao Flooring declined its opportunity to comment or submit new factual information to rebut the findings of the report.

Next, Commerce maintains its position, based on the China NME Status Report, that all labor unions in China, including those with equity ownership in Jinqiao Flooring, are controlled

---

[119] *See* Jinqiao Flooring's Comments at 3, fn 1.
[120] *See Shandong Rongxin Import & Export Co., Ltd., v. United States*, 203 F. Supp.3d 1327 (CIT Feb 3, 2017) (*Shandong Rongxin*).
[121] *See generally Remand Order*.
[122] *See Remand Order* at 11-12.

by the Chinese government.  As noted above, the CIT has upheld Commerce's findings articulated in the China NME Status Report that all labor unions in China are controlled by the government.[123]  Moreover, Jinqiao Flooring did not comment or provide rebuttal new factual information challenging the finding in the Chinese NME Status Report that Chinese labor unions function under the control of the Chinese government, despite having the opportunity to do so. Jinqiao Flooring continues to argue that the China NME Status Report is not relevant to the underlying review or this redetermination; such a perspective is unsupported and ignores the stated role, as provided for in section 771(18)(C)(i) of the Act, of Commerce's China NME status determination.  Commerce relied on the China NME Status Report finding that all Chinese labor unions are controlled by the Chinese government in response to Jinqiao Flooring's assertion that despite majority ownership of the Chinese government, it is free from *de facto* government control because a minority shareholder Chinese labor union selected three of five board of directors and the board of directors appoint the company's general manager and senior management.[124]  Although the Chine NME Status Report was issued in the context of the LTFV investigation of aluminum foil from China, Commerce conducted that inquiry into China's NME status pursuant to its authority under section 771(18)(C)(ii) of the Act, which states that Commerce may make a determination with respect to a country's nonmarket economy status "at any time."  When Commerce makes a determination that a "foreign country" is a "nonmarket economy," it "shall remain in effect until revoked by the administering authority."[125]  This is a determination as to whether a "foreign country" "operate{s} on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the

---

[123] *See ZMC*, Slip. Op. 21-78 at 7.
[124] *See* Jilin Forest's Letter, "Jilin Forest Case Brief," dated February 28, 2018 at 9; *see also Final Results* IDM at 7-8.
[125] *See* section 771(18)(C)(i) of the Act

merchandise."[126]  Such determinations are intended to apply to, and inform, future determinations involving injurious imports from the country in question, until revoked.[127]  In the course of that inquiry, Commerce evaluated the extent to which wage rates in China are determined by free bargaining between labor and management, concluding that "{l}abor unions are under the control and direction of the All-China Federation of Trade Unions (ACTFU), a government-affiliated CCP organ."[128]  Therefore, the China NME Status Report is relevant to the underlying administrative review and this redetermination.

Further, Jinqiao Flooring did not avail themselves of the opportunity, pursuant to the *Remand Order*, to place information on the record of this redetermination to rebut or otherwise undermine Commerce's determination that all Chinese labor unions are under the control and direction of a government-affiliated Chinese Communist Party (CCP) organ.  Accordingly, the labor union that is a minority shareholder in Jinqiao Flooring, which elects the majority of its board of directors and selects certain management, is a Chinese labor union, and as such is under the control of the Chinese government, consistent with our NME status finding.  We continue to find that Jinqiao Flooring's argument that it is the labor union and not the government that controls the company fails to rebut the presumption of control.

Regarding the role of the labor union as a government controlled organ, Jinqiao Flooring states that "Commerce therefore determined that Jinqiao Labor Union was a Chinese government entity, that Jinqiao Flooring was therefore a 100% government owned company and did not establish its entitlement to a separate company rate."[129]  In fact, in the underlying administrative review and draft results of redetermination, Commerce found that the government had

---

[126] *See* section 771 (18)(A) of the Act.
[127] *See* section 771(18)(C)(i) of the Act.
[128] *See* China NME Status Report at 8.
[129] *See* Jinqiao Flooring's Comments at 3.

"majority" ownership of Jinqiao Flooring.[130]  However, in reexamining the record, Commerce does agree with Jinqiao Flooring that when labor union ownership is taken into consideration, Jinqiao Flooring is indeed wholly controlled by the government.  As a consequence, there is no other party outside of the government to exercise control over the company operations of Jinqiao Flooring, including its export activities.  Jinqiao Flooring's argument that another, non-government party controls its export activities is not supported by the record evidence.

We also address Jinqiao Flooring's argument that the draft results of redetermination did not take into account the entirety of the four *de facto* factors normally used to evaluate whether the government exercised control over a company's export activities.  As noted in the draft results of redetermination, what is key in Commerce's *de facto* analysis is not a showing of actual control but rather the *potential* for control which is demonstrated by majority government ownership.[131]  Jinqiao Flooring's comments misapprehend the presumption of government control that has been upheld by the CAFC[132] and places the burden on respondents to demonstrate freedom from *de jure* and *de facto* government control.[133]  Jinqiao Flooring's comments misapprehend the presumption of government control that has been upheld by the CAFC[134] and places the burden on respondents to demonstrate freedom from *de jure* and *de facto*

---

[130] *See* Separate Rate Analysis Memorandum at 5 ("Jinqiao Flooring reported that [        ] is majority-owned by [    ], confirming that [            ] is in fact a Chinese [  ].  In turn, [        ]'s and [              ]'s combined [    ]% shareholding of Jinqiao Flooring indicates that, by way of [          ], the government entity holds a majority ownership share ([  ] percent) in the respondent.")

[131] *See* IDM at 11.

[132] *See, e.g.*, *CMA*, 1 F.4th at 1032 ("Commerce's policy, which we have approved, is that exporters that fail to demonstrate independence from government control do not qualify for a separate rate.") (citing *Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (CAFC 2002)).

[133] *See ZMC*, Slip. Op. 21-78 at 12 ("Thus, because the burden is on a separate rate applicant to show that there is no potential for government control, ZMC's various arguments that Commerce needed to show actual control are unpersuasive.")

[134] *See, e.g.*, *CMA*, 1 F.4th at 1032 ("Commerce's policy, which we have approved, is that exporters that fail to demonstrate independence from government control do not qualify for a separate rate.") (citing *Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (CAFC 2002)).

government control.[135]  This potential or ability to exercise control, or interest in exercising

control, over Jinqiao Flooring's company operations extends specifically to Jinqiao Flooring's

export activities, including the selection of management, the setting of export prices, the

negotiation and signature of contracts and other agreements, and decisions regarding the

disposition of profits or losses.  Specifically, the record reflects that Jinqiao Flooring's

shareholders appoint the Board of Directors who have the right to "appoint or dismiss the general

manager," and "according to nomination of the general manager, to appoint or dismiss the vice

general manager, financial manager...."[136]  Thus, through their appointment of the Board of

Directors, Jinqiao Flooring's shareholders *i.e.*, its government shareholders, have the ability and

potential to control, and interest in controlling, the company's operations, including Jinqiao

Flooring's export activities.  Jinqiao Flooring's comments in this regard are deficient, as Jinqiao

Flooring does not demonstrate that its government shareholders do not have the ability or

potential to control and interest in controlling company operations, and further, as discussed

above, there are no other shareholders to exercise control or possess interest in Jinqiao Flooring

except for the government shareholders.

**Comment 2:  Jinqiao Flooring's Status as a Mandatory Respondent**

- The *Remand Order* held that "the Department shall calculate an antidumping duty rate of Jilin and use it in its construction of the all-other rate or provide a reasonable explanation for why it need not."  In response, Commerce reviewed its long-term policy of applying a single rate to NME exporters unable to demonstrate government independence but assumes, contrary to substantial evidence, that Jinqiao Flooring failed to rebut the NME presumption and independence from the China-wide entity.
- Jinqiao Flooring agrees with the Court that application of the rate for China-wide entity is tantamount to an unfair application of AFA.  Commerce appears to agree that Jinqiao Flooring has been a cooperative respondent as it is undisputed that all requests for

---

[135] *See ZMC*, Slip. Op. 21-78 at 12 ("Thus, because the burden is on a separate rate applicant to show that there is no potential for government control, ZMC's various arguments that Commerce needed to show actual control are unpersuasive.")
[136] *See* SQR4.

information to allow Commerce to apply a calculated rate were submitted in a timely fashion.

- Jinqiao Flooring agrees with the Court that "having designated Jilin a mandatory respondent and, thus, a "known exporter," Commerce placed itself under the general obligation to determine "individual weighted average dumping margin" for Jinqiao Flooring.
  - o It is undisputed that Commerce had all of the information needed to determine an individual weighted-average dumping margin for Jinqiao Flooring.
  - o The draft results of redetermination are deficient in that Commerce continues to fail to provide a reasonable explanation for why it is not obligated under the Court's order to calculate an antidumping duty rate for Jinqiao Flooring. Its only explanation is its conclusory determination, unsupported by the record, that Jinqiao Flooring has not rebutted the presumption that it is not government controlled. As the Court noted previously, "{b}eyond concluding that the NME Policy should be applied, Commerce does little to explain why it did not determine Jilin's individual rate."
  - o The draft results of redetermination, although lengthy, do not rectify this deficiency by explaining why Jinqiao Flooring is not entitled to a separate rate, given its compliance and how the application of the rate for the China-wide entity furthers the statutory goal of establishing an accurate rate for Jinqiao Flooring. This gap should be filled in.

**Commerce's Position:** We disagree with Jinqiao Flooring that we failed to provide a reasonable explanation as to why it is not entitled to a separate rate and that Commerce was obligated to calculate an individual weighted-average dumping margin for Jinqiao Flooring because it was selected as a mandatory respondent. As explained above and throughout the draft results of redetermination, Jinqiao Flooring is ineligible for a separate rate because it has not demonstrated that its export activities are independent from *de facto* government control. Accordingly, consistent with our practice and as upheld by the CAFC,[137] we have found that Jinqiao Flooring is a constituent part of the China-wide entity and assigned it the rate applicable for the China-wide entity. As a result, consistent with the statutory direction of section 751(a) of the Act, Commerce determined it will assess antidumping duties for the entries associated with Jinqiao Flooring based on the established rate for the China-wide entity.

---

[137] *See, e.g.*, *Sigma*, 117 F.3d at 1405-06.

We applied the China-wide rate to Jinqiao Flooring not because of its failure to cooperate during the underlying administrative review, but because it did not demonstrate its independence from *de facto* government control.  Pursuant to the NME presumption, as discussed above, the China-wide entity has a single antidumping rate that is applied uniformly to all constituent companies of the China-wide entity.  Accordingly, we disagree with Jinqiao Flooring's argument that assigning it the rate for the China-wide entity is an application, fair or unfair, of AFA.  Moreover, the CAFC has recognized the lawfulness of Commerce's ability to assign a single rate to the NME-wide entity, even when based in whole on AFA, to a cooperative mandatory respondent that failed to rebut the presumption of government control.[138]

Additionally, Commerce maintains its position that it is not legally obligated to calculate an individual rate for Jinqiao Flooring despite having designated Jinqiao Flooring as a mandatory respondent.  Above, we provided an overview of our broad authority under the statutory scheme and explained at length the purpose of Commerce's NME presumption and the interplay with "limited examination" of all known producers and exporters under section 777A(c)(2) of the Act, including the relevant legal theories regarding deference to the agency.  We also outlined the application of Commerce's NME presumption, and the corresponding rate for the China-wide entity, to Jinqiao Flooring.  Further, we explained that the CAFC has issued binding precedent sustaining Commerce's policy to assign a mandatory respondent that fails to rebut the presumption of government control the rate applicable to the NME-wide entity.[139]

---

[138] *See CMA*, 1 F.4th at 1039-40.
[139] *See, e.g., CMA*, 1 F.4th at 1030-31 (citing *Sigma*, 117 F.3d at 1405-06); *id.* at 1032 ("Commerce's policy, which we have approved, is that exporters that fail to demonstrate independence from government control do not qualify for a separate rate.") (citing *Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (CAFC 2002)), 1039-40.

## IV.    Conclusion

Pursuant to the *Remand Order*, Commerce has responded to the Court's questions, considered Jinqiao Flooring's Comments and, in light of the foregoing analysis, has made no changes to the *Final Results*.

11/15/2021

X

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties of the
 Assistant Secretary for Enforcement and Compliance