Slip Op. 23-14

UNITED STATES COURT OF INTERNATIONAL TRADE

JILIN FOREST INDUSTRY JINQIAO
FLOORING GROUP CO., LTD.,

               Plaintiff,

            v.

UNITED STATES,

               Defendant.

Before: Richard K. Eaton, Judge

Court No. 18-00191

## OPINION AND ORDER

[Results of remand of fifth administrative review of multilayered wood flooring from the People's Republic of China are remanded to U.S. Department of Commerce.]

Dated: February 9, 2023

    *Lizbeth R. Levinson*, *Ronald M. Wisla*, and *Brittney R. Powell*, Fox Rothschild LLP, of Washington, D.C., for Plaintiff.

    *Brendan D. Jordan*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Tara K. Hogan*, Assistant Director, and *Sonia M. Orfield*, Trial Attorney. Of counsel on the brief was *Rachel A. Bogdan*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

    Eaton, Judge: Before the court are the U.S. Department of Commerce's ("Commerce" or

the "Department") Final Results of Redetermination Pursuant to Remand Order ("First Remand

Results"), ECF No. 62-1, on remand of *Multilayered Wood Flooring From the People's Republic

of China*, 83 Fed. Reg. 35,461 (Dep't Commerce July 26, 2018) ("Final Results") and

accompanying Issues and Decision Memorandum (July 18, 2018), PR[1] 340 ("Final IDM"). *See*

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 45 CIT __, 519 F. Supp. 3d 1224

(2021) ("*Jilin I*").

On remand, Commerce again determined that mandatory respondent Jilin Forest Industry

Jinqiao Flooring Group Co., Ltd. ("Jilin") had failed to rebut the presumption that it is state

controlled. In addition, although given an opportunity to do so by the *Jilin I* order, Commerce

chose not to determine an individual rate for Jilin separate from the rate established for the "China-

wide entity" (also termed the Nonmarket Economy ("NME") Entity). *See* First Remand Results at

3-4, 34. As was the case in *Jilin I*, Jilin challenges these decisions. *See* Pl.'s Cmts. on Commerce's

Final Results of Redetermination Pursuant to Remand Order, ECF No. 66 ("Pl.'s Cmts.").

Defendant the United States, on behalf of Commerce, argues the First Remand Results should be

sustained. *See* Def.'s Resp. to Cmts. on Remand Redetermination, ECF No. 67. The court has

jurisdiction under 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018) and will

uphold Commerce's remand redetermination unless it is "unsupported by substantial evidence on

the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Because the court finds that Commerce has not shown that its NME Policy (also termed

the "NME presumption"[2]) is in accordance with law with respect to Jilin, the case is again

remanded to Commerce.

---

[1]       In this opinion, "PR" means the public record of the Final Results. "PRR" means the public remand record.

[2]       In the First Remand Results, Commerce refers to the NME presumption, which the court called the NME Policy in *Jilin I*. For the remainder of this opinion, the court adopts Commerce's term as employed in the First Remand Results.

## BACKGROUND

This opinion presumes familiarity with *Jilin I*, which concerns the 2015-2016 period of review ("POR") of the antidumping duty order on multilayered wood flooring from China. The prior decision remanded, as unlawful, Commerce's determination of *de facto* government control of Jilin for the reason that Jilin had not been provided a meaningful opportunity to respond to new information that Commerce had relied on in its Final Results. *See Jilin I*, 45 CIT at __, 519 F. Supp. 3d at 1233-34. The new information, which deemed all of China's labor unions to be under state control, was contained in the memorandum "China's Status as a Non-Market Economy,"[3] dated October 26, 2017, that was part of Investigation A-570-053, involving aluminum foil from China.[4] *See Certain Aluminum Foil From the People's Republic of China: Notice of Initiation of Inquiry Into the Status of the People's Republic of China as a Nonmarket Economy Country Under the Antidumping and Countervailing Duty Laws*, 82 Fed. Reg. 16,162 (Dep't Commerce Apr. 3,

---

[3]      A nonmarket economy country is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority." *Id.* § 1677(18)(C)(i). "The administering authority may make a determination under subparagraph (A) with respect to any foreign country at any time." *Id.* § 1677(18)(C)(ii). Thus, in general, if "subject merchandise is exported from a nonmarket economy country," and Commerce "finds that available information does not permit the normal value of the subject merchandise to be determined" by reference to price in the usual commercial quantities and ordinary course of trade to the United States or a foreign country, then with certain exceptions (not here relevant) Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* § 1677b(c).

[4]      The October 2017 issuance of the final report regarding China's NME status occurred during the fact-gathering stage of the 2015-2016 review of the antidumping duty order on multilayered wood flooring. *See* Decision Mem. for the Preliminary Results of Antidumping Duty Admin. Rev.: Multilayered Wood Flooring from the People's Republic of China; 2015-2016 (Jan. 2, 2018) at 2-4, PR 308.

2017) ("*Aluminum Foil*"); *see also* Mem. from Rebecca Trainor to All Interested Parties re: Remand Redetermination Concerning the 2015-2016 Administrative Review of Multilayered Wood Flooring from the People's Republic of China (July 23, 2021), attach. III, PRR 1 ("*China NME Status Report*"). The Final Results referenced that information, but Commerce did not formally place it on the record until remand.

In addition, the court remanded to Commerce, for reconsideration or further explanation, the application of its NME Policy of presuming that every domestic Chinese exporter or producer, including Jilin, is part of the China-wide entity. *See Jilin I*, 45 CIT at __, 519, F. Supp. 3d at 1246-47. This policy results in what Commerce calls the NME presumption. *Jilin I* remanded to Commerce for explanation of its NME presumption in full, and the use of the NME presumption as to Jilin, and to "calculate an antidumping duty rate for Jilin and use it in its construction of the all-others rate or provide a reasonable explanation for why it need not." *Id.* On remand, Commerce's explanations of its NME presumption and its reasons for not calculating an individual rate for Jilin are intertwined. Because Commerce, on remand, has not explained how its policy of employing the NME presumption and the application of the NME presumption to Jilin are in accordance with law, the case is again remanded.

## DISCUSSION

### I.    NME Presumption as Applied to Jilin

While, as shall be seen, there is considerable doubt as to whether, under the facts presented here, Commerce's NME presumption will survive this litigation with respect to Jilin, the court will nevertheless address the state control arguments. As part of its NME presumption, Commerce presumes that all Chinese exporters are part of the NME Entity—a single, country-wide concept

employed by Commerce as a sort of legal fiction. The NME Entity is neither "China" nor the "Government of China," but consists of all Chinese exporters and producers of subject merchandise for export to the United States. Since these companies operate in a nonmarket economy, Commerce presumes that they all operate subject to government control. *See* U.S. Dep't Commerce, Import Administration Policy Bulletin 05.1 (Apr. 5, 2005) at 1, https://enforcement.trade.gov/policy/bull05-1.pdf ("Policy Bulletin 05.1") ("In an NME antidumping investigation, the Department presumes that all companies within the NME country are subject to governmental control . . . ."). The presumption is rebuttable, and Jilin sought to rebut it through its responses to section A of Commerce's questionnaire. *See* Decision Mem. for the Preliminary Results of Antidumping Duty Admin. Rev.: Multilayered Wood Flooring from the People's Republic of China; 2015-2016 (Jan. 2, 2018) at 10, PR 308.

In the Final Results, Commerce found that Jilin's labor union was state controlled. Based on this finding, Commerce did not credit Jilin's argument that its labor union was independent of the Chinese government and thus that an entity, not subject to the Chinese government, actually controlled the company (by appointing three of the five members of the board of directors and two of three supervisors). Commerce therefore concluded that Jilin failed to rebut the presumption of state control of the company. *See* Final IDM at 6-8.

Commerce's finding that Jilin's labor union was, in fact, not independent of the Chinese government relied on the *China NME Status Report*, a memorandum from the less-than-fair-value investigation of aluminum foil from China.[5] Apparently, that memorandum was never made part

---

[5]     The purpose of the *China NME Status Report* memorandum was to make an historical and current review of China's nonmarket economy status as a whole. *See* 19 U.S.C. § 1677(18)(C)(ii) ("The administering authority may make a determination [on whether an economy operates on market or nonmarket principles] with respect to any foreign country at any

of Commerce's preliminary results nor placed on the record, even though it was referenced in the

Final Results. *See* First Remand Results at 2-3. Because Jilin had not been provided an opportunity

to comment on the *Aluminum Foil* findings in the context of this review, prior to the Final Results,

the court remanded this issue. *Jilin I*, 45 CIT at __, 519 F. Supp. 3d at 1233-34.

On remand, in addition to referencing the *Aluminum Foil* proceeding—as it had in the Final

Results—Commerce placed on the record the *China NME Status Report* from that proceeding and

provided Jilin with the opportunity to comment on it. *See* First Remand Results at 2. Jilin did not

avail itself of that opportunity and submitted comments later only on the draft remand results. *See*

First Remand Results at 3.

The *China NME Status Report* concluded that all of China's labor unions are controlled by

the Chinese Communist Party and are not independent. *See* First Remand Results at 20-23. That

conclusion expands on the findings in the *Aluminum Foil* investigation and now guides

investigations or reviews of China's unfair trade practices before Commerce. *See, e.g.*, *Zhejiang*

*Mach. Imp. & Exp. Corp. v. United States*, 45 CIT __, 521 F. Supp. 3d 1345, 1351 (2021)

(sustaining Commerce's explanation of China's control over labor unions), *appeal docketed*, No.

21-2257 (Fed. Cir. Aug. 27, 2021). Thus, relying on the *China NME Status Report* from *Aluminum*

*Foil* in the First Remand Results (as well as *Aluminum Foil* itself), Commerce found that Jilin's

labor union was under the control of the Chinese government and concluded that "the role played

by the labor union in the selection of the board of directors and management did not demonstrate

that [Jilin] was free from government control over its export activities." First Remand Results at

10. Indeed, based on the *China NME Status Report*, Commerce reached the opposite conclusion

---

time."). The *China NME Status Report* examines six nonmarket economy factors, five of which
are irrelevant here, and one that is relevant (*i.e.*, "the extent to which wage rates in the foreign
country are determined by free bargaining between labor and management"). *Id.* § 1677(18)(B)(ii).

from that argued by Jilin. Commerce found

> that when labor union ownership is taken into consideration, [Jilin] is indeed wholly controlled by the [Chinese] government. As a consequence, there is no other party outside of the government to exercise control over the company operations of [Jilin], including its export activities. [Jilin]'s argument that another, nongovernment party[, *i.e.*, its labor union,] controls its export activities is not supported by the record evidence.

First Remand Results at 41. Commerce thus again determined, on remand, that based on the Chinese government's control of its labor union, Jilin was not entitled to a separate rate.

The First Remand Results emphasize that, notwithstanding Jilin's previous separate rate certifications, this was the first time Jilin had been individually examined. This individual examination was the result of Jilin being selected as a mandatory respondent for this review. *Jilin I* discussed, at length, Commerce's original Final Results. Jilin's responses during the review indicated to Commerce that the vast majority of the ownership of Jilin was held by an organization controlled by the Government of China and that a small percentage of its shares were held by Jilin's labor union. Finding that Jilin was majority owned by the Chinese government indicated to Commerce the Chinese government's "potential" to exercise control over Jilin's export activities. First Remand Results at 11-13. On that basis, Commerce determined that Jilin had not made the requisite affirmative demonstration to rebut the NME presumption that the Chinese government exercised *de facto* control over the company's operations. *See* First Remand Results at 13. For Commerce, the "potential or ability to exercise control, or interest in exercising control, over [Jilin]'s *company operations* extends specifically to [Jilin]'s *export activities*,[6] including the

---

[6]    In response to the court's question on its terminology, Commerce explained that it uses "export functions" and "export activities" interchangeably, in contrast to "company operations," which "refers [to] the general operations of a company and encompasses a broad range of business activities, inclusive of export functions/activities, as well as management, board meetings, manufacturing, sales, advertising, and marketing." First Remand Results at 9-10.

selection of management, the setting of export prices, the negotiation and signature of contracts and other agreements, and decisions regarding the disposition of profits or losses." First Remand Results at 11 (emphasis added).

In its comments on the draft remand results, Jilin relied heavily on its argument that *its independent labor union* controlled the appointment of the board of directors and management. Thus, although a majority of the stock in the company was owned by the Chinese government or its creatures, Jilin insisted that actual control rested with its independent labor union. In Jilin's view, because its independent labor union actually controlled the management of the company, and because the Chinese government did not control its labor union, it had rebutted the presumption of state control. *See* Pl.'s Cmts. at 2-3. Jilin made this argument even though its labor union owned only a fairly small proportion of the company's stock (the exact percentage being confidential information).

Before the court, Jilin continues to rely on its separate rate certification[7] and on statements in its Articles of Association and by-laws as to its labor union's control of the company's board of directors and management. *See* Pl.'s Cmts. at 2-3, 6. Also, Jilin complains that the *China NME Status Report* was issued on October 26, 2017, in the context of a completely different administrative proceeding with a distinct administrative record, while the POR of this fifth administrative review of multilayered wood flooring from China was December 2015 through

---

[7]     Jilin's separate rate certification stated that: (1) the firm's export prices were not set by, or subject to the approval of any government entity; (2) the firm had independent authority to negotiate and sign export contracts and other agreements; (3) that the firm had autonomy from all levels of government in making decisions regarding the selection of management; (4) the firm did not have to submit for approval any of its candidates for managerial positions within the firm to any government entity; and (5) the firm retained the proceeds of its export sales and made independent decisions regarding the disposition of profits or the financing of losses. *See* Pl.'s Cmts. at 6.

November 2016. *See* Pl.'s Cmts. at 3. According to Jilin, "[t]he general status of labor unions in China is simply not relevant as to whether or not . . . the administrative record in this case establishes whether the [Jilin] Labor Union, acting in accordance with the provisions of [Jilin]'s Articles of Association during the [POR], operated free from Chinese government control." Pl.'s Cmts. at 4.

These arguments, however, do not address the facts Commerce drew from the *China NME Status Report* with respect to Jilin. These facts make Commerce's case. Because Jilin's labor union was just another arm of the Chinese government, Jilin's insistence that its labor union selected the board and management of the company confirms Commerce's conclusion that the company was under the complete control of the Chinese government.

Jilin asserts that "Commerce's remand results . . . failed to cite to any record evidence that would even suggest, under the circumstances of this case, that the [All-China Federation of Trade Unions ("ACFTU")] exerted control over the [Jilin] labor union's selection of [Jilin]'s management or any of its export activities during the relevant [POR]." Pl.'s Cmts. at 4.

The problem with that argument is that the *China NME Status Report* provides plenty of evidence that the ACFTU, a government-affiliated and Chinese Communist Party organ, exerts control over all Chinese labor unions. *See China NME Status Report* at 5. Importantly, the *China NME Status Report* was both an historical and then a current review of China's NME status as a whole. *See, e.g.*, *id.* at 21 (footnotes omitted) ("ACFTU has been China's official trade union since the founding of the People's Republic of China in 1949. ACFTU's legal monopoly on all trade union activities is codified in the *Trade Union Law of the People's Republic of China* ("*Trade Union Law*") adopted in 1992, and remains unchanged after amendments to the law in 2001 and 2009. . . . The *Trade Union Law* provides for ACFTU to preside over a network of subordinate

trade unions that . . . subordinates lower-ranking unions to higher-ranking ones. ACFTU is subject to [Chinese Communist Party] control, and trade union leaders concurrently hold office at a corresponding rank in the [Chinese Communist Party] or the government."). The relevant POR covered by the Final Results is December 1, 2015, through November 30, 2016, or well after adoption of China's *Trade Union Law. See id.*

Because Commerce's review of China's labor laws and other facts in the *China NME Status Report* reasonably concludes that the ACFTU exerts control over all Chinese labor unions, Commerce has pointed to substantial evidence demonstrating that Jilin's unsupported claims that its labor union was independent cannot be credited. Moreover, this evidence is substantial evidence to support Commerce's conclusion that Jilin has not rebutted the presumption of state control, because if Jilin's labor union is under state control, its appointment of a majority of Jilin's board of directors confirms that the state controls the company. Therefore, should the use of Commerce's NME presumption survive this case with respect to Jilin, its application will not be prohibited here.

## II.    The Mandatory Respondent Exception and the NME Presumption

As discussed in *Jilin I*, under the facts of this case, the Mandatory Respondent Exception and the NME presumption are intertwined. The use of the statutory Mandatory Respondent Exception is authorized when the number of respondents in a proceeding is so "large" that it is "not practicable to make individual weighted average dumping margin determinations."[8] 19 U.S.C. § 1677f-1(c)(2); *see Jilin I*, 45 CIT at __, 519 F. Supp. 3d at 1235 (quoting 19 U.S.C. § 1677f-1(c)(2)). If Commerce finds that this situation exists, it may determine the weighted-

---

[8]        Absent this exception, the statute requires Commerce to determine individual weighted-average dumping margins for every known respondent exporter and producer of subject merchandise. *See* 19 U.S.C. § 1677f-1(c)(1).

average dumping margins for a "reasonable" number of exporters or producers by limiting its

examination: (1) to a valid statistical sample of exporters, producers, or types of products, or (2) to

the "exporters and producers accounting for the largest volume of the subject merchandise from

the exporting country that can be reasonably examined." *Id.* (quoting 19 U.S.C.

§ 1677f-1(c)(2)(A), (B)). The weighted average of the rates for each mandatory respondent forms

the basis of the rate for respondents not individually examined.[9] *Id.* (citing 19 U.S.C.

_____

[9]        Remarkably, Commerce notes that the statute only references an "all-others" rate
in the context of *investigations*, not administrative reviews—thereby seeming to imply that it is
improper, unlawful, or erroneous to speak of an "all-others" rate in the context of an administrative
review. *See* First Remand Results at 28 ("Commerce only calculates an 'all-others' rate in a market
economy LTFV [less than fair value] investigation pursuant to [19 U.S.C. § 1673d(c)(5)]"); *see
also* 19 U.S.C. § 1673d(c)(5)(A) ("[T]he estimated all-others rate shall be an amount equal to the
weighted average of the estimated weighted average dumping margins established for exporters
and producers individually investigated, excluding any zero and de minimis margins, and any
margins determined entirely under section 1677e of this title."). Commerce also states that when
it "does not individually examine these companies [when using the Mandatory Respondent
Exception], it determines an estimated weighted-average dumping margin for them normally based
on the rates determined for the individually-examined companies consistent with the methodology
of" 19 U.S.C. § 1673d(c)(5). That is the law for determining the "all-others" rate in investigations.
*See* First Remand Results at 29. Then, Commerce points out that in administrative reviews it looks
to that part of the statute covering investigations for "guidance" as to a rate for everyone else not
individually examined. It is difficult to understand what Commerce is trying to get at here.
Numerous cases have used the term "all-others" in the context of administrative review
proceedings. *See, e.g.*, *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 45 CIT __, __, 520
F. Supp. 3d 1314, 1331 (2021), *aff'd*, 50 F.4th 98 (Fed. Cir. 2022) ("Separate Rate Plaintiffs note
that . . . Commerce justifies 'the high all others rate in this review' . . . ."); *Husteel Co. v. United
States*, 45 CIT __, __, 517 F. Supp. 3d 1342, 1345 (2021) ("In the Final Results, Commerce
assigned weighted-average dumping rates of 10.91% for Husteel, 8.14% for Hyundai Steel, and
the all-others rate of 9.53% for NEXTEEL and Hyundai Steel (Pipe Division)."); *Shanxi Hairui
Trade Co. v. United States*, 45 CIT __, __, 503 F. Supp. 3d 1307, 1320 (2021), *aff'd*, 39 F.4th 1357
(Fed. Cir. 2022); *Bosun Tools Co. v. United States*, 45 CIT __, __, 493 F. Supp. 3d 1351, 1358
(2021) ("In calculating the all others separate rate, Commerce departed from the expected method
. . . ."), *aff'd*, No. 21-1929, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022); *see also, e.g.*, *Albemarle
Corp. v. United States*, 821 F.3d 1345, 1352-53 (Fed. Cir. 2016) (clarifying that the methods under
19 U.S.C. § 1673d apply to administrative reviews as well as investigations).

        Moreover, Commerce itself has referred to the "all-others" rate in reviews, even as it
contends that the phrase should only be used when a market economy country is involved. *See*

§ 1673d(c)(1)(B)(i)).

Commerce refers to this as "limited examination." *See* First Remand Results at 15. In its

Final Results, noting the "large" number of respondents in the underlying proceeding, Commerce

chose to employ this Mandatory Respondent Exception and base the determination of the rate for

unexamined separate rate respondents on the rate determined for two mandatory respondents.

These respondents were the two largest exporters of subject merchandise by volume during the

---

First Remand Results at 28 ("Commerce only calculates an 'all-others' rate in a market economy LTFV [less than fair value] investigation pursuant to [19 U.S.C. § 1673d(c)(5)]."). *But see, e.g.*, *Shanxi Hairui Trade Co. v. United States*, 39 F.4th 1357, 1361 (Fed. Cir. 2022) (emphasis added) (noting that "[i]n 2013, Commerce promulgated a new policy for calculating *all-others rates in administrative reviews* for NME entities," *i.e.*, *Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 Fed. Reg. 65,963, 65,964 (Dep't Commerce Nov. 4, 2013) ("*2013 Change in Practice*")); *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1322 (Fed. Cir. 2020) (emphasis added) ("In the course an investigation *or review*, Commerce 'determine[s] the estimated weighted average dumping margin for each exporter and producer individually investigated' *or reviewed* and 'the estimated all-others rate for all exporters and producers not individually investigated' *or reviewed*." (quoting 19 U.S.C. § 1673d(c)(1)(B)(i))); *see also* 19 U.S.C. § 1677f-1(c) (providing for the "[d]etermination of dumping margin[s]" in investigations *and reviews* for "a reasonable number of exporters or producers"). Even here, Commerce in its First Remand Results acknowledges that when it "does not individually examine these companies, it determines an estimated weighted-average dumping margin for them normally based on the rates determined for the individually-examined companies consistent with the methodology of" § 1673d(c)(5). *See* First Remand Results at 29. As indicated, that statute provides as a general rule that "[f]or purposes of this subsection and section 1673b(d) of this title, the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title," (*i.e.*, on the basis of facts available or adverse facts available). 19 U.S.C. § 1673d(c)(5)(A).

In any event, according to Commerce's First Remand Results, we have a rate in this case (and elsewhere) without a name, although how this unnamed rate differs from the "all-others" rate remains a bit of a mystery.

POR. *See* Respondent Selection Mem. (Apr. 7, 2017) at 1, PR 161. Jilin was one of these. [10]

As noted in *Jilin I*, there is nothing in the language of the statutory Mandatory Respondent Exception that exempts Commerce from its duty to determine a weighted-average dumping margin for Jilin as a "known" exporter or producer using the company's own information. This is true, even though Commerce need not, in every circumstance, employ this rate when determining the rate for unexamined respondents. *See Jilin I*, 45 CIT at __, 519 F. Supp. 3d at 1238. *Compare* 19 U.S.C. § 1677f-1(c), *with* 19 U.S.C. § 1673d(c)(1)(B)(i) (the Department must (I) "determine the estimated weighted average dumping margin for each exporter and producer individually investigated" and (II) "determine" in accordance with the statute's methodology "the estimated all-others rate for all exporters and producers not individually investigated"[11]). This is what Congress anticipated would happen when it directed Commerce to "*calculate* individual dumping margins for those firms selected for examination and an 'all others' rate to be applied to those firms not selected for examination." Uruguay Round Agreements Act, Statement of Administrative

_____

[10]    The other mandatory respondent, Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., is not a party in this case.

[11]    Specifically, pursuant to 19 U.S.C. § 1673d(c)(1)(B), Commerce calculates this estimated all-others rate under paragraph 1673d(c)(5). This paragraph states as the general rule, "(A)," that "the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title." 19 U.S.C. § 1673d(c)(5)(A). The exception, "(B)," is that

> If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins, or are determined entirely under section 1677e of this title, [Commerce] may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.

*Id.* § 1673d(c)(5)(B).

Action, H.R. Doc. No. 103-316, vol. 1, at 872 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4200

(emphasis added).[12]

Here, however, is where the NME presumption comes in. By employing the presumption

that all exporters and producers are part of the NME Entity and thereby subject to government

control (unless the mandatory respondent can demonstrate otherwise), Commerce seeks to avoid

an express statutory direction to calculate an individual rate for Jilin. "The statute clearly directs

that Commerce must determine an individual rate for respondents chosen for individual

examination as mandatory respondents, because they are 'known' exporters or producers." *Jilin I*,

45 CIT at __, 519 F. Supp. 3d at 1244 (citing 19 U.S.C. § 1677f-1(c)). While Commerce may apply

facts available or adverse facts available to a mandatory respondent when certain conditions are

met (*e.g.*, to fill gaps in the record of necessary information), the statute does not indicate that

Commerce can simply assign a rate to a mandatory respondent based on its relationship to an NME

government. *See* 19 U.S.C. § 1677e.

## A.  The NME Presumption Has Never Been Fully Explained

As noted in *Jilin I*, although Commerce has used the NME presumption for years, it has

never identified the source in law authorizing the presumption or even given a real reason for the

NME presumption's use.[13] Unlike the Mandatory Respondent Exception, or "limited examination"

---

[12]        The Statement of Administrative Action is "an authoritative expression" of legislative intent when interpreting and applying the Uruguay Round Agreements Act. *See* 19 U.S.C. § 3512(d).

[13]        As observed in *Jilin I*, the closest Commerce has come to explaining its policy was in *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide From the People's Republic of China*, 59 Fed. Reg. 22,585 (Dep't Commerce May 2, 1994) ("*Silicon Carbide*"):
> A recent analysis by the Central Intelligence Agency supports [the Ministry of Foreign Trade and Economic Cooperation]'s statement [of the People's Republic

as Commerce terms it, the NME presumption is not found in the statute, or, for that matter, in

regulations. As shall be seen later in this opinion, the policy is also unexplained. That is, Commerce

has given no reason for its use. Not being provided for in either statute or regulation, the NME

presumption has always been, and remains now, a policy with no identified source, as well as an

---

of China ("PRC")] that ownership "by all the people" is not synonymous with central government control. (*See* 1992 report to the Joint Economic Committee, Hearings on Global Economic and Technological Change: Former Soviet Union and Eastern Europe and China, Pt. 2 (102 Cong., 2d Sess[.]), 143, 196 (hereinafter, "CIA report")[)]. The report states that a state-owned enterprise was subject to central government control prior to 1980, but that "[t]he reform decade of the 1980s brought significant changes to this scheme" and that the central government devolved control of enterprises owned "by all the people". *We have, therefore, come to the conclusion that ownership "by all the people" does not require the application of a single rate.* Thus, we believe a PRC respondent may receive a separate rate if it establishes on a *de jure* and *de facto* basis that there is an absence of governmental control. We have, therefore, adapted and amplified the test set out in *Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China*[, 56 Fed. Reg. 20,588 (Dep't Commerce May 6, 1991) ("*Sparklers*"),] to determine whether the respondents in this case are entitled to separate rates.

59 Fed. Reg. at 22,587; *see also Sparklers*, 56 Fed. Reg. at 20,589 ("We have determined that exporters in nonmarket economy countries are entitled to separate, company-specific margins when they can demonstrate an absence of central government control, both in law and in fact, with respect to exports. Evidence supporting, though not requiring, a finding of *de jure* absence of central control includes: (1) An absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; or (3) any other formal measures by the government decentralizing control of companies. *De facto* absence of central government control with respect to exports is based on two prerequisites: (1) Whether each exporter sets its own export prices independently of the government and other exporters; and (2) whether each exporter can keep the proceeds from its sales."). It turned out that China's "reforms" were illusory, which resulted in Commerce adopting a more stringent NME presumption with the addition of "potential" to the consideration of government control in its *de jure* and *de facto* tests as a result of the *Diamond Sawblades* litigation. *See Advanced Tech. & Materials Co. v. United States*, 37 CIT 1487, 938 F. Supp. 2d 1342 (2013), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014).

It is worth noting that, as is the case here, Commerce's announcement in the Federal Register describes the mechanics of the NME presumption but gives no hint as to how it will cure a particular problem, and the announcement neither cites a statute or regulation as the source of its authority to declare the NME presumption nor gives a reason why government control matters.

unexplained policy, employed and enforced by Commerce by means of a rebuttable presumption.

Policy Bulletin 05.1 states:

>        This policy bulletin describes the Department's application process for separate rates status in [NME] investigations . . . .

>        In an NME antidumping investigation, the Department presumes that all companies within the NME country are subject to governmental control and should be assigned a single antidumping duty rate unless an exporter demonstrates the absence of both *de jure* and *de facto* governmental control over its export activities. If an NME entity demonstrates this independence with respect to its export activities, it is eligible for a rate that is separate from the NME-wide rate. This separate rate is usually either an individually calculated rate or a weighted-average rate based on the rates of the investigated companies, excluding any rates that are zero, *de minimis*, or based entirely on facts available. The Department's separate rates test is not concerned, in general, with macroeconomic border-type controls (*e.g.*, export licenses, quotas, and minimum export prices). Rather, the test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level.

>        To establish whether a firm is sufficiently independent from governmental control in its export activities to be eligible for separate rate status, the Department analyzes each exporting entity under a test . . . . Under this test, the Department assigns separate rate status in NME cases only if an exporter can demonstrate the absence of both *de jure* and *de facto* governmental control over its export activities.

Policy Bulletin 05.1 at 1-2 (citations omitted).[14] As is universally the case, while Commerce

---

[14]      Policy Bulletin 05.1 goes on to describe that for companies seeking a separate rate that can demonstrate they exported during the period of investigation (or review), the *de jure* factors Commerce considers are: "1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; 2) any legislative enactments decentralizing control of companies; and 3) any other formal measures by the government decentralizing control of companies." Policy Bulletin 05.1 at 2. The *de facto* factors Commerce typically considers when analyzing governmental control of a company's export function are:

> 1) whether the export prices are set by, or subject to the approval of, a governmental authority; 2) whether the respondent has authority to negotiate and sign contracts and other agreements; 3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and 4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

explains how the NME presumption works, it neglects to explain its statutory source, or even the rationale for its use, or explain what it is meant to accomplish. The *explanation* only tells respondents what they must do to rebut the presumption.[15]

Because the NME presumption is not found in the statute, its lawfulness would normally be judged through the lens of the *Chevron*, *Skidmore*, and *Auer* line of cases.[16] In other words, the

---

Policy Bulletin 05.1 at 2. A failure to satisfy each of these considerations denies a company its own rate, apart from the NME Entity rate.

[15]    As the Supreme Court has stated:

> One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions. The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." That requirement is satisfied when the agency's explanation is clear enough that its "path may reasonably be discerned." But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (first quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); then quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); and then citing 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42-43).

[16]    *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (footnotes omitted) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."); *Auer v. Robbins*, 519 U.S. 452, 457-58 (1997) (on the question of whether the Secretary of Labor's "salary-basis" test for determining an employee's exempt status reflects a permissible reading of the Fair Labor Standards Act of 1938 ("FLSA") as it applies to public-sector employees, since Congress has not "directly spoken to the precise question at issue" the Court "must sustain the Secretary's approach so long as it is 'based on a permissible construction of the statute'" and "[b]ecause the FLSA entrusts matters of judgment such as this to the Secretary, not the federal courts, we cannot say that the disciplinary-deduction rule is invalid as applied to law enforcement personnel" (quoting *Chevron*, 467 U.S. at 842-43)).

degree of judicial deference to administrative practices and policies is found in judge-made law.

To start with, *Chevron* deference by judges to an administrative determination involves a several-step inquiry. "Step one of the *Chevron* analysis requires us to determine whether Congress has expressed an unambiguous intent using the traditional tools of statutory construction." *Hyundai Steel Co. v. United States*, 19 F.4th 1346, 1352 (Fed. Cir. 2021) (cleaned up) (citations omitted); *see Merck & Co. v. U.S. Dep't of Health & Hum. Servs.*, 385 F. Supp. 3d 81, 89 (D.D.C. 2019) (courts rely on "traditional tools of statutory construction" to determine whether Congress implicitly delegated authority to regulate), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020); *see, e.g.*, ROBERT A. KATZMANN, JUDGING STATUTES (2014). If Congress has not unambiguously expressed its intent, *i.e.*, when an agency's authority to act is not expressly authorized, further analysis is required. So, for the agency to get *Chevron* deference for a policy, the question becomes whether the agency's action or presumption is based on a "permissible" construction of an identified statute (not a regulation). *See Hyundai*, 19 F.4th at 1352. Only the agency's interpretations reached through formal proceedings with the force of law qualify for *Chevron* deference, such as reasoned and published determinations or notice-and-comment rulemaking. Agency interpretations contained in opinion letters, policy statements, agency manuals, or other formats do not carry the

---

As stated in *Skidmore*, "[t]he fact that the Administrator's policies and standards are not reached by trial in adversary form does not mean that they are not entitled to respect." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The Court continued:

> [T]he rulings, interpretations and opinions of the Administrator under [the FLSA], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.*

force of law and do not warrant *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 229-31 (2001); *see also Hyundai*, 19 F.4th at 1354-55 (rejecting argument that legislative history indicates congressional intent to leave a gap in the particular market situation statute).

Here, Commerce makes no claim either in the Final Results or in the First Remand Results for *Chevron* deference for its NME presumption. Nor does it identify any gap in any statute or identify any silence or ambiguity for which it would have lawful authority to supply a reasonable interpretation.

Specifically, Commerce does not cite any statute whose lawful interpretation would permit it to ignore the statutory provision directing it to determine a rate for any *examined* respondent. *See* 19 U.S.C. § 1677f-1(c)(1) (emphasis added) ("[T]he administering authority *shall* determine the individual weighted average dumping margin for *each known* exporter and producer of the subject merchandise.").

### B.  What Is the Lawful Authority for the NME Presumption?

Because Commerce makes no claim to *Chevron* deference and the First Remand Results identify no statutory source for the NME presumption, the court finds that the Department has conceded that there is no statutory source for the presumption.

Nonetheless, although Commerce itself has identified no statutory source for the NME presumption, it is useful to the court's analysis to examine the several sections of the Tariff Act of 1930 (as amended) (the "Act") that Commerce does cite in its First Remand Results. That is to say, the court will consider each of the statutes mentioned in the First Remand Results to see if any could legally be the underlying source of the NME presumption:

- Section 777A of the Act, 19 U.S.C. § 1677f-1, authorizes the use of averaging and statistically valid samples if there is a significant volume of sales of the subject merchandise or a significant number or types of products. 19 U.S.C. § 1677f-1(a). Subsection (b) requires Commerce to consult with "the exporters

and producers regarding the method to be used to select exporters, producers, or types of products under this section." *Id.* § 1677f-1(b). These provisions appear straightforward and do not touch on the subject of determining rates in an NME context. For its part, Commerce has identified no pertinent gap or ambiguity in this statute with respect to the authority for its NME presumption,[17] and it is difficult to find any.

• Section 731 of the Act, 19 U.S.C. § 1673, authorizes the imposition of antidumping duties against foreign merchandise that is, or is likely to be, sold in the United States at less than its fair value that causes material injury (or threat of material injury) to a domestic industry. This is also straightforward. The determination is made by comparing "normal value" with "export price" or "constructed export price," which are all terms defined by statute. *See* 19 U.S.C. §§ 1677a, 1677b. Again, Commerce has identified no pertinent gap or ambiguity in this statute with respect to the authority for its NME presumption, and it is difficult to find any.

• Section 751(a)(1) of the Act, 19 U.S.C. § 1675(a)(1), provides that if a request for review is received, Commerce is required to review and determine, in accordance with 19 U.S.C. § 1675(a)(2), the amount of any antidumping duty. Commerce states that "if a review is requested of the NME-wide entity in an administrative review, under its current practice (which was in effect at the time of this review), Commerce will review the NME-wide entity and determine a rate potentially different from the rate determined in the underlying investigation." First Remand Results at 26. Commerce states that while the antidumping statute (*i.e.*, 19 U.S.C. § 1675(a) and 19 U.S.C. § 1677f-1(c)) "does not specify whether the rate from the investigation or a completed review may be carried forward to subsequent periods of review in an NME proceeding," it contends that "the Act does not prohibit this practice." *Id.* That, indeed, may be a permissible construction of the statute in the context of this case. But beyond construing the statute as to a rate "carried forward to subsequent periods of review in an NME proceeding," Commerce does not identify it as the authority for any agency policy, including the NME presumption, and it is difficult to see how it could be.

• Section 751(a)(2) of the Act, 19 U.S.C. § 1675(a)(2), is straightforward as well. It provides that Commerce shall, in general (and similar to § 1673), determine the dumping margin for the purpose of assessment based on a comparison of normal value with export price or constructed export price "of each entry of the

---

[17]        *Cf. Nippon Steel Corp. v. United States*, 26 CIT 1416, 1419 (2002) ("[T]he court must determine 'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)); *see also* Francis J. McCaffrey, Statutory Construction 4 (1953) ("A statute has a single meaning when its terms are plain and free from ambiguity, and do not admit of another meaning by the context." (citing *People v. Schoonmaker*, 63 Barb. 44 (N.Y. Gen. Term 1871))).

subject merchandise." 19 U.S.C. § 1675(a)(2)(A)(i). Here, of course, Commerce did not follow the straightforward direction found in the statute but assigned Jilin a rate, rather than calculate a dumping margin. Importantly, Commerce has identified no pertinent gap or ambiguity in this subsection with respect to the authority for its NME presumption, and it is difficult to see how a provision that expressly directs Commerce to calculate a rate for Jilin could be the source of the NME presumption, a presumption applied in this instance that voids a clear congressional direction. As noted, Commerce makes no claim that this subsection is the source of the NME presumption.

- Section 735(c)(5) of the Act, 19 U.S.C. § 1673d(c)(5), provides the method for the estimated all-others rate for unexamined respondents when Commerce uses the Mandatory Respondent Exception during an investigation. The statute directs that the all-others rate shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins. Commerce insists that this provision "is limited to calculating an estimated weighted-average dumping margin 'for all exporters and producers not individually investigated' in a preliminary determination (section 733(d) of the Act) and in a final determination (section 735(c) of the Act) in [a less than fair value] investigation." First Remand Results at 28-29 (footnote omitted). Here, however, Commerce chose to individually examine Jilin, and Commerce has identified no statutory provision that exempts it from the duty to determine Jilin's individual rate.[18] The calculation of a rate for each mandatory respondent is clearly directed and anticipated by 19 U.S.C. § 1677f-1(c)(1) and (c)(2). *See, e.g.*, 19 U.S.C. § 1673d(c)(1)(B)(i)(I). As has been noted, Commerce cites no gap in this statute on which it could rely to construct the NME presumption. And none of the sub-provisions of § 1673d(a) or (c) contain any authority for the NME presumption.

- Section 777A(c)(1), 19 U.S.C. § 1677f-1(c)(1), provides that in determining weighted-average dumping margins Commerce "*shall* determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise." 19 U.S.C. § 1677f-1(c)(1). Here, of course, Commerce did not determine a rate for Jilin in the manner directed by the statute; rather, it assigned the company a rate. That is, Commerce ignored the explicit direction of the statute, and the Department has identified no gap or ambiguity in the

---

18        *See, e.g.*, 19 U.S.C. § 1677f-1(c)(2) (emphasis added) ("If it is not practicable to make individual weighted average dumping margin determinations . . . because of the large number of exporters or producers involved in the investigation or review, the administering authority may *determine the weighted average dumping margins for* a reasonable number of exporters or producers by limiting its examination to—(A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or (B) *exporters and producers accounting for the largest volume of the subject merchandise from the exporting country* that can be reasonably examined.").

statute with respect to the authority for its NME presumption, and it is difficult to find any.

- Section 777A(c)(2), 19 U.S.C. § 1677f-1(c)(2), provides, as an exception, that if it is not "practicable" to make individual weighted-average dumping margin determinations because of the "large" number of exporters or producers involved, [19] Commerce is authorized to limit its determination of the weighted-average dumping margins to (A) a statistically valid sample of exporters, producers, or types of products or (B) the exporters or producers accounting for the largest volume of subject merchandise that Commerce can reasonably examine. Whatever ambiguity may be arguable over the terms "large" or "weighted average," they cannot be said to be ambiguous to the extent of authorizing the presumption that Jilin is part of the China-wide entity. Moreover, Commerce does not suggest that limiting the number of individually examined respondents creates a gap that could reasonably be filled by the NME presumption, nor does Commerce otherwise identify a gap or ambiguity in this statute with respect to the authority for its NME presumption. And it is not possible to find any.

- Section 771(18) of the Act, 19 U.S.C. § 1677(18), provides the definition of a NME country: "The term 'nonmarket economy country' means any foreign country that the administering authority determines does not operate on market

---

[19]    Here, Commerce relied on 19 U.S.C. § 1677f-1(c)(2) to limit its examination, and it selected Jilin for individual examination as one of two mandatory respondents from among the numerous companies for which administrative review was initiated. Commerce states that pursuant to § 1677f-1(c), it can subdivide these companies into two groups: mandatory respondents selected for individual examination, and companies not selected for individual examination. *See* First Remand Results at 14. Additionally, Commerce states that when limited examination is based on § 1677f-1(c)(2)(B) (*i.e.*, accounting for the largest volume of subject merchandise), the exclusion of "a rate" for a mandatory respondent that has been found to be part of the unreviewed China-wide entity does not impact the accuracy of the weighted-average dumping margin calculated for companies not selected for individual examination. *See id.* at 30-31. Commerce maintains that it is not legally obligated to calculate an individual rate for Jilin despite having designated Jilin as a mandatory respondent. *See id.* at 27. And yet, it is undisputed that as a mandatory respondent Jilin was a "known" exporter or producer within the meaning of § 1677f-1(c) for the purpose of "determin[ing] the individual weighted average dumping margin" of such exporter or producer and thus subject to the statutory injunction that its rate be calculated. *See* 19 U.S.C. § 1677f-1(c)(1).

    Also, it is again worth noting that the plain language of § 1677f-1(c)(2) (specifying that Commerce "may determine the weighted average dumping margins for a reasonable number of exporters or producers") *means* "that a 'reasonable number' is generally more than one"—as recently confirmed by the Federal Circuit. *See YC Rubber Co. (N. Am.) LLC v. United States*, No. 21-1489, 2022 WL 3711377, at *4 (Fed. Cir. Aug. 29, 2022); *see also Schaeffler Italia S.R.L. v. United States*, 35 CIT 725, 729, 781 F. Supp. 2d 1358, 1362-63 (2011).

principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). Any determination by Commerce that a foreign country is a nonmarket economy country remains in effect until revoked by Commerce, and Commerce can make a nonmarket economy determination with respect to any foreign country at any time. *See id.* § 1677(18)(C). The specific statutory provisions invoking "nonmarket economy" in the antidumping duty context predominately authorize their use when considering normal value. *See id.*; *id.* § 1677b(c); *cf. id.* § 1673c(*l*) (termination/suspension of investigation upon agreement with NME) (providing a "special rule" for nonmarket economy countries generally, when suspension of an investigation is contemplated). Commerce claims that "[a]s described by the [Federal Circuit], there exists a general statutory recognition of a 'close correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources.'" First Remand Results at 17 (quoting *Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997)). Nonetheless, Commerce does not identify this statutory definition as providing the authority for the NME presumption; nor does the Department identify a gap or ambiguity in this statute that gives rise to delegated authority to presume *all* companies within the NME country are under government control, then to create a policy that "permits" respondents to escape this presumption if they make the requisite showing, and further to apply this policy to *mandatory respondents* examined pursuant to 19 U.S.C. § 1677f-1(c)(2). Commerce makes no such claim of authority, and it is difficult to see the "gap" in the statute giving rise to it.

- Section 773(c) of the Act, 19 U.S.C. § 1677b(c), provides special rules for the determination of normal value if the subject merchandise is exported from an NME country. In general, if Commerce finds that "available information" does not "permit" a typical calculation of normal value pursuant to subsection (a), then Commerce is authorized to "construct" normal value based on the factors of production and an amount for general expenses and profit, using the best available information from a surrogate country. *See* 19 U.S.C. § 1677b(c)(1). Possibly except for "available information," this provision is clear. While "available information" might be ambiguous, it is not ambiguous in the context of this case. Jilin apparently provided Commerce with all the information it needed to calculate its rate. There was no factual gap to fill with facts available (under 19 U.S.C. § 1677e). Commerce has not otherwise identified a gap or ambiguity with respect to the authority for its NME presumption from this statute, and it is difficult to find any.

- Section 776 of the Act, 19 U.S.C. § 1677e, provides, in subsection (a), that Commerce "shall" reach a determination on the basis of "the facts otherwise available" whenever necessary information is not available on the record, or an interested party or any other person "withholds" requested information or fails to provide such information by the deadlines for its submission or "significantly impedes" a proceeding or provides such information but the information cannot

be verified. Subsection (b) provides that if an interested party has failed to
cooperate by not acting to the best of its ability to comply with a request for
information, Commerce may use an inference that is adverse to the interests of
that party in selecting from among the facts otherwise available. The First
Remand Results state only that pursuant to these sections Commerce has
determined the estimated weighted-average dumping margin for the NME
Entity based on adverse facts available, and that in the underlying investigation
it found the NME Entity uncooperative by not providing requested
information.[20] In commenting on *Jilin I*, Commerce also states that while it
relied on adverse facts available for the Final Results with respect to the NME
Entity, in other investigations the estimated weighted-average dumping margin
for the NME Entity has not been based on adverse facts available. *See* First
Remand Results at 23-24. Commerce does not cite 19 U.S.C. § 1677e as
authorizing the NME presumption, and it difficult to see how the provision
could do so.

The foregoing represents all of the statutory provisions mentioned in the First Remand

Results. Importantly, Commerce has identified no statute (including any of these) as being the

statutory source of its NME presumption and pointed to no statutory gap in any of these or

elsewhere that it had the authority to fill with the NME presumption. The purpose of the preceding

exercise is to confirm as correct Commerce's apparent finding that there is no statutory source for

its NME presumption.

Commerce's entire explanation of its NME presumption in the First Remand Results

---

[20]     First Remand Results at 23 ("In the underlying LTFV [less than fair value]
investigation of this proceeding, the China-wide entity was found not to have cooperated by not
providing requested information, and accordingly, Commerce relied on [adverse facts available]
for the *Final LTFV Determination* with respect to the China-wide entity." (citation omitted)); *see
Multilayered Wood Flooring From the People's Republic of China*, 76 Fed. Reg. 64,318, 64,322
(Dep't Commerce Oct. 18, 2011) (final less-than-fair-value determination) ("Because the PRC-
wide entity did not provide the Department with requested information, pursuant to section
776(a)(2)(A) of the Act, the Department continues to find it appropriate to base the PRC-wide rate
on [facts available]."); *see also id.* ("The Department determines that, because the PRC-wide entity
did not respond to our request for information, the PRC-wide entity has failed to cooperate to the
best of its ability. Therefore, pursuant to section 776(b) of the Act, the Department finds that, in
selecting from among the [facts available], an adverse inference is appropriate for the PRC-wide
entity."). Commerce's application of adverse facts available to the NME Entity is not in dispute.

consists of a few sentences.[21] It is important to bear in mind that, should Commerce appeal this

---

[21]        They are as follows:

- "In a proceeding involving an NME country, Commerce maintains the rebuttable presumption that all companies within the NME country are subject to government control and, thus, should be assessed a single antidumping duty rate, *i.e.*, the NME presumption . . . ."

First Remand Results at 4 (citing Policy Bulletin 05.1).

- "It is, therefore, Commerce's *policy* to assign all exporters of the subject merchandise in an NME proceeding a single antidumping duty rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its export activities or functions."

First Remand Results at 5 (first emphasis added) (citing Policy Bulletin 05.1 at 1-2).

- "To establish whether a company is sufficiently independent to be entitled to a separate, company-specific rate, Commerce analyzes each exporter in an NME proceeding requesting a separate rate under the test established in *Sparklers*, as amplified by *Silicon Carbide*, and further clarified by *Diamond Sawblades*."

First Remand Results at 5 (first citing *Sparklers*, 56 Fed. Reg. 20,588; then citing *Silicon Carbide*, 59 Fed. Reg. 22,585; and then citing *Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China* (Dep't Commerce May 6, 2013), *sustained in Advanced Tech. & Materials Co.*, 37 CIT at 1500, 938 F. Supp. 2d at 1353).

- "In order to demonstrate its eligibility for a separate rate, Commerce requires that an exporter submit either a separate rate application (SRA) or a separate rate certification (SRC). In general, a company for which a review was initiated and which, at the time of the initiation of the administrative review, has a separate rate, may submit an SRC rather than an SRA stating that it continues to meet the criteria for obtaining a separate rate. Further, if a company is issued an antidumping questionnaire, Commerce requires that a respondent provide the information required to establish its eligibility for a separate rate as part of the response to section A of the questionnaire."

First Remand Results at 5-6 (citations omitted).

- "Typically, in an NME proceeding, Commerce has considered four criteria in evaluating whether a respondent has affirmatively demonstrated an absence of government control in fact (*de facto*) over its export activities. These are:

case, it cannot introduce "new" explanations not previously raised here. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

Commerce's explanation of the NME presumption found in the First Remand Results generally states how the NME presumption *works*, but not its source. Thus, up to page fifteen of the First Remand Results, Commerce describes what the NME presumption *is*, and generally how it is applied, but not its statutory source. Nor does Commerce provide an explanation of what it hopes to accomplish or how the NME presumption accomplishes this unstated goal.

## C.  Questions From *Jilin I*

The Department turned as follows to questions the court posed in *Jilin I*:

> The Court first posed a series of questions related to, in the Court's terminology, the "Mandatory Respondent Exception" (*i.e.*, "limited examination"), the "NME Policy" (*i.e.*, "NME presumption") and the "all others rate" (*i.e.*, the weighted-average dumping margin determined for non-examined companies that are eligible for a separate rate) . . . . Because these questions deal with similar issues, we address them together, *beginning with an overview of Commerce's broad*

---

(1) whether the respondent's export prices are set by or are subject to the approval of a governmental agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses. Commerce has determined that an analysis of the *de facto* control criteria is critical in determining whether an exporter should receive a separate rate. When conducting our *de facto* separate rate analysis, Commerce asks an exporter requesting a separate rate questions regarding: (1) ownership of the exporter and whether any individual owners hold office at any level of the NME government; (2) export sales negotiations and prices; (3) composition of company management, the process through which managers were selected, and whether any managers held government positions; (4) the disposition of profits; and (5) affiliations with any companies involved in the production or sale in the home market, third-country markets, or the United States of merchandise which would fall under the description of merchandise covered by the scope of the proceeding."

First Remand Results at 8-9 (citations omitted).

*authority under the statutory scheme; the purpose of Commerce's NME presumption and the interplay with "limited examination" of all known producers and exporters under section 777A(c)(2) of the Act; and the relevant legal theories regarding deference to the agency. . . .*

Section 731 of the Act [19 U.S.C. § 1673] states that, if Commerce determines that a "class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value," and the International Trade Commission finds a domestic industry is being injured as a result of dumping, "there shall be imposed upon such merchandise an antidumping duty." Furthermore, sections 735(a)(1) and 735(c)(1)(B)(i) of the Act state that if Commerce makes an affirmative final determination of sales at LTFV [less than fair value] in an investigation, then Commerce "shall (I) determine the estimated weighted average dumping margin for each exporter and producer individually investigated, and (II) determine, in accordance with {section 735(c)(5)}, the estimated all-others rate for all exporters and producers not individually investigated."

Section 751(a)(1) of the Act [19 U.S.C. § 1675(a)(1)] provides that if a request for review has been received, Commerce shall "review, and determine (in accordance with {section 751(a)(2) of the Act}, the amount of any antidumping duty{.}" Section 751(a)(2) of the Act provides that Commerce shall determine "(i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry."

Section 777A(c)(1) of the Act [19 U.S.C. § 1677f-1(c)(1)], applicable to investigations and reviews, directs Commerce to determine an individual weighted-average dumping margin for each known exporter and producer of the subject merchandise. However, when Commerce is faced with a large number of producers or exporters, and Commerce determines it is not practicable to individually examine all companies, section 777A(c)(2) of the Act [19 U.S.C. § 1677f-1(c)(2)] provides an exception to section 777(A)(c)(1) of the Act [19 U.S.C. § 1677f-1(c)(1)] *and authorizes Commerce to determine the weighted-average dumping margin for a reasonable number of such companies by limiting its examination under section 777A(c)(2)(A) or (B) [19 U.S.C. § 1677f-1(c)(2)(A) or (B)].* [22]

---

[22] Interestingly, this paragraph of the First Remand Results states that the statute permits it to "determine *an individual* weighted-average dumping margin" for a limited number of companies. First Remand Results at 17. In other words, Commerce argues that, using the Mandatory Respondent Exception, it need only determine an individual margin for the mandatory respondents.

Jilin is a mandatory respondent here, but Commerce did not determine a dumping margin for it as the Department insists the statute directs.

First Remand Results at 15-17 (emphasis added) (citation omitted).

These paragraphs cite the usual statutory provisions for determining a dumping margin in a review and describe the Mandatory Respondent Exception. To this point in the First Remand Results, Commerce provided no reason for not following these statutory provisions that direct the determination of "the weighted average dumping margin" for Jilin when employing the Mandatory Respondent Exception. That is, Commerce gives no reason why it fails to follow the statutory directions for determining a dumping margin for every "known" respondent, including mandatory respondents. *See* 19 U.S.C. § 1677f-1(c). In other words, Commerce does not cite a statutory reason for not calculating an individual rate for Jilin.

### D.  The NME Presumption Policy Origin and Development Mystery

Laws passed by Congress are not the only source for an agency policy. An agency's own regulations may provide the necessary authority.[23] *See, e.g.*, *Kisor v. Wilkie*, 588 U.S. __, __, 139 S. Ct. 2400, 2416 (2019) ("Under *Auer*, as under *Chevron*, the agency's reading [of its regulation] must fall 'within the bounds of reasonable interpretation.'" (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013))).[24] However, the ultimate source for the development of agency policy that

---

[23]         The idea here, of course, is that first there must be an identified regulation that has been adopted to lawfully implement a statute before a policy emanating from it can be employed. *Cf. N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 76 (1st Cir. 2018) (citations omitted) ("[T]he adoption of a substantive policy in a preamble added to a regulation after notice and comment is procedurally improper[; therefore], such a policy cannot be the source of an interpretation to which a court defers."); *see also Encino Motorcars*, 579 U.S. at 220 ("*Chevron* deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation." (quoting *Mead Corp.*, 553 U.S. at 227)).

[24]         *Auer* deals with an agency's interpretation of its own regulations, and judicial "deference" applies only in cases of genuine interpretive ambiguity. To determine whether such ambiguity exists, a court must apply traditional tools of interpretation (*e.g.*, text, structure, history, and purpose of the regulation). If the regulation is ambiguous, the agency's interpretation must be reasonable, and it must reflect the agency's "authoritative" or "official" position, not simply an *ad hoc* result.

affects rights must either be legislative or executive. *See* Charles H. Koch, Jr., *Judicial Review of Administrative Policymaking*, 44 WM. & MARY L. REV. 375, 378-79 (2002); *see, e.g.*, *Haig v. Agee*, 453 U.S. 280, 296-301 (1981) (describing regulatory evolution of policy from executive order and congressional approval of policy as developed). Here, Commerce offers neither.

Commerce's explanation in its First Remand Results cites 19 C.F.R. § 351.107(d) ("Rates in antidumping proceedings involving nonmarket economy countries"). *See* First Remand Results at 18. The explanation is that

> Section 351.107(d) of Commerce's regulations, entitled "Rates in antidumping proceedings involving nonmarket economy countries," states: "In an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers." According to the CAFC in its recent *CMA* decision,[25] "binding cases (too numerous to list in their entirety) have uniformly sustained Commerce's recognition of an NME-wide entity as a single exporter for purposes of assigning an antidumping rate to the individual members of the entity."

First Remand Results at 18 (footnote omitted). Commerce elsewhere continues: "[N]ot only has the NME presumption and use of a single antidumping duty rate for the NME-wide entity been affirmed by the CAFC, but Commerce has described these policies in detail in the context of its administrative proceedings and in adopting its regulation 19 CFR 351.107(d)." *Id.* at 22 (footnote omitted). Title 19 C.F.R. § 351.107(d) itself provides that "[i]n an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."[26] According to Commerce, this "single-rate

---

[25]     *See China Mfrs. All., LLC v. United States*, 1 F.4th 1028 (Fed. Cir. 2021).

[26]     In passing, Commerce also confirmed that the only parties who may seek review of the NME Entity under 19 C.F.R. § 351.213(b)(1) would be a domestic interested party or an interested party described in 19 U.S.C. § 1677(9)(B) (*i.e.*, the foreign government), not, as it seemed to suggest in its papers, that Jilin as a respondent exporter could have requested review of the China-wide entity. Commerce stated in the Final Results that "no party requested a review of

regulation" "clarifies that in an antidumping proceeding involving imports from a nonmarket

economy . . . country, the Secretary may calculate a single dumping margin applicable to all

exporters and producers." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,311

(Dep't Commerce Feb. 27, 1996) (proposed rule).

Commerce is right that the regulation provides for a single rate. But, it is worth pointing

out that the Department stops short of citing the regulation as the source of the NME presumption.

That is, while Commerce cites to 19 C.F.R. § 351.107(d), it still avoids specifically claiming it as

the legal source of its own NME presumption. So, Commerce does not claim the "single-rate

regulation" as the source of the NME presumption, and more specifically for its authority not to

calculate an individual rate for Jilin. This is for good reason.

First, the NME presumption predated the adoption of the "single rate" regulation, as the

commentary accompanying the adoption of the regulation makes clear. *See, e.g.*, *Antidumping

Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,304 (Dep't Commerce May 19, 1997)

(final rule) (emphasis added) ("Four commenters suggested that the Department codify its *current*

presumption of a single rate."). It is, of course, the case that the NME presumption cannot be found

to be a reasonable interpretation of the single-rate regulation when the presumption was in use

years before the regulation was adopted.

The second reason that the single-rate regulation cannot be found to be the source of the

---

the China-wide entity," seemingly trying to say that Jilin brought this problem on itself. *See* Final
IDM at 10. Because of that circumstance, Commerce concluded that the rate determined for the
NME Entity in the investigation was the only rate available for assignment to Jilin in this review.
*Id.* In its First Remand Results, however, Commerce concedes that Jilin could not have requested
a review of the NME Entity. *See* First Remand Results at 32 ("[U]nder 19 CFR 351.213(b)(1) and
the *2013 Change in Practice*, the only parties who may seek review of the entity would be a
'domestic interested party' or an interested party described in section 771(9)(B) of the Act [19
U.S.C. § 1677(9)(B)] (*i.e.*, the foreign government).").

NME presumption is that Commerce specifically disavowed any idea that the regulation has anything to do with the NME presumption. This disavowal is made clear in the Federal Register commentary. The regulation was adopted in May 1997, claiming as its legislative source the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994), whose purpose was to write into U.S. law statutes to implement what had been agreed to in the Antidumping Agreement that evolved out of that round of trade negotiations.[27]

Commerce's explanation for the new regulation goes on for some pages in the Federal Register, but when it came to codifying the NME presumption itself, Commerce demurred:

> *We have decided not to codify the current presumption in favor of a single rate or the so-called "separate rates test,"* which outlines the type of information that an exporter or producer must present to obtain a separate rate. Because of the changing conditions in those NME countries most frequently subject to antidumping proceedings, this test (and the assumptions underlying the test) must be allowed to adjust to such changes on a case-by-case basis.
>
> The Department received comments proposing changes to the separate rates test, as well as objections to the proposed changes. *Because we are codifying neither the single rate presumption nor the separate rates test, we are not addressing these comments at this time. However, we will take the comments into consideration as our policy in this area evolves*.

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. at 7,311 (emphasis added). Therefore, the single-rate regulation cannot be the source of a policy that existed long before its promulgation

---

[27]       *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. at 27,296 (emphasis added) (revising Commerce's regulations to conform to the URAA, stating, in summary: "[I]n these regulations the Department has sought to: where appropriate and feasible, translate the principles of the implementing legislation into specific and predictable rules, thereby facilitating the administration of these laws and providing greater predictability for private parties affected by these laws; simplify and streamline the Department's administration of antidumping and countervailing duty proceedings in a manner consistent with the purpose of the statute and the President's regulatory principles; and *codify certain administrative practices determined to be appropriate* under the new statute and under the President's Regulatory Reform Initiative."); *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. at 7,308 (proposed text is substantially identical). Apparently, the NME presumption was not found to be an appropriate administrative practice under the new statute.

and which Commerce explicitly denied having any effect. Moreover, nothing in the regulation explains the reason for the NME presumption or explains ignoring the statutory directive to determine a rate for a "known" respondent like Jilin.

It is worth noting that, apart from the First Remand Results, there appears to be no other reference in the record to the single-rate regulation. Importantly, nothing that Commerce cites in the First Remand Results attempts to *explain* the NME presumption or its purpose. Rather, Commerce cites only to places where the mechanics of the NME presumption are described. *See* First Remand Results at 5 nn.16-18.

It is also worth repeating that Commerce nowhere claims that the single-rate regulation is the source of its authority not to determine Jilin's rate. Even if the single-rate regulation could somehow be found to provide a potential justification for the NME presumption, it could not be said to provide a lawful justification for not determining Jilin's rate. This is because, in order to be found to provide a lawful justification, the agency (in this case, Commerce) would have to provide a reasonable explanation for (1) why the policy is within its authority and (2) why the policy is a reasonable extension of that authority with respect to Jilin. *See, e.g.*, *Garg Tube Exp. LLP v. United States*, 46 CIT __, __, 569 F. Supp. 3d 1202, 1220 (2022) ("The court cannot determine if Commerce's decision to exclude variables for fiscal, monetary, and taxation policies is reasonable because Commerce does not explain whether the variables are relevant or whether their omission introduced an unacceptable amount of bias into the regression."); *Guizhou Tyre Co. v. United States*, 46 CIT __, __, 557 F. Supp. 3d 1302, 1326 (2022) ("Commerce has not promulgated a rule of general applicability for NME country investigations or reviews that addresses the question of whether government control of selection of board and management is either a rebuttable or irrebuttable presumption of government control over export activities. . . . [T]he discussion

Commerce put forth in the Issues and Decision Memorandum cannot suffice as an explanation for adoption of such a rule or policy.").

### E.  Court Cases

Commerce next claims that the Court of Appeals for the Federal Circuit has identified general statutory recognition of a "close correlation between nonmarket economy and government control of the prices, output decisions, and the allocation of resources," and that Commerce has the "broad" authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate. First Remand Results at 17-18 (citing *Sigma*, 117 F.3d at 1405-06).

This seems to be the crux of Commerce's argument, *i.e.*, that somehow, apart from other executive agencies, it has special powers that free it from the constraints placed upon other agencies that must identify a statutory or regulatory source of their actions. *Cf. Chevron*, 467 U.S. 837.

While it might be said that the cases have provided both the authority and the reasonable explanation for the NME presumption (policy), here Commerce cannot rely on them because (1) the agency, and not the courts, must supply these justifications for the policy to be lawful, and (2) any holdings (not dicta) are binding only when the facts of cases are identical. Here, as noted, we have different facts from other court holdings, even if certain similarities are present.

An examination of cases reveals why. First, this idea of "broad authority" as justification for Commerce's position seems out of step with the trend in judicial rulings dealing with administrative action. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 710 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (rejecting the argument that "the SEC actually has statutory authority to issue rules by which the SEC could give itself power to direct and supervise all Board inspections, investigations, and enforcement actions"), *aff'd in part, rev'd in*

*part, and remanded*, 561 U.S. 477 (2010) (in accord with opinion of Kavanaugh, J.); *Griffon v. U.S. Dep't of Health & Hum. Servs.*, 802 F.2d 146, 146-47 (5th Cir. 1986) (ruling that the Secretary exceeded her authority where, in the absence of any dispositive congressional intent, by regulation, she severed and applied the procedural elements of the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, thereby inferring and implementing congressional intent to apply the statute retroactively in part, and observing that "[s]uch bootstrapping by progressively linked inferences is beyond the reach of any reasonable, interpretive powers").

Recent cases also suggest that the wind is blowing against wide-ranging claims for deference. *See, e.g.*, *West Virginia v. EPA*, 597 U.S. __, 142 S. Ct. 2587, 2609 (2022) ("We presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting))); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (citations omitted) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

While Jilin's case might not present a "major question"[28] of doctrine on par with *West*

---

[28]    There is at least some argument that the court is presented with a major question. When providing the special procedure for investigations and reviews involving NME countries, Congress directed that an NME designation would effect the method of determining normal value. When providing for the special procedure though, Congress did not address, or even contemplate, the significant—or, possibly, "major"—question of whether a fully cooperative mandatory respondent can be denied an individually-determined rate (which the statute directs) simply because of the NME presumption—of which Congress made no mention, and which Commerce has failed to ground in a statutory interpretation of the antidumping law. In *West Virginia v. EPA*, the question presented to the Supreme Court had a statutory basis identified by the agency. But here, Commerce has failed to identify a statutory basis or regulatory authority for applying its NME presumption. Rather, Commerce asks the court to recognize its "broad authority under the statutory scheme" and defer to its deployment to deny Jilin the statutorily directed determination of its own rate. If Commerce is trying to hide its own elephant in a mousehole, it first must identify where in the antidumping statute such a mousehole exists.

*Virginia v. EPA*, at least there the question presented to the Supreme Court had a statutory basis. Commerce here claims no statutory basis or regulatory authority for failing to individually determine Jilin's rate or for applying its NME presumption. Rather, Commerce asks the court to recognize its "broad authority under the statutory scheme" and defer to its deployment to deny Jilin the statutorily directed determination of its own rate.

To repeat, Commerce cites neither statutory authorization nor the single-rate regulation nor any other regulation as the source for this denial. The most that can be said is that in its administration of the regulation Commerce has promised further explanation of the NME presumption. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. at 27,304 (in response to unsolicited comments on NME presumption and solicited comments on proposed "single-rate" regulation, "we intend to continue developing our policy in this area"); *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. at 7,311 ("The Department received comments proposing changes to the separate rates test, as well as objections to the proposed changes. Because we are codifying neither the single rate presumption nor the separate rates test, we are not addressing these comments at this time. However, we will take the comments into consideration as our policy in this area evolves."); *see also* 19 C.F.R. § 351.107(d).

When distilled to its essence, Commerce's explanation for using its NME presumption, with respect to Jilin, is not from statute, nor from any regulation, but is merely a practice bolstered by Federal Circuit dicta that Commerce has "broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate." First Remand Results at 17 (quoting *Sigma*, 117 F.3d at 1402).

Because the facts of this case are not identical to those presented in previous cases, in *Jilin I* the court concluded that Commerce's unexplained NME presumption was entitled to no deference.

*Jilin I*, 45 CIT at __, 519 F. Supp. 3d at 1243. Notably, *no court may provide the explanation* for

its lawful use in any case *where the Department has not supplied one itself. Id.* (first citing *Bowen*

*v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (declining to give deference "to an agency

counsel's interpretation of a statute where the agency itself has articulated no [intelligible] position

on the question"); and then citing *Prime Time Com. LLC v. United States*, 43 CIT __, __ n.14, 396

F. Supp. 3d 1319, 1331 n.14 (2019) ("[I]t is not for this court to provide a rationale supporting

Commerce's determination.")).

## CONCLUSION AND ORDER

Upon consideration of the Final Results of the Redetermination Pursuant to Remand Order,

ECF No. 62-1, from the U.S. Department of Commerce, on remand of *Multilayered Wood*

*Flooring From the People's Republic of China*, 83 Fed. Reg. 35,461 (Dep't Commerce July 26,

2018), PR 351, and accompanying Issues and Decision Mem. (July 18, 2018), PR 340, and because

Commerce has failed to provide a lawful justification for its use of the NME presumption with

respect to Jilin as a cooperative mandatory respondent chosen and examined by the Department,

and as ordered in *Jilin I*, it is hereby

**ORDERED** that Commerce calculate an individual weighted average margin for Jilin; and

it is further

**ORDERED** that Commerce's results of second remand shall be due ninety (90) days

following the date of this Opinion and Order; any comments to the remand results shall be due

thirty (30) days following the filing of the remand results; and any responses to those comments

shall be filed fifteen (15) days following the filing of the comments; and it is further

**ORDERED** that in view of the burden of calculating an individual weighted-average

margin, the court will entertain a motion for an appeal to the Court of Appeals for the Federal

Circuit contesting this Opinion and Order, should a party file one with the court within 30 days

from the date of the Opinion and Order.


                                                        /s/ Richard K. Eaton
                                                              Judge


Dated:  February 9, 2023
          New York, New York