A-570-970
Remand
Slip Op. 23-14
POR:  12/1/2015 – 11/30/2016
**Public Document**
E&C/OVIII:  RT

**Jilin Forest Industry Jinqiao Flooring Group Co. Ltd. v. United States,**
**Court No. 18-00191, Slip Op. 23-14 (CIT February 9, 2023)**
**Multilayered Wood Flooring from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT ORDER**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the U.S. Court of International Trade's (the Court) remand order in

*Jilin Forest Industry Jinqiao Flooring Group Co. Ltd. v. United States*, Slip Op. 23-14, Court

No. 18-00191 (CIT February 9, 2023) (*Second Remand Order*).  The *Second Remand Order*

concerns the first results of redetermination involving the *Final Results* of the 2015-2016

administrative review of the antidumping duty order on multilayered wood flooring (MLWF)

from the People's Republic of China (China) (*Order*).[1]  In its opinion, the Court held that

Commerce's application of the non-market economy (NME) presumption to cooperative

mandatory respondent Jilin Forest Industry Jinqiao Flooring Group Co. Ltd. (Jilin Forest) was

unlawful, as under section 777A(c) of the Tariff Act of 1930, as amended (the Act), Commerce

is not exempt from determining a weighted-average dumping margin for Jilin Forest as a

"known" exporter using Jilin Forest's own information.[2]  Thus, the Court ordered that

---

[1] *See Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015–2016*, 83 FR 35461 (July 26, 2018) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM); *see also Multilayered Wood Flooring from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 FR 76690 (December 8, 2011).
[2] *See Second Remand Order* at 13.

Commerce calculate an individual weighted-average dumping margin for Jilin Forest using the company's own information.[3]

Pursuant to the *Second Remand Order*, and under respectful protest, Commerce calculated a weighted-average dumping margin for Jilin Forest using the U.S. sales and factors of production (FOP) data Jilin Forest submitted on the record of the 2015-2016 administrative review and the surrogate value data on the record of the review.

## II.   REMANDED ISSUE

### Background

In the *Final Results*, Commerce determined that mandatory respondent Jilin Forest did not qualify for a separate rate because it is an entity that is majority-owned by the Chinese government and, therefore, had not demonstrated an absence of *de facto* government control.[4] Commerce also determined Jilin Forest's reliance on the labor union's control over the selection of management does not rebut the finding of government control because, pursuant to a report issued by Commerce in 2017, all Chinese labor unions are also under government control.[5]

In the *First Remand Order*, the Court held the following:  (1) Commerce's determination of *de facto* government control of Jilin Forest, a cooperating mandatory respondent, lacks the support of substantial evidence and is not in accordance with law; and (2) Commerce failed to explain how the application of its NME presumption to Jilin Forest after the company was selected for individual examination was in accordance with law and supported by substantial evidence.[6]

---

[3] *Id.* at 36.
[4] *See Final Results* IDM at 7.
[5] *Id.* at 8 (citing Memorandum, "Aluminum Foil from the People's Republic of China:  China's Status as a Non-Market Economy," dated October 26, 2017 (China NME Status Report), at 5).
[6] *See Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*, 519 F. Supp. 3d 1224 (CIT 2021) (*First Remand Order*).

In the *First Remand Redetermination*, Commerce further explained its determination that Jilin Forest failed to rebut the presumption of *de facto* government control.[7]  Commerce also responded to nine questions posed by the Court in its *First Remand Order* requesting an explanation of Commerce's NME presumption and its application to Jilin Forest in the underlying administrative review.  In responding to these questions, Commerce provided an overview of Commerce's broad authority under the statutory scheme, the purpose of Commerce's NME presumption and the interplay with "limited examination" of all known producers and exporters under section 777A(c)(2) of the Act, and the relevant legal theories regarding deference to the agency.[8]  Commerce also addressed the application of its NME presumption and the application of the weighted-average dumping margin established for the China-wide entity to Jilin Forest.[9]  Commerce cited U.S. Court of Appeals for the Federal Circuit (Federal Circuit) decisions that have affirmed Commerce's application of the NME presumption[10] and recognition of an NME-wide entity as a single exporter for purposes of assigning an antidumping duty rate to the individual members of the NME-wide entity that have not demonstrated either their *de jure* or *de facto* independence from government control.[11]

---

[7] *See Final Results of Redetermination Pursuant to Court Remand, Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*, Court No. 18-00191, Slip Op. 21-49 (CIT April 29, 2021), dated November 15, 2021 (*First Remand Redetermination*), at 4-13 and 37-42, available at https://access.trade.gov/resources/remands/21-49.pdf.

[8] *Id.* at 15 -22.

[9] *Id.* at 25-28.

[10] *Id.* at 19 (citing *China Manufacturers Alliance, LLC v. United States*, 1 F.4th 1028, 1032 (Fed. Cir. 2021) (*CMA*) ("Commerce's policy, which we have approved, is that exporters that fail to demonstrate independence from government control do not qualify for a separate rate.") (citing *Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (Fed. Cir. 2002)) and 21 (citing *Sigma Corp v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997) (holding that the employment of the presumption of state control for exporters in a nonmarket economy was within Commerce's authority)).

[11] *Id.* at 20 (citing *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017) ("Because ATM failed to rebut the presumption of government control, Commerce's conclusion that the {China}-wide entity is subject to an {adverse facts available (AFA)}-based rate logically requires Commerce to apply the same AFA-based rate to all members of the {China}-wide entity that have not proven their independence from the state, including ATM.")) and 21 (citing *CMA*, 1 F.4th at 1036-37 ("binding cases (too numerous to list in their entirety) have uniformly sustained Commerce's recognition of an NME-wide entity as a single exporter for

Commerce maintained that Jilin Forest had failed to rebut the NME presumption that it was *de facto* controlled by the Chinese government and, therefore, was not entitled to an individual weighted-average dumping margin separate from the rate established for the China-wide entity.[12]

In its *Second Remand Order*, the Court held that Commerce's reliance on the China NME Status Report for the basis that labor unions in China are under state control is substantial evidence "to support Commerce's conclusion that Jilin has not rebutted the presumption of state control { } because if Jilin's labor union is under state control, its appointment of a majority of Jilin's board of directors confirms that the state controls the company."[13]  Thus, the Court held that "should the use of Commerce's NME presumption survive this case with respect to Jilin, its application will not be prohibited here."[14]  The Court also held that nothing in the statute exempts Commerce from its duty to determine a weighted-average dumping margin for Jilin as a "known" exporter or producer using the company's own information in accordance with section 777A of the Act.[15]  Further, the Court held that while Commerce may apply adverse facts available to a mandatory respondent under certain circumstances, the statute does not indicate that Commerce may assign a rate to a mandatory respondent based on its relationship to an NME government.[16]  The Court also determined that in the *First Remand Redetermination*, Commerce never identified the source in law, either in the statute or its regulations, authorizing the NME presumption, nor did Commerce make a claim for *Chevron* deference in either the *Final Results* or in the *First Remand Redetermination*, or identify a gap, silence, or ambiguity in the statute for

---

purposes of assigning an antidumping rate to the individual members of the entity.") (citing *Michaels Stores, Inc. v. United States*, 766 F.3d 1388, 1390-91 (Fed. Cir. 2014)).

[12] *Id.* at 35-36 and 43-44.
[13] *Id. Second Remand Order* at 10.
[14] *Id.*
[15] *Id.* at 10-14.
[16] *Id.* at 14 (citing section 776 of the Act).

which Commerce would have lawful authority to supply a reasonable interpretation.[17] Accordingly, the Court determined that the NME presumption is not entitled to deference.[18] Lastly, the Court held that Commerce cannot rely on the Federal Circuit opinions cited in the *First Remand Redetermination* because:  (1) Commerce, not the courts, must supply a justification for its policy for it to be lawful; and (2) the holdings cited are not binding because the facts of the cited cases differed from the facts of this review.[19]

Thus, the Court found that Commerce did not provide a "lawful justification for its use of the NME presumption with respect to Jilin as a cooperative mandatory respondent" and ordered Commerce to calculate an individual weighted-average dumping margin for Jilin Forest.[20]

**Analysis**

To comply with the *Second Remand Order*, under respectful protest, Commerce calculated a weighted-average dumping margin for Jilin Forest in accordance with the methodology set out in the *Preliminary Results*.[21]  We are conducting this remand under protest because we respectfully disagree that Commerce lacks the legal authority to apply its NME presumption and that, as a result, Commerce is required to determine an individual rate for Jilin Forest using its own data.

As detailed below, we calculated export price (EP) for Jilin Forest in accordance with section 772 of the Act.  Further, as detailed below, because China is an NME country within the meaning of section 771(18) of the Act, we calculated normal value (NV) in accordance with

---

[17] *Id.* at 17 and 19 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (*Chevron*)).
[18] *Id.* at 35-36.
[19] *Id.* at 33.
[20] *Id.* at 32.
[21] *See Multilayered Wood Flooring from the People's Republic of China:  Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission of Review, in Part; 2015– 2016*, 83 FR 2137 (January 16, 2018) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM), unchanged in the *Final Results*.

section 773(c) of the Act.[22]  We calculated EP and NV using the U.S. sales and FOP data that

Jilin Forest placed on the record of the underlying administrative review.[23]

Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), to determine

whether Jilin Forest's sales of the subject merchandise to the United States were made at less

than NV, Commerce compared the EP to the NV as described in the "Export Price" and "Normal

Value" sections of this memorandum.

Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping

margins by comparing weighted-average NVs to weighted-average EPs or constructed export

prices (CEP) (*i.e.*, the average-to-average (A-A) method) unless the Secretary determines that

another method is appropriate in a particular situation.  In a less-than-fair-value investigation,

Commerce examines whether to compare weighted-average NVs with the EPs or CEPs of

individual sales (*i.e.*, the average-to-transaction (A-T) method) as an alternative comparison

method using an analysis consistent with section 777A(d)(1)(B) of the Act.  Although section

777A(d)(1)(B) of the Act does not strictly govern our examination of this question in the context

of an administrative review, Commerce nevertheless finds that the issue arising under 19 CFR

351.414(c)(1) in an administrative review is, in fact, analogous to the issue in a less-than-fair-

value investigation.[24]

---

[22] *See* Memorandum, "Draft Remand Results Calculation Memorandum for Jilin Forest Industry Jinqiao Flooring Group Co. Ltd." dated April 10, 2023 (Draft Remand Results Calculation Memorandum).
[23] *Id.*
[24] *See, e.g.*, *Ball Bearings and Parts Thereof from France, Germany, and Italy:  Final Results of Antidumping Duty Administrative Reviews; 2010–2011*, 77 FR 73415 (December 10, 2012), and accompanying IDM at Comment 1; *see also JBF RAK LLC v. United States*, 790 F.3d 1358. 1363-65 (Fed. Cir. 2015) ("{t}he fact that the statute is silent with regard to administrative reviews does not preclude Commerce from filling gaps in the statute to properly calculate and assign antidumping duties") (internal citations omitted).

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-T method is appropriate in a particular situation consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[25]  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method in these final results of redetermination.  Commerce will continue to evaluate its approach in this area based on comments received in these final results of redetermination and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-A method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used in these final results of redetermination examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-A method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are defined using the reported destination code

---

[25] *See, e.g.*, *Polyethylene Terephthalate Resin from Taiwan:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 83 FR 19696 (May 4, 2018), unchanged in *Polyethylene Terephthalate Resin from Taiwan:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 83 FR 48287 (September 24, 2018); *Large Diameter Welded Pipe from Canada:  Preliminary Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 83 FR 43649 (August 27, 2018), unchanged in *Large Diameter Welded Pipe from Canada:  Final Affirmative Determination of Sales at Less Than Fair Value*, 84 FR 6378 (February 27, 2019); and *Cast Iron Soil Pipe from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 83 FR 44567 (August 31, 2018), unchanged in *Cast Iron Soil Pipe from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 84 FR 6767 (February 28, 2019).

(*i.e.*, ZIP codes) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the period of review (POR) based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied.  The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group.  First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise.  Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise.  The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test:  small, medium, or large (0.2, 0.5, and 0.8, respectively).  Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists.  For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's $d$ test.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's $d$ test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the A-T method to all sales as an alternative to the A-A method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's $d$ test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of the A-T method to those sales identified as passing the Cohen's $d$ test as an alternative to the A-A method, and application of the A-A method to those sales identified as not passing the Cohen's $d$ test.  If 33 percent or less of the value of total sales passes the Cohen's $d$ test, then the results of the Cohen's $d$ test do not support consideration of an alternative to the A-A method.

If both tests in the first stage (*i.e.*, the Cohen's $d$ test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-A method can appropriately account for such differences.  In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's $d$ and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-A method only.  If the difference between the two calculations is meaningful, then this demonstrates that the A-A method cannot account for differences such as those observed in this analysis and, therefore, an alternative comparison method would be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if:

(1) there is a 25 percent relative change in the weighted-average dumping margins between the A-A method and the appropriate alternative method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-A method and the appropriate alternative method move across the *de minimis* threshold.

<u>Results of the Differential Pricing Analysis</u>

Based on the results of the differential pricing analysis, we preliminarily find that 28.70 percent of Jilin Forest's U.S. sales pass the Cohen's *d* test, which does not confirm the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.[26] Accordingly, Commerce determines to apply the A-A method for all U.S. sales to calculate the weighted-average dumping margin for Jilin Forest.

<u>Date of Sale</u>

Pursuant to 19 CFR 351.401(i), in identifying the date of sale of the subject merchandise, Commerce normally will use the date of invoice. However, Commerce may use a date other than the date of invoice if it is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale. Additionally, Commerce has a long-standing practice of finding that, where the shipment date precedes the invoice date, the shipment date better reflects the date on which the material terms of sale are established.

Jilin reported the date of invoice as the date of sale for all U.S. sales because the invoice best sets the final sale terms such as quantity and price. However, for certain sales transactions, Jilin reported that the date of shipment preceded the date of invoice. Therefore, consistent with 19 CFR 351.401(i) and Commerce's practice, we used the earlier of Jilin's shipment date or invoice date as the date of sale, as applicable.

---

[26] *See* Draft Remand Results Calculation Memorandum.

<u>Export Price</u>

In accordance with section 772(a) of the Act, EP is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States," as adjusted under section 772(c) of the Act.  We calculated EP for Jilin Forest's reported sales to the United States because they represent the first sale made before the date of importation to an unaffiliated purchaser in the United States and the use of CEP was not otherwise warranted.  In accordance with section 772(c)(2)(A) of the Act, where appropriate, we deducted from the starting price (gross unit price) to unaffiliated purchasers, foreign inland freight and foreign brokerage and handling expenses.  Because an NME vendor provided freight and brokerage services, we valued these expenses using surrogate values (SV), as appropriate.

<u>Value-Added Tax</u>

Commerce's practice in NME cases is to adjust EP (or CEP) for the amount of any unrefunded (herein irrecoverable) value-added tax (VAT) in certain NME countries, in accordance with section 772(c)(2)(B) of the Act.[27]  Commerce has previously explained that, when an NME government imposes an export tax, duty, or other charges on subject merchandise, or on inputs used to produce subject merchandise, from which the respondent was not exempted, Commerce will reduce the respondent's EP and CEP prices accordingly, by the amount of the tax, duty or charge paid, but not rebated.[28]  Where the irrecoverable VAT is a fixed percentage of

---

[27] *See Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481, 36483-84 (June 19, 2012) (*Methodological Change*).
[28] *Id.*

EP or CEP, Commerce explained that the final step in arriving at a tax neutral dumping comparison is to reduce the U.S. EP or CEP downward by this same percentage.[29]

Commerce's methodology, as explained above and applied in these final results of redetermination, incorporates two basic steps:  (1) determine the irrecoverable VAT on subject merchandise; and (2) reduce U.S. price by the amount determined in step one.  The Chinese VAT schedule placed on the record of this review demonstrates that the VAT rate for the subject merchandise was 17 percent during the POR, and the VAT refund (exemption) rate for the subject merchandise was nine percent during the POR.[30]  Thus, we reduced the price of each U.S. sale by the irrecoverable VAT rate of eight percent of gross unit price.[31]  We note that this is consistent with Commerce's policy and the intent of the statute, that dumping comparisons be tax neutral.[32]

Normal Value

Section 773(c)(1) of the Act provides that Commerce shall determine the NV using an FOP methodology if the merchandise is exported from an NME and the information does not permit the calculation of NV using home market prices, third country prices, or constructed value under section 773(a) of the Act.  Commerce bases NV in an NME context on FOPs because the presence of government controls on various aspects of NME countries renders price comparisons and the calculation of production costs invalid under Commerce's normal methodologies.[33]  Therefore, we calculated NV based on FOPs in accordance with sections 773(c)(3) and (4) of the

---

[29] *Id.*
[30] *See* Jilin Forest's Letter, "Submission of Section C Response," dated May 31, 2017, at 6.
[31] *See* Draft Remand Results Calculation Memorandum.
[32] *See Methodological Change*.
[33] *See, e.g.*, *Preliminary Determination of Sales at Less Than Fair Value, Affirmative Critical Circumstances, In Part, and Postponement of Final Determination:  Certain Lined Paper Products from the People's Republic of China*, 71 FR 19695, 19703 (April 17, 2006), unchanged in *Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part:  Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079 (September 8, 2006).

Act and 19 CFR 351.408(c).  Under section 773(c)(3) of the Act, FOPs include, but are not

limited to:  (1) hours of labor required; (2) quantities of raw materials employed; (3) amounts of

energy and other utilities consumed; and (4) representative capital costs.[34]  We used the FOPs

reported by Jilin Forest for materials, energy, labor, packing, and freight.  In accordance with

section 773(c) of the Act and 19 CFR 351.408(c)(1), we calculated NV by multiplying the

reported per-unit FOP consumption rates by publicly available SVs.[35]

Factor Valuation Methodology

As noted above, when selecting from among the available information for valuing FOPs,

Commerce's practice is to select, to the extent practicable, SVs which are publicly available,

broad market averages, contemporaneous with the POR or closest in time to the POR, product-

specific, and tax- and duty-exclusive.[36]  In all instances, we valued FOPs using publicly available

information that was contemporaneous with the POR; therefore, we did not adjust the SVs using

inflation indices.  In addition, as discussed in more detail below, where appropriate, we adjusted

input prices by including freight costs to make them delivered prices.  An overview of the SVs

used to calculate a weighted-average dumping margin for Jilin Forest is provided below.

---

[34] *See* section 773(c)(3)(A)-(D) of the Act.
[35] *See* Memorandum, "Surrogate Values for the Draft Results of Redetermination," dated April 10, 2023 (SV Memorandum).  In the *Preliminary Results*, we selected Romania as the primary surrogate country and continue to do so for the reasons articulated in the *Preliminary Results* PDM at 14-17.
[36] *See, e.g.*, *Electrolytic Manganese Dioxide from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FR 48195 (August 18, 2008), and accompanying IDM at Comment 2; and *Notice of Preliminary Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances and Postponement of Final Determination:  Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam*, 69 FR 42672, 42682 (July 16, 2004), unchanged in *Final Determination of Sales at Less Than Fair Value:  Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam*, 69 FR 71005 (December 8, 2004).

Direct and Packing Materials

The record indicates that import statistics from the primary surrogate country, Romania, which are available through the Global Trade Atlas, are generally contemporaneous with the POR, publicly available, product-specific, tax-exclusive, and representative of a broad market average.[37]  Thus, we based SVs for Jilin Forest's direct materials and packing materials on these import values.

Pursuant to section 773(c)(5) of the Act and Commerce's long-standing practice, Commerce disregards SVs if it has a reason to believe or suspect the source data may be comprised by subsidized prices.[38]  In this regard, Commerce has previously found that it is appropriate to disregard such prices from India, Indonesia, the Republic of Korea (Korea), and Thailand because we have determined that these countries maintain broadly available, non-industry specific export subsidies.[39]  Based on the existence of the subsidy programs that were generally available to all exporters and producers in these countries at the time of the POR, we find that it is reasonable to infer that all exporters from India, Indonesia, Korea, and Thailand may have benefited from these subsidies.  Therefore, we have not used prices from those countries in calculating the Romanian import-based SVs.

---

[37] See SV Memorandum.

[38] See section 505 of the Trade Preferences Extension Act of 2015, Pub. Law 114-27 (June 29, 2015) (amending section 773(c)(5) of the Act to permit Commerce to disregard price or cost values without further investigation if it has determined that certain subsidies existed with respect to those values); see also Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 FR 46793, 46795 (August 6, 2015).

[39] See, e.g., Certain Frozen Warmwater Shrimp from India:  Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination; 2011-2012, 78 FR 42492 (July 16, 2013), and accompanying IDM at 7-19; see also Certain Lined Paper Products from Indonesia:  Final Results of the Expedited Sunset Review of the Countervailing Duty Order, 76 FR 73592 (November 29, 2011), and accompanying IDM at 1; Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2012, 79 FR 46770 (August 11, 2014), and accompanying IDM at 4; Certain Frozen Warmwater Shrimp from Thailand:  Final Negative Countervailing Duty Determination, 78 FR 50379 (August 19, 2013), and accompanying IDM at IV.

Additionally, consistent with our practice, Commerce disregarded data from NME countries when calculating Romanian import-based per-unit SVs.[40]  Commerce also excluded from the calculation of Romanian import-based per-unit SVs imports labeled as originating from an "unidentified" country because Commerce could not be certain that these imports were not from either an NME country or a country with generally available export subsidies.

As appropriate, we added surrogate inland freight costs to import values used as SVs. We calculated freight SVs using the shorter of the reported distance from the domestic supplier to the factory that produced the subject merchandise or the distance from the nearest port to the factory that produced the subject merchandise, where appropriate.  This adjustment is in accordance with the Federal Circuit's decision in *Sigma Corp*.[41]  We valued truck freight expenses using average truck rates from the World Bank's report, *Doing Business 2017: Romania*.[42]  This World Bank report gathers information concerning the distance and cost to transport a containerized shipment weighing 15 metric tons from the peri-urban area of the economy's largest business city to the country's major port.  We did not inflate or deflate this SV because it is contemporaneous with the POR, December 1, 2015, through November 30, 2016.

Labor

In NME antidumping proceedings, Commerce prefers to value labor solely based on data from the primary surrogate country.[43]  In *Labor Methodologies*, Commerce determined that the best methodology to value the labor input is to use industry-specific labor rates from the primary

---

[40] *See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Chlorinated Isocyanurates from the People's Republic of China*, 69 FR 75294, 75301 (December 16, 2004), unchanged in *Notice of Final Determination of Sales at Less Than Fair Value:  Chlorinated Isocyanurates from the People's Republic of China*, 70 FR 24502 (May 10, 2005).
[41] *See Sigma Corp. v. United States*, 117 F.3d 1401, 1407-08 (Fed. Cir. 1997) (*Sigma Corp.*).
[42] *See* SV Memorandum.
[43] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production:  Labor*, 76 FR 36092 (June 21, 2011) (*Labor Methodologies*).

surrogate country.  Additionally, Commerce determined that Chapter 6A:  Labor Cost in

Manufacturing, from the International Labor Organization (ILO) Yearbook of Labor (*i.e.*, wages,

benefits, housing, training, *etc.*) is the preferred source where another source is not more

appropriate.[44]

However, for these final results of redetermination, Commerce valued the labor input

using data from the National Institute of Statistics of Romania for 2016.[45]  Although the National

Institute of Statistics data are not from the ILO, we find that this fact does not preclude us from

using this source for valuing labor.  In *Labor Methodologies*, we decided to change to the use of

ILO Chapter 6A from the use of ILO Chapter 5B data, on the rebuttable presumption that

Chapter 6A data better account for all direct and indirect labor costs.[46]  We did not, however,

preclude all other sources for evaluating labor costs in an NME antidumping proceeding.

Consistent with section 773(c)(1) of the Act, we continue to follow our practice of selecting the

"best available information" to determine SVs for inputs, such as labor.[47]  In these final results of

redetermination, we find that the National Institute of Statistics of Romania data for 2016 are the

best available information for valuing labor because the 2016 data are contemporaneous with the

POR, industry-specific, and reflect all costs related to labor, including wages, benefits, housing,

and training.

Financial Ratios

Commerce's criteria for choosing surrogate financial statements from which we derive

the financial ratios are the availability of contemporaneous financial statements, their

---

[44] *Id.*
[45] *See* SV Memorandum.
[46] *See Labor Methodologies.*
[47] *See, e.g.*, *Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013), and accompanying IDM at Comment 6-C; and *Drawn Stainless Steel Sinks from the People's Republic of China:  Investigation, Final Determination*, 78 FR 13019 (February 26, 2013), and accompanying IDM at Comment 3.

comparability to the respondent's experience, and whether they are publicly available.[48]

Moreover, to value factory overhead, selling, general, and administrative expenses, and profit,

Commerce normally will use non-proprietary information gathered from producers of identical

or comparable merchandise in the surrogate country.[49]  In addition, the Court has held that in the

selection of surrogate producers, Commerce may consider how closely the surrogate producers

approximate the NME producer's experience.[50]

    The record contains one set of financial statements for a Romanian producer of

comparable merchandise, SC Sigstrat SA (Sigstrat), for the fiscal year ending December 31,

2016.  As noted above, Commerce's preference is to value all FOPs in a single surrogate country

pursuant to 19 CFR 351.408(c)(2).  Accordingly, because we have a useable set of financial

statements from the primary surrogate country, Romania, we have used Sigstrat's financial

statements for the calculation of the surrogate financial ratios.[51]

By-Product Offset

    Commerce's practice is to grant respondents an offset to a reported FOP for by-products

generated during the production of the subject merchandise if evidence is provided that such by-

product has commercial value.[52]  Specifically, Commerce may grant a by-product offset "for

merchandise that is either sold or reintroduced into production during the POR, up to the amount

---

[48] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value:  Chlorinated Isocyanurates from the People's Republic of China*, 70 FR 24502 (May 10, 2005), and accompanying IDM at Comment 3.

[49] *See, e.g.*, *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances:  Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303 (May 22, 2006), and accompanying IDM at Comment 2; *see also* section 773(c)(4) of the Act; and 19 CFR 351.408(c)(4).

[50] *See Rhodia, Inc. v. United States*, 240 F. Supp. 2d 1247, 1253-54 (CIT 2002); *see also Persulfates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 70 FR 6836 (February 9, 2005), and accompanying IDM at Comment 1.

[51] *See* SV Memorandum.

[52] *See, e.g.*, *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Reviews and Final Rescission and Partial Rescission of Antidumping Duty Administrative Reviews*, 70 FR 54897 (September 19, 2005), and accompanying IDM at Scrap Offset.

of that by-product/co-product actually produced during the POR."[53]  Thus, to be eligible for an

offset, a respondent must provide and substantiate the quantity of by-product it generated from

the production of subject merchandise during the POR, as well as demonstrate that the by-

product has commercial value.[54]  Pursuant to 19 CFR 351.401(b)(1), parties that are in

possession of the relevant information have the burden of establishing the amount and nature of a

particular adjustment.  Jilin Forest provided production records demonstrating its reported

recovered quantities of the by-product and that it later sold these recovered quantities.

Accordingly, we allowed a by-product offset to the reported FOP.[55]

Adjustment Under Section 777A(f) of the Act

In applying section 777A(f) of the Act in this administrative review, Commerce

examines:  (1) whether a countervailable subsidy (other than an export subsidy) has been

provided with respect to a class or kind of merchandise; (2) whether such countervailable

subsidy has been demonstrated to have reduced the average price of imports of the class or kind

of merchandise during the relevant period; and (3) whether Commerce can reasonably estimate

the extent to which that countervailable subsidy, in combination with the use of NV determined

pursuant to section 773(c) of the Act, has increased the weighted-average dumping margin for

the class or kind of merchandise.  For a subsidy meeting these criteria, the Act requires

Commerce to reduce the antidumping duty by the estimated amount of the increase in the

weighted-average dumping margin subject to a specified cap.

---

[53] *See* Commerce's Letter, "Antidumping Questionnaire," dated April 10, 2017, at Section D-VI.
[54] *See, e.g.*, *Narrow Woven Ribbons With Woven Selvedge from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 75 FR 41808 (July 19, 2010), and accompanying IDM at Comment 2.
[55] *See* SV Memorandum.

In conducting this analysis, Commerce has not concluded that concurrent application of NME antidumping duties and countervailing duties necessarily and automatically results in overlapping remedies.  Rather, a finding that there is an overlap in remedies, and any resulting adjustment, is based on a case-by-case analysis of the totality of facts on the administrative record for that segment of the proceeding as required by the statute.

In order to examine the effects of companion countervailable subsidies in calculating the weighted-average dumping margin for Jilin Forest, Commerce requested that Jilin Forest submit information with respect to subsidies relevant to its eligibility for an adjustment to the calculated weighted-average dumping margin.[56]  Jilin Forest identified three programs that might apply during this POR, *i.e.*, Provision of Electricity for Less Than Adequate Remuneration (LTAR), Provision of Wood Inputs for LTAR, and Provision of Paint Inputs for LTAR.[57]

Commerce also examined whether Jilin Forest demonstrated:  (1) a subsidies-to-cost link, *e.g.*, subsidy impact on cost of manufacture; and (2) a cost-to-price link, *e.g.*, respondent's prices changed as a result of changes in the cost of manufacture.  Jilin Forest did not demonstrate that the subsidies received resulted in a change to its cost of manufacturing during the relevant period.  Therefore, the subsidies-to-cost linkage was not satisfied.  Additionally, because Jilin Forest did not identify a subsidies-to-cost linkage, it also did not identify a cost-to-price linkage, as no price fluctuations were tied directly to the change in cost associated with the subsidies identified in the relevant period.  Accordingly, we made no adjustment for double remedies to Jilin Forest's weighted-average dumping margin for these final results of redetermination.

---

[56] *See* Commerce's Letter, "Double Remedies Supplemental Questionnaire," dated November 9, 2017.
[57] *See* Jilin Forest's Letter, "Submission of Double Remedy Response," dated November 16, 2017.

Currency Conversion

Where necessary, Commerce made currency conversions into U.S. dollars, in accordance with section 773A(a) of the Act, based on the exchange rates, as certified by the Federal Reserve Bank, in effect on the date of the U.S. sales.

## III.    COMMENTS ON DRAFT RESULTS OF REDETERMINATION

On April 10, 2023, we released the draft results of redetermination and invited parties to comment.[58]  In response, Jilin Forest asserts that Commerce has fully implemented the Court's instructions and properly calculated the antidumping dumping margin for Jilin Forest in accordance with law.[59]  No other interested party commented on the Draft Results.

## IV.  FINAL RESULTS OF REDETERMINATION

In accordance with the *Second Remand Order*, under respectful protest, Commerce has revised the weighted-average dumping margin for Jilin Forest for the period December 1, 201, through – November 30, 2016 as follows:

| Company | Remand Redetermination Weighted-Average Dumping Margin (percent) |
|---|---|
| Jilin Forest Industry Jinqiao Flooring Group Co. Ltd | 0.00 |

---

[58] *See* Draft Results of Redetermination Pursuant to Court Order, *Jilin Forest Industry Jinqiao Flooring Group Co. Ltd. v. United States*, Slip Op. 23-14, Court No. 18-00191 (CIT February 9, 2023), dated April 10, 2023 (Draft Results).
[59] *See* Jilin Forest's Letter, "Multilayered Wood Flooring from the People's Republic China: Jinqiao Flooring's Comments On Commerce's Draft Results of Redetermination Pursuant to Second Remand Order," dated April 17, 2023.

We made no changes to the Draft Results.  Should the Court affirm these final results of redetermination, Commerce intends to publish a notice of amended final results in the *Federal Register.*  In addition, Commerce intends to issue appropriate customs instructions to U.S. Customs and Border Protection when there is a final court judgment in this proceeding.

5/3/2023

X

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
 for Enforcement and Compliance